**No. 24-13372**

# In the United States Court of Appeals for the Eleventh Circuit

CITY OF HOLLYWOOD POLICE OFFICERS RETIREMENT SYSTEM and
THE PEMBROKE PINES FIREFIGHTERS AND POLICE OFFICERS PENSION FUND,
individually and on behalf of all others similarly situated,
*Plaintiffs-Appellants,*

v.

NEXTERA ENERGY, INC., et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 9:23-cv-80833-AMC (The Hon. Aileen Cannon)

## BRIEF OF PLAINTIFFS-APPELLANTS

| | |
|---|---|
| JEFFREY CRAIG BLOCK | MATTHEW W.H. WESSLER |
| JACOB A. WALKER | DEEPAK GUPTA |
| BRENDAN JARBOE | GUPTA WESSLER LLP |
| MARK BYRNE | 2001 K Street, NW, Suite 850 North |
| Block & Leviton, LLP | Washington, DC 20006 |
| 260 Franklin Street, Suite 1860 | (202) 888-1741 |
| Boston, MA 02110 | *matt@guptawessler.com* |
| (617) 398-5600 | |
| | JESSICA GARLAND |
| | GUPTA WESSLER LLP |
| | 505 Montgomery Street, Suite 625 |
| | San Francisco, CA 94111 |
| | (202) 888-1741 |
| | *jessie@guptawessler.com* |

February 26, 2025                    *Counsel for Plaintiffs-Appellants*

No. 24-13372, *City of Hollywood Police Officers Retirement System v. NextEra Energy, Inc.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eleventh Circuit Rule 26.1, Appellants hereby disclose the following list of known persons, associated persons, firms, partnerships or corporations that have a financial interest in the outcome of this case, including all subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party in this case:

1.    Abelman, Nathan J.,

2.    AEGIS Insurance Services, Inc.,

3.    Block & Leviton, LLP,

4.    Block, Jeffrey Craig,

5.    Byrne, Mark,

6.    Cannon, The Honorable Aileen M.,

7.    City of Hollywood Police Officers Retirement System,

8.    Edelsberg Law, PA,

9.    Edelsberg, Scott Adam,

10.   Florida Power & Light Company,

11.   Friedman, David Phillip,

12.   Garland, Jessica,

13.   Gold, Chris,

14.   Gupta Wessler LLP,

No. 24-13372, *City of Hollywood Police Officers Retirement System v. NextEra Energy, Inc.*

15.  Gupta, Deepak,

16.  Hernandez, Andy,

17.  Hill, Jr., Joshua,

18.  Jarboe, Brendan,

19.  Jastram, Maha

20.  Klausner Kaufman Jensen & Levinson,

21.  Klausner, Robert David,

22.  Kramer, David J.,

23.  Madden, Kevin P.,

24.  Marks, William Thomas,

25.  Martinez-Cid Law,

26.  Martinez-Cid, Jordi,

27.  Matthewman, The Honorable William Donald,

28.  Miller Shah, LLP,

29.  NextEra Energy, Inc. (NYSE: NEE),

30.  Paul Weiss Rifkind Wharton & Garrison, LLP,

31.  Pembroke Pines Firefighters & Police Officers Pension Fund,

32.  Reuter, David P.,

33.  Robo, James,

34.  Sendra, Sean Michael,

C-2 of 3

No. 24-13372, *City of Hollywood Police Officers Retirement System v. NextEra Energy, Inc.*

35.    Silagy, Eric,

36.    Soloway, Audra J.,

37.    Walker, Jacob,

38.    Wessler, Matthew W.H.,

39.    Zipperian, Nathan,

Pursuant to 11th Cir. R. 26.1-3(b), NextEra Energy, Inc. (NYSE: NEE), is the parent company for Defendant-Appellee Florida Power & Light. Plaintiffs-Appellants City of Hollywood Police Officers Retirement System and the Pembroke Pines Firefighters and Police Officers Pension Fund are both private entities and therefore have nothing to declare in a Corporate Disclosure Statement pursuant to FRAP 26.1(a) and/or Eleventh Circuit Rule 26.1-2(a).

Dated: February 26, 2025                    */s/ Matthew W.H. Wessler*
                                            Matthew W.H. Wessler

C-3 of 3

## STATEMENT REGARDING ORAL ARGUMENT

The plaintiffs-appellants request oral argument. This securities-fraud appeal presents an important question regarding loss causation and the standards that govern how district courts should assess the sufficiency of a complaint's allegations that a company's "corrective disclosures" plausibly caused investors' losses.

The case involves claims against NextEra Energy for a years-long effort to mislead investors into believing that neither it nor its subsidiary, Florida Power & Light, had any involvement in or legal exposure from, widespread illegal political and campaign-finance activity. In January 2023, NextEra disclosed through a series of statements that it could no longer deny that it faced legal risk for this activity and that the corporate officer who allegedly spearheaded the scheme was unexpectedly resigning and had agreed to an unusual multi-year claw back on compensation for any legal wrongdoing. The market reacted immediately, and NextEra's stock dropped by $15 billion—its largest freestanding drop in the past 25 years.

The district court (the Honorable Aileen Cannon presiding) dismissed the claims against NextEra because, in its view, none of the statements made in January 2023 could, in isolation, plausibly rise to the level of a "corrective disclosure" for purposes of establishing loss causation. This Court should hear argument to assist in deciding whether the district court's approach for assessing loss causation was correct.

i

**TABLE OF CONTENTS**

Certificate of interested persons and corporate disclosure statement ................... C-1

Statement regarding oral argument ......................................................................... i

Table of citations ................................................................................................ iv

Introduction ....................................................................................................... 1

Jurisdictional statement ....................................................................................... 5

Statement of the issue ........................................................................................ 5

Statement of the case ......................................................................................... 6

    A.    Florida Power & Light uses corporate funds to target elected officials, influence elections, and intimidate journalists ........................ 6

    B.    NextEra learns of FPL's illegal activities .............................................. 12

    C.    Public reporting exposes FPL's ghost candidate scheme ................... 14

    D.    NextEra and FPL repeatedly deny any wrongdoing ........................... 15

    E.    After investigating, NextEra discloses its potential liability for FPL's wrongdoing, that FPL's CEO Silagy was abruptly resigning, and that NextEra could claw back his compensation if he was found to have played a role in the illegal activity ................ 18

    F.    Based on these new disclosures, the company's stock immediately plummets ................................................................ 20

    G.    The pension funds file suit seeking recovery for losses caused by NextEra's false and misleading statements .......................................... 23

    H.    The district court dismisses the claims .............................................. 25

Standard of review .......................................................................................... 26

Summary of argument ...................................................................................... 27

Argument ........................................................................................................... 32

    I.     The complaint adequately pled that the defendants' fraudulent misstatements caused investors' losses. ............................................... 32

        A.     The defendants' misstatements are a textbook example of "fraud on the market" ............................................................... 32

        B.     The complaint sufficiently pled all three requirements for establishing loss causation. ........................................................ 34

    II.    The district court's dismissal relied on a flawed analysis of loss causation and "corrective disclosures" ............................................... 39

        A.     The disclosures should have been considered "cumulatively" ........................................................................ 40

        B.     Each of the disclosures plausibly provided new, corrective information regarding past statements ...................................... 43

        C.     The disclosures did not need to explicitly "mention" the alleged misstatements ............................................................ 49

    III.   The complaint also sufficiently alleged loss causation by showing that, when the risk the defendants concealed materialized, the stock dropped ......................................................... 53

Conclusion ......................................................................................................... 55

# TABLE OF CITATIONS

## Cases

*Alaska Electric Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ........................................................................31, 50

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) .............................................................................. 28, 35

*Financial Security Assurance, Inc. v. Stephens, Inc.*,
  500 F.3d 1276 (11th Cir. 2007) ...................................................................26

*FindWhat Investor Group v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011)...........................27-29, 31-35, 37-40, 43, 44, 46, 47, 50

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) .....................................................................44

*In re Harman International Industries, Inc. Securities Litigation*,
  791 F.3d 90 (D.C. Cir. 2015)...................................................................... 41

*In re Omnicom Group, Inc. Securities Litigation*,
  597 F.3d 501 (2d. Cir. 2010) ......................................................................54

*In re Williams Security Litigation*,
  558 F.3d 1130 (10th Cir. 2009) ..................................................................46

*Jackson v. Wal-Mart Stores, Inc.*,
  753 F. App'x 866 (11th Cir. 2018) ...............................................................54

*Luczak v. National Beverage Corp.*,
  812 F. App'x 915 (11th Cir. 2020)......................................................29, 40, 42, 49

*MacPhee v. MiMedx Group, Inc.*,
  73 F.4th 1220 (11th Cir. 2023) .......................................... 33, 35, 37, 38, 40, 41, 50

*Macquarie Infrastructure Corp. v. Moab Partners*,
  601 U.S. 257 (2024)................................................................................ 32

*Massachusetts Retirement System v. CVS Caremark, Inc.*,
  716 F.3d 229 (1st Cir. 2013).................................................35, 39, 41, 45, 47, 50

*Meyer v. Greene,
    710 F.3d 1189 (11th Cir. 2013) ........................................................ 40, 43, 50, 52, 54

Mineworkers' Pension Scheme v. First Solar Inc.,
    881 F.3d 750 (9th Cir. 2018) ...................................................................38

Mizzaro v. Home Depot, Inc.,
    544 F.3d 1230 (11th Cir. 2008) .............................................................. 27

Norfolk County Retirement System v. Community Health System, Inc.,
    877 F.3d 687 (6th Cir. 2017) .............................................................41, 46

*Ohio Public Employees Retirement System v. Federal Home Loan Mortgage
    Corporation,
    830 F.3d 376 (6th Cir. 2016) ...............................................24, 32, 53, 54

Public Employees Retirement System of Mississippi v. Amedisys,
    769 F.3d 313 (5th Cir. 2014) ....................................................... 30, 41, 50

Schleicher v. Wendt,
    618 F.3d 679 (7th Cir. 2010) .................................................................33

*Singer v. Reali,
    883 F.3d 425 (4th Cir. 2018) .................................................................45

Smith v. Bowen,
    792 F.2d 1547 (11th Cir. 1986) ..........................................................32, 55

Vargas v. Citrix Systems, Inc.,
    716 F. Supp. 3d 1295 (S.D. Fla. 2024) ................................................. 27

## Statutes and Rules

15 U.S.C. § 78u-4 ..................................................................................53

28 U.S.C. § 1291 .....................................................................................5

28 U.S.C. § 1331 .....................................................................................5

52 U.S.C. § 30122 .................................................................................. 10

17 C.F.R. § 240.10b-5 .............................................................................32

Fla. Stat. § 106.08 ................................................................................. 11

**INTRODUCTION**

In 2016, Florida Power & Light Company (FPL), the principal subsidiary of NextEra Energy, one of the largest utility companies in America, found its lucrative expansion plans hamstrung by local politicians opposed to its projects. In response, FPL's chief executive Eric Silagy embarked on an ambitious—and illegal—years-long effort to deploy corporate funds to get them "out of the way." A39.

When a city councilor blocked FPL's $11 billion bid to purchase the Jacksonville Electric Authority, FPL worked with its political consulting firm Matrix to offer him a fake job worth over $230,000 that was "explicitly conditioned" on the councilor "leaving the City Council." A41-42. After a Florida state senator introduced a bill allowing for more competition against FPL, Silagy directed his subordinates to "make his life a living hell … seriously." A58. That resulted in FPL and Matrix recruiting a person who shared the senator's last name and paying him $50,000 to run as a spoiler candidate in the next election—which successfully "siphon[ed] off enough votes" to cost the sitting senator the election. A54.

FPL went to great lengths to shield these activities from the public. As but one example, Silagy created a "pseudonymous email" account under a fake name to communicate with Matrix employees. A36. And the companies constructed a nearly impenetrable daisy chain of shell entities designed to "conceal" FPL's funding of

1

political races—even though federal and state law explicitly prohibit corporations from using "straw" donations to hide political contributions. A73; A56-57, A63, A65.

In 2021, however, Matrix's founder discovered that FPL had enlisted his employees in activities that he "feared could be illegal." A35. Alarmed, he sent a painstakingly detailed memo, supported by "155 pages of exhibits," to NextEra's CEO, James Robo, alerting him of FPL's efforts "to secretly divert" millions of dollars in "corporate resources" to "political campaigns." A29, A37, A100. After news of the memo leaked, however, Robo and other executives repeatedly denied the existence of any wrongdoing. For a year, they consistently issued blanket assurances that there was "no basis" for, and "no evidence" to support, the conclusion that there had been any "illegality or any wrongdoing on the part of FPL." A86. Even Silagy "categorical[ly]" denied his and FPL's involvement in any wrongdoing. A91.

But in early 2023, NextEra dropped a bombshell. On January 25, it filed two Form 8-Ks with the SEC—which are reserved for announcements of "major events that shareholders should know about." A91. The first admitted that, after a months-long investigation, NextEra could no longer provide any assurance that it would avoid legal exposure for FPL's alleged corruption. The second announced that Silagy was unexpectedly resigning and that a former NextEra executive was coming out of retirement to temporarily replace him. Then, a week later, additional reporting disclosed that Silagy's severance terms included an unusual claw-back

2

requirement compelling Silagy to disgorge his compensation should he be found to have engaged in illegal wrongdoing.

The market reacted immediately. On the same day that NextEra released its two Form 8-Ks, the company's stock dropped by more than $14 billion—the only time in the last 25 years that NextEra stock experienced such a substantial drop while the rest of the market rose. That was because market watchers understood the announcements to be "causally related." A93. The two statements revealed that NextEra could no longer "deny[] that the allegations had any basis" and reflected instead that the company was "finally acknowledg[ing] that the political misconduct Silagy orchestrated had created a source of legal and reputational risk." A93, A100-101. Then, after it was disclosed that Silagy's claw-back requirement was not customary, NextEra's stock dropped by almost another $1 billion. A96.

In the wake of these developments, two pension funds filed suit against the company and its executives. The complaint alleged that the defendants committed fraud on the market when they knowingly made material misrepresentations denying the existence of, and any exposure to, wrongdoing related to FPL's activities. As the complaint detailed, that fraud was revealed to the market through the three "corrective disclosures" made in January 2023 that, taken together, disclosed the truth of NextEra's potential exposure from FPL's alleged wrongdoing and caused the nearly $15 billon in market capitalization losses suffered by NextEra's investors.

3

The district court dismissed the claims on the theory that none of the three disclosures could plausibly be considered "corrective." Even though two were issued simultaneously (and all three within the same week), the court did not consider the cumulative effect of the disclosures but instead evaluated each standing alone. It then concluded that none could plausibly be said to "reveal any new information that was previously concealed or obscured." A236. The first, according to the court, merely summarized information—the existence of an investigation and "nothing more"—that had previously been disclosed. A235. The second, it said, just disclosed generic information regarding executive turnover. And it dismissed the third for failing to unambiguously clarify whether the claw-back requirement was unusual. It also faulted the disclosures for failing to specifically "mention" any of the alleged misstatements. A234.

This analysis was flawed in multiple ways. It departed from a wealth of precedent, including from this Court, holding that, when multiple disclosures are alleged to cumulatively disclose a company's fraud, a court must consider them together. It parsed each disclosure far too narrowly at the pleading stage, drawing reasonable inferences against, rather than in favor, of the funds. And it ignored this Court's longstanding recognition that, to be corrective, a disclosure need not specifically mention the alleged misstatements. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. On September 27, 2024, the district court granted the defendants' motion to dismiss. A224. The plaintiff timely filed a notice of appeal on October 16, 2024. A241. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

For roughly a year, NextEra denied that either it or its subsidiary FPL had any involvement in, or legal exposure from, widespread political and campaign-finance wrongdoing. In January 2023, however, NextEra made a series of announcements disclosing that it could no longer deny that it faced legal risk for this illegal activity and that the corporate officer who allegedly spearheaded the scheme was unexpectedly resigning and had agreed to a non-customary, multi-year claw back on compensation. The market reacted immediately, and NextEra's stock dropped by $15 billion while the rest of the market rose—NextEra's largest stock drop in the past 25 years independent of a market-wide shock.

The issue presented is: Did the district court err in dismissing the claims that NextEra committed fraud on the market because, in its view, none of the January 2023 disclosures could, in isolation, plausibly rise to the level of a "corrective disclosure" for purposes of establishing loss causation?

## STATEMENT OF THE CASE

### A.     Florida Power & Light uses corporate funds to target elected officials, influence elections, and intimidate journalists.

NextEra Energy is one of the "largest power and utility holding companies in North America." A32. Its subsidiary, Florida Power & Light Company (FPL), provides more than 80% of NextEra's revenue and is the "largest public utility in the State of Florida." A25, A32. Beginning in 2016, FPL sought support from politicians for lucrative acquisition and expansion efforts in the utility space. A26, A39, A51, A57-58. To accomplish this goal, FPL engaged in a concerted effort to use "corporate funds to influence state and local elections, target elected officials who opposed certain FPL initiatives and intimidate journalists who scrutinized FPL's actions." A26. But because FPL did not want to disclose its use of corporate funds, it "took pains to hide [its] involvement" in these activities "from the public." A50, A57, A60.

**1. FPL's attempt to bribe a Jacksonville City Councilor.** Over a decade ago, NextEra and FPL started working with Matrix, a political consulting, lobbying, and communications firm. A33. The CEO of Matrix, Jeff Pitts, worked "directly for FPL," and, at times, directly with the CEO of FPL, Eric Silagy. *Id.*, A37, A45. In 2019, when FPL launched a $11 billion bid to purchase the Jacksonville Electric Authority, "one of the largest publicly owned utility companies in the country," FPL "relied on Matrix" and Pitts "to push the purchase forward." A38.

FPL's bid to privatize the Electric Authority ran into a problem. It required the Jacksonville City Council's approval and one City Councilor was a "staunch opponent of privatizing" the Jacksonville Electric Authority. A39, A41. FPL and Matrix hatched a plan to push the City Councilor out of his job—but first made sure that FPL's executives had "advanced notice." A41. Matrix incorporated a new organization called "Grow United" with "the dual purpose" of "provid[ing] a job opportunity for" the intransigent City Councilor and "facilitat[ing] covert political expenditures made by FPL." A83-84. The organization was "funded by FPL." A41-42, A45; A83 (noting that Matrix stored numerous "invoices associated with Grow United" for FPL in a folder named "FPL_2019," and discussed the funding on an email chain called "FPL Expenses for Grow United").

Matrix then instructed Grow United to "exten[d] a phony job offer to [the] City Councilor … to get him out of the way." A39, A42. The job offer "included a $180,000 annual salary," a "$50,000 travel budget," and "was explicitly conditioned on [the City Councilor] leaving the City Council." A41-42. After realizing the "offer [w]as a scam," however, the Councilor rejected it. A41.

**2. FPL's funding of ghost candidates.** The failed bid did not deter FPL and Matrix from "using corporate funds to … target elected officials who opposed [] FPL initiatives." A26. With FPL's CEO Eric Silagy's "direct participation in [the] planning and FPL personnel's involvement in the execution," FPL used its corporate

funds to "influence local elections" and "advance FPL's political interests." *Id.*, A30, A36, A45.

This effort principally focused on the Florida Senate. That body was "responsible for confirming members to the Florida Public Service Commission"— the entity responsible for regulating FPL—and "[s]everal of FPL's favored candidates" were "locked in tight races with candidates the Company disfavored and actively wished to unseat." A45, A54. To ensure the races went its way, FPL supported "spoiler or 'ghost' candidates"—"persons who had no interest in campaigning or actually holding elected offices but who were paid … to enter the race merely to divert votes away from" disfavored candidates. A44-45, A54. And, as before, Matrix used FPL's dollars to fund the scheme. *See, e.g.*, A44-48, A51-53, A55, A56-57.

Silagy personally helped identify specific elected officials for Matrix to target. *See, e.g.*, A58. For example, after one official, Senator Rodriguez, introduced a bill allowing "property owners to sell home-generated solar power," and therefore to compete with FPL, Silagy directed his subordinates to "make his life a living hell … seriously." *Id.* (quoting Silagy's email). That led to a plan to oust Rodriguez by recruiting a spoiler candidate to run against him. A55, A58-59. A Matrix-controlled contractor offered a man who shared Senator Rodriguez's last name "$50,000 to

8

enter the" race in an effort to "siphon off enough votes" from the actual Senator Rodriguez. A54-55, A69.

After Matrix set up this scheme, FPL became an "active participant." A46. FPL pushed "to charge full speed ahead" with the ghost candidate. A66. And Silagy himself was briefed on the race's specifics, including a "[m]ap of the doors canvased." A68-69, A97. In the end, FPL's financial support of the ghost candidate worked—Senator Rodriguez lost when the spoiler candidate diverted thousands of votes to the other Mr. Rodriguez. A55, A69.

FPL and Matrix didn't stop there. They defeated another state senate candidate by contributing to a another "'straw' candidate" who "effectively siphon[ed] votes from Floridians who could not distinguish between the two." A49-50. FPL also opposed an incumbent Miami-Dade County Commissioner who had "fought FPL plans" to expand a nuclear power plant. A51. So again, Matrix recruited a spoiler candidate—paying him, through an intermediary, a $60,000 salary and arranging for him to move into the district and covering his rent—all "on FPL's dime." A52-53.

**3. FPL's attempts to hide the money trail.** FPL went to significant lengths to shield the nature of its spending from public view. A46, A98. For example, after asking Matrix to "coordinate" funds to a U.S. House candidate, Silagy warned Matrix to be cautious "to make sure they don't triangulate this donation to others

we have done." A47. Silagy even created a "pseudonymous email" account under a fake name in "an apparent attempt to conceal [] communications" with Matrix about the use of FPL funds. A36, A46, A60-62, A98-99. And when FPL was subpoenaed "by a special Jacksonville City Council committee" requesting a list of firms FPL had "engaged to work … on its behalf," FPL "conceal[ed] Matrix's role" by omitting Matrix from the list. A40.

To address FPL's disclosure concerns, Matrix sent Silagy a "Funding Memo" detailing its plans to funnel FPL funds to political races through "several layers" of nonprofits "for the express purpose of concealing the identity of FPL" as the true funding source. A62-64, A73, A82, A97. The memo directed FPL to send funds to a newly created entity without "public disclosure," which would then be routed "through three layers of 501(c)(4) organizations" before being sent to campaigns. A62. The memo even included a flow chart—with FPL at the head—detailing how a daisy chain of nonprofits would funnel FPL's money to be used for "[p]olitical purposes." A63 (flow chart).

All of this was illegal. Both federal and state law prohibit corporations from using "straw" donations to hide political contributions. A50. And the Federal Election Campaign Act (FECA) and Florida law likewise prohibit knowingly making or accepting a contribution in the name of another person. *Id.*; *see* 52 U.S.C. § 30122;

Fla. Stat. § 106.08(5)(a). Silagy and FPL nevertheless used the funding strategy in time for the 2020 election season. A56-57, A63, A65.

At first, the elaborate shell game worked. When local prosecutors uncovered the ghost candidate scheme involving Senator Rodriguez in 2021, they failed to trace it back to FPL. A69. But the "daisy chain that fed FPL money into ghost candidates" led to allegations of federal-law violations and, in October 2022, a complaint filed with the Federal Election Commission asserted that the nonprofits used by FPL violated the FECA. A70-71. The complaint noted that "the true sources of contributions" in the 2020 election cycle were "falsely attributed to conduit entities." A71 (quoting complaint). And it suggested that, because FPL was "the ultimate source of the funds that were improperly funneled through intermediaries," the company "face[d] potential liability for the scheme as an illicit straw donor." A73.

**4. FPL's attacks on the media**. Complaints about potential campaign finance violations weren't FPL's only problem. In 2019, a *Florida Times-Union* reporter, Nate Monroe, began writing "a series of columns criticizing" FPL's bid to privatize the Jacksonville Electric Authority. A43. In response, "Matrix began to dig up information that could discredit Monroe on FPL's behalf." *Id.* In October 2019, Matrix sent FPL a 72-page report detailing Monroe's "sensitive personal data, including Monroe's financial history," "the names and phone numbers of his relatives and neighbors," and "his unredacted social security number." *Id.*

11

Matrix and FPL were unable to stop Monroe's reporting, but they successfully used FPL's funds to take "control of a supposedly independent news website." A27. In 2018, they "arranged for a Matrix-controlled entity to acquire control [of a] Florida-based news website called 'the Capitolist.'" A73. FPL and Matrix then "used the Capitolist to publish articles … denigrating political opponents and media outlets which had reported on the Company unfavorably" and to "publish articles supporting FPL and [NextEra]-backed priorities." *Id.*; *see* A76 (Matrix emailing Silagy about additional ideas to "stealthily … inject content" into additional news outlets so that "nobody [] know[s] who's actually pulling the strings").

## B. NextEra learns of FPL's illegal activities.

When Matrix's CEO, Jeff Pitts, left Matrix in 2020, a Matrix employee discovered that "someone had tried to destroy with a 'hammer'" a server with "all of the work Pitts was doing for FPL." A33-34. The employee discovered that Pitts' and Matrix's work for FPL had, in fact, been "hidden from most Matrix employees" and even from Matrix's founder, Joseph Perkins. A34 Despite the attempted destruction, the employee was able to "recover" information from the damaged server and eventually "uncovered a scheme" involving political campaigns "and money flows that were highly suspicious." *Id.* After Perkins learned of this, he "notified" NextEra about "activities that [he] feared could be illegal." A38.

12

On November 3, 2021, Perkins sent James Robo, NextEra's CEO and Chairman, a memo about "Florida Power & Light Officers' Potential Unlawful Conduct Through Third-Party Consultants and Vendors." A29, A124. The memo, referred to here as the "Robo Memo," was sent to Robo "via FedEx Overnight." A29. It described an internal Matrix investigation that "identified the involvement of [FPL] president Eric Silagy" and former Matrix employees in a scheme "to secretly divert corporate resources to off-the-books communications and political campaigns" to advance FPL's political interests. A29-30, A36-37 (quoting Robo Memo). Those actions included "disguised political contributions to fund ghost candidates" and an "attempted bribe of a public official." A64-65 (quoting Robo Memo). The memo also explained how FPL had "funded" Grow United and, with Matrix, used it as a "vehicle for covert financial transactions." *Id.*, A83-84 (quoting Robo Memo).

The memo was supported by "155 pages of exhibits, including emails, text messages, checks, invoices, tax records, bank statements, legal memoranda, and an internal financial ledger" linking Silagy and other FPL officers to Matrix's scheme. A29. The documents showed how Silagy worked with Matrix employees "to use Grow United" and other nonprofits to funnel "tens of millions of dollars" "to various political campaigns" and ghost candidates. A37. They included "communications"

13

between Matrix's CEO and Silagy that "demonstrate[d] Silagy's knowledge and control of dark money donations." A30 (quoting Robo Memo).

## C.     Public reporting exposes FPL's ghost candidate scheme.

About a month after NextEra executives received the Robo Memo, the memo was leaked to the *Orlando Sentinel*. A80-81. On December 2, 2021, the paper published a story entitled "Florida Power & Light Execs Worked Closely with Consultants Behind 'Ghost' Candidate Scheme, Records Reveal." *Id*. The article described how Matrix had billed FPL for millions of dollars it moved through various dark money nonprofits to fund ghost candidates. *Id.,* A57. The *Sentinel* also reported that Silagy personally arranged the funding. A80-81.

Before publishing the article, the *Sentinel* sent "detailed questions" about key aspects of the story to Silagy and asked if he would comment. A82-83, A102. He refused. Instead, the day before the article was published, he sold 62,480 shares of NextEra stock—"more than double the number of shares [he] traded on any other day on record"—netting a "total value of $5,435,760." A102.

Over the next eight months, buoyed by "internal Matrix documents obtained by the press," Florida papers wrote "more than a dozen articles attempting to connect FPL and [NextEra] to the ghost candidate schemes" and "surveillance of journalists." A81. At the papers' request, Matrix's founder Perkins "verified that the records [we]re legitimate." A34-35. Based on these records, the *Miami Herald* reported

that "[s]everal of the payments" to a ghost candidate in a 2018 Miami-Dade County Commission race had actually been paid "with FPL funds." A52. The *Herald* also revealed how "FPL secretly took over a Florida news site [The Capitolist] and used it to bash critics." A78. Other journalists uncovered Matrix's "phony job offer" to the Jacksonville City Councilor, which the Robo Memo had characterized as an "attempted bribe." A27.

### D.    NextEra and FPL repeatedly deny any wrongdoing.

For the better part of a year, NextEra and FPL repeatedly assured investors that they were not involved in, or exposed to, any wrongdoing related to the scandals detailed in the news reports and the Robo Memo.

**December 2021.** Those denials began a month after NextEra's CEO received the Robo Memo, when the *Orlando Sentinel* asked FPL and NextEra about one of the ghost candidate schemes. A82. On December 2, 2021, David Reuter, NextEra's Chief Communications Officer (who also served as the primary corporate spokesperson of FPL), publicly denied FPL's involvement in any ghost candidate scheme, flatly stating that "neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf" to ghost candidates. A81. He stressed that "any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election" was "patently false." *Id.* A week later Reuter added more detail, specifically

15

asserting that "FPL had no involvement in the creation of Grow United" and that, instead, Matrix had "created" Grow United for a "another client." A83.

After Reuter's denials, the *Sentinel* reported that NextEra had received the same records from the Robo Memo on which the *Sentinel's* reporting was based. A29, A81. In response, Reuter admitted that the Robo Memo had been "shared with us." A81-82. But he still insisted that NextEra "had no knowledge" of the "[funding] structure being used by Matrix." A84. And he asserted that FPL found "no evidence that FPL or our employees" used Matrix's web of nonprofits to funnel political spending "during the 2020 election cycle." *Id.*

**January 2022.** A month later, Robo himself also denied FPL's involvement in the political activity. On a call with investors on January 25, 2022, Robo admitted that he had "received the [Robo Memo]" that led to the "allegations that have been in the press." A86. But he assured investors that the company had "conducted a very extensive and thorough investigation … [a]nd the bottom line is we found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees." *Id.* He reiterated: "I feel very good that there is no basis to any of these allegations." *Id.*

**Summer 2022.** The denials continued through that summer. In May 2022, Silagy was asked by reporters whether he had been subpoenaed by federal prosecutors in connection with an ongoing criminal case against the CEO and CFO

16

of Jacksonville Electric Authority. A101-102. He categorically denied it—telling reporters that "we've never been subpoenaed." *Id.* But "Federal prosecutors had issued a subpoena to [NextEra] regarding the JEA scandal on April 21, 2020." *Id.*; A40. NextEra had even responded to it—by "provid[ing] a document production" and making "certain employees available for interviews with the government—including Silagy." A101-102.

Silagy also denied that FPL had ever interfered with journalists, asserting that "we did not engage in any activities having to do with following" journalists. A131. And FPL's spokesperson even denied that FPL had "an ownership interest in the Capitolist—either directly or indirectly" or any "editorial control over what the Capitolist writes or publishes." A87.

**November 2022.** On November 3, 2022, Next Era filed its required Form 10-Q with the SEC.[1] In it, NextEra noted that it had "engaged outside counsel" to investigate "potential state and federal campaign finance violations, including the allegations raised in the media articles and the FEC complaint." A236. It told investors that the "review is ongoing and [NextEra] and FPL cannot predict, as of the date of this report, the outcome of the review." *Id.* In announcing the start of the

---

[1] The SEC requires companies to file 10-Qs each quarter to "provide[] a continuing view of the company's financial position during the year." A227 n.4.

investigation, NextEra also acknowledged that "any ultimate findings of violations could result in the imposition of fines, penalties or other sanctions." *Id.*

**E.     After investigating, NextEra discloses its potential liability for FPL's wrongdoing, that FPL's CEO Silagy was abruptly resigning, and that NextEra could claw back his compensation if he was found to have played a role in the illegal activity.**

NextEra's denials ended in early 2023. On January 25, NextEra filed two Form 8-Ks with the SEC. Unlike Form 10-Qs, which are required every quarter, Form 8-Ks are used only "to announce major events that shareholders should know about." A88. The first acknowledged the allegations of "Florida state and federal campaign finance law violations by FPL." *Id.* It then warned investors that, after three months of investigation, FPL and NextEra "cannot provide assurance that" any of the "allegations of legal violations … will not result in the imposition of material fines, penalties." *Id.*

The filing also did not "refute" the allegations contained in the FEC complaint "that approximately $1.3 million had been improperly routed through dark money entities." Instead, it advised that "FPL and [NextEra] cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or [NextEra] violated federal campaign finance or other laws." A88. In full, the Form 8-K said:

> Allegations of violations of law by FPL or NEE have the potential to result in fines, penalties, or other sanctions or effects, as well as cause reputational damage for FPL and NEE, and could hamper FPL's and NEE's effectiveness in interacting with governmental authorities.

18

FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL. These articles are referenced in a complaint subsequently filed with the Federal Election Commission (FEC) that alleges certain violations of the Federal Election Campaign Act. FPL and NEE cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws, that applicable federal or state governmental authorities may not investigate or take enforcement actions with respect to the allegations or assert that legal violations by FPL or NEE have occurred, or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred.

In addition, notwithstanding the completion or pendency of any internal review or investigation by FPL or NEE of any allegations of legal violations, including of the allegations regarding campaign finance laws set forth in the media articles or FEC complaint, FPL and NEE cannot provide assurance that any of the foregoing will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE, or will not have a material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with governmental regulators or other authorities.

A28.

NextEra filed a second 8-K that same day. In it, the company disclosed that Silagy would step down as CEO within three weeks. A88. The company also reported that it would temporarily be bringing a former NextEra executive out of retirement to replace him. A88, A100.

A week later, on January 31, 2023, the *Florida Times-Union* published an article reporting on a Bank of America analyst report that followed a meeting with FPL

executives regarding Silagy's departure. A89. The analyst report described two key provisions of Silagy's severance agreement: "a muti-year claw back on compensation for any legal wrongdoing, and [] a two-year non-compete." A149. The report specified that the non-compete provision was "customary," but it did not extend that description to the claw-back provision. A149, A96. The *Times-Union* article explained that the report's choice not to describe the claw-back provision as "customary" left it "unclear" if the agreement's "claw back [terms], are standard for FPL leaders." A163. The article also noted that, in 2021, a summary of FPL's executive compensation policies did "not describe a 'claw back' applying to former executives if they are found to have broken the law or committed other kinds of misconduct." A163, A96.

## F.    Based on these new disclosures, the company's stock immediately plummets.

The same day NextEra released its two Form 8-Ks, the company's stock sank on "unusually high trading volume," falling $7.31 per share, or about 8.7%— "representing a market capitalization loss of more than $14 billion." A94. The drop was one of the "five worst single-day drops in the Company's share price in 25 years." A95. Every other drop of over 8% in the last 25 years "coincided with [a] market-wide shock[]"—either the "beginning of the great financial crisis" in 2008 or the onset of the "COVID-19 pandemic." A95-96. Unlike those events, however, this drop actually

20

coincided with a market rise. A96. And the stock dropped even though NextEra "concurrently released positive financial news" the same day. A95.

Like NextEra's stock drop, market analysts' reaction was swift and unequivocal. By releasing the two Form 8-Ks on the same day, NextEra revealed that Silagy had "orchestrated" the "political misconduct" that now "created a source of legal and reputational risk for" NextEra. A100-101. Analysts understood these two disclosures to be "causally related." A93. They concluded that the "simultaneous release of both the new risk disclosure and the announcement of Silagy's departure, as well as the content of the disclosure," qualified "the scope of potential exposure rather than denying that the allegations had any basis," and therefore "supported the conclusion that the two items were causally related." A93. For example, Bloomberg issued a story quoting a Glenrock Associates analyst explaining that NextEra's "share drop" was "driven substantially by the unexpected management change and the update they gave on their review into political activity" in the Form 8-Ks. A94.

Other firms "quickly connected Silagy's abrupt departure and the new risk disclosure described in the 8-K to the political scandals that had engulfed" FPL "during his tenure." A89. RBC Capital Markets wrote that, despite "solid [financial] numbers," it was issuing a "[n]egative" note on NextEra because of the 8-K's disclosures. A93. The firm explained that the concurrent timing of Silagy's

resignation with the "warn[ing] that th[e] allegations could have a material impact on the company" "does not help optics." A93. Credit Suisse similarly observed that, despite financial results "in-line with expectations," "[o]vershadowing th[at] update was the sequencing of disclosures on F[lorida] campaign finance law allegations, the announced retirement of … Silagy and new risk disclosures around the event." A93. Evercore ISI also published a report recognizing that investors "have some concerns about the timing of Silagy's retirement given the campaign finance allegations against FPL." A94.

For its part, NextEra argued that the parallel timing of the disclosures was coincidental. The market was unconvinced. A93. One firm noted that "investors weren't buying" NextEra's explanation. *Id.* It also observed that NextEra's decision bringing back a retired executive to replace Silagy was a clear sign that there was no "near-term succession plan" in place and that Silagy's resignation was rushed. *Id.* A Bank of America analyst echoed this, noting that Silagy's exit was "rushed" and "difficult to separate from recent political controversies." A28, A100.

The following morning, on January 26, 2023, Bank of America announced that, because of the disclosures, it was downgrading NextEra's stock. A95. The downgrade was driven by "the long-term subsidiary CEO resign[ing] unexpectedly in the middle of an ongoing [FEC] complaint against FPL which management expects to persist until late 2023." *Id.* The Bank's "key concern was the sharp

22

inflection in FPL leadership: if the turnover had been planned, the ability to articulate and promote a new [CEO] would have been conveyed earlier," but Silagy's abrupt departure was "surprising." *Id.*

And it wasn't just market analysts who understood the significance of the two 8-Ks. A local newspaper also wrote that the disclosures confirmed there was something to the previously reported campaign finance allegations. A89. The *South Florida Sun Sentinel* described the disclosures as "a tacit admission that $1.3 million from FPL went into the dark money pipeline." *Id.*

Then, on January 31, 2023—after it was reported that Silagy's severance agreement included the non-customary claw-back provision—NextEra's common stock dropped even more. It lost $0.42 per share on high trading volume—a loss of "more than $850 million in market capitalization." A96. In total, within the week between January 25 and January 31, NextEra "lost $15.77 billion in market capitalization." A29.

## G.    The pension funds file suit seeking recovery for losses caused by NextEra's false and misleading statements.

Four months after the massive stock drop, two pension funds for retired police officers and firefighters filed suit on behalf of investors who purchased NextEra securities between December 1, 2021 and February 1, 2023. A14, A228.

They alleged that NextEra, FPL, and their corporate executives made material misrepresentations by denying "FPL's potential connection to alleged

political misconduct." A89-90. The funds alleged that those misstatements violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 and Section 20(a) of the Exchange Act. A25. And they asserted that the misrepresentations were made "to mislead the market" as to whether NextEra "was in fact exposed to reputational and legal risks," "which caused [NextEra's] securities to be overvalued and artificially inflated." A89-90. According to the complaint, it was not until NextEra provided corrective disclosures announcing that, after a months-long investigation, it could not deny that it faced potential liability, that the central subject of the investigation, FPL's CEO Silagy, would suddenly be resigning, and that NextEra had retained the unusual right to claw back Silagy's already paid compensation in the event he was found to have played a role in the illegal activity that the market was able to correct itself. A92, A96. As a result, the pension funds alleged, NextEra's stock immediately crashed and the funds lost substantial portions of their investments. *Id.*

To establish loss causation, the funds' complaint also advanced an alternative "materialization of risks" theory, which does not require "corrective disclosures." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384-85 (6th Cir. 2016). As the complaint explained, by insisting that the allegations against FPL and Silagy were baseless, NextEra concealed a risk that materialized when Silagy was forced to abruptly resign. A94, A96. The market perceived Silagy's rushed

24

resignation as an implicit acknowledgement of NextEra's potential liability and exposure for his past wrongdoing. *Id.* And the complaint alleged that it was foreseeable that the market would then devalue NextEra's stock when Silagy resigned amid allegations of his and FPL's wrongdoing. *Id.*

**H.    The district court dismisses the claims.**

The district court, however, dismissed the claims. It held that the funds failed to adequately plead only one element of a securities-fraud claim—loss causation. A232. The complaint had relied on the three disclosures made in January 2023—the two Form 8-Ks issued on the same day and the third report released a week later regarding the claw-back provision in Silagy's exit agreement—to show that the falsity of the company's previous denials was revealed to the market. A27-29. The court first refused to consider these disclosures together, opting instead to evaluate each "standing alone." A235. It then concluded that each individually failed to plausibly allege any "new" or "corrective" information regarding NextEra's and FPL's alleged misstatements. A236-237.

As to the first Form 8-K, the court held that it did "nothing more" than reveal the existence of an investigation—which hinted just at a "potential future risk"—and therefore simply summarized information the company had previously disclosed in its November 10-Q. A235; *see also* A236 (focusing on similar language in the 10-Q stating the underlying allegations may "have an adverse impact"). It then dismissed

25

the second Form 8-K as only generically announcing "the retirement of a CEO." A237. And it faulted the third disclosure for failing to explicitly "classify" Silagy's claw-back provision "as unique or not customary" and leaving it "unclear if all the terms of Silagy's exit, including the claw back, are standard for FPL leaders." A238. It also criticized the disclosures for failing to "mention" the previous misstatements or correct their specific details. A234. The court did not consider or evaluate the significance of any of the market analysts' real-time reactions to these disclosures in holding that the disclosures could not plausibly be considered "corrective."

After dismissing the funds' Section 10(b) and Rule 10b-5 claims, the court also dismissed the individual claims because, without a "viable Section 10(b) or Rule 10b-5 claim," any claims against the individual defendants "cannot stand." A239. Finally, although the court noted that the funds advanced an alternative "materialization of the risks" theory (which does not require corrective disclosures) to establish loss causation, it did not reach the theory on its merits. A237.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's dismissal of a [securities fraud] complaint for failure to state a claim upon which relief could be granted, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007). Because the complaint alleges securities fraud, it is subject to the

26

pleading standards imposed by the Private Securities Litigation Reform Act and Rule 9(b). *See FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). But any heightened pleading standards do not apply to the causation element of a securities fraud claim. *See Vargas v. Citrix Sys., Inc.*, 716 F. Supp. 3d 1295, 1311 (S.D. Fla. 2024) (citing in-circuit courts that have addressed this issue and held that "loss causation pleading need not satisfy the heightened standards of Rule 9(b) or the PSLRA"); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (omitting causation from its description of the elements that are governed by Rule 9(b)).

## SUMMARY OF ARGUMENT

**I.** The funds' complaint adequately pled loss causation, which requires showing only that the defendants' fraudulent misstatements plausibly caused investors' losses. *FindWhat*, 658 F.3d at 1310.

**A.** The claims in this case involve a textbook example of "fraud on the market"—which occurs when a defendant knowingly disseminates a material misrepresentation that artificially inflates the company's stock and later "corrective disclosures" reveal "the truth underlying the falsehood." *Id*. As the complaint alleged, NextEra's repeated denials that either it or FPL had any "potential connection to alleged political misconduct" artificially inflated NextEra's stock because it "misl[e]d the market as to whether [NextEra] was in fact exposed to reputational and legal risks." A89-90. And when "corrective disclosures"—all made in a single week in

27

January 2023—revealed, contrary to those denials, that NextEra in fact faced a "material risk" related to the alleged wrongdoing, the market immediately "digest[ed] the new information" and NextEra's stock plunged. *FindWhat*, 658 F.3d at 1315; A29, A94, A96.

**B.** The only element at issue in this appeal is loss causation. Pleading loss causation is "not meant to impose a great burden." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). It is "frequently" met when a complaint (1) identifies "corrective disclosures," (2) plausibly alleges that "the stock price dropped soon after the corrective disclosure," and (3) contains an allegation "eliminating other possible explanations for this price drop." *FindWhat*, 658 F.3d at 1311-12.

The funds' complaint included all three of these allegations. *First*, it identified three "corrective disclosures" that, taken together, "reveal[ed] to the market" that the defendants' past denials were material misrepresentations. *Id.* at 1311. Specifically, it identified the two Form 8-Ks that NextEra released simultaneously warning investors that, after a months-long investigation, NextEra could no longer deny the possibility that it could face liability for the alleged misconduct, and that Silagy, the lead executive at the center of the alleged misconduct, was unexpectedly resigning. A88. And it also identified a third disclosure—released a week later—revealing that Silagy's severance terms included a non-customary "muti-year 'claw back on

28

compensation for any legal wrongdoing'" that further confirmed NextEra's recognition of potential liability. A29, A96.

*Second*, the complaint alleged "the stock price dropped soon after" the disclosures—indeed, the same day they were revealed—and totaled approximately $15 billion in market capitalization. A29, A94-96; *see FindWhat*, 658 F.3d at 1311. And *third*, the complaint ruled out other explanations for the drop. NextEra's stock dropped even as the market as a whole rose and even as NextEra contemporaneously released "positive financial news." A95.

These allegations are more than sufficient to meet the plaintiffs' modest burden—at the pleading stage—to plausibly establish loss causation.

**II.** In dismissing the complaint, the district held that the complaint failed to sufficiently identify a "corrective disclosure." But, in doing so, the court misapplied the controlling standards for analyzing "corrective disclosures" and mischaracterized the significance of the disclosures themselves.

**A.** For starters, the court refused to consider the disclosures together and instead evaluated each standing alone. That was error. When multiple disclosures are alleged to "cumulatively disclose[] [a company's] allegedly fraudulent practices," *Luczak v. Nat. Beverage Corp.*, 812 F. App'x 915, 922 (11th Cir. 2020), as the funds did here, a court must consider whether the relevant statements, taken together, "collectively

29

constitute and culminate in a corrective disclosure." *Pub. Emps. Ret. Sys. v. Amedisys*, 769 F.3d 313, 324 (5th Cir. 2014).

**B.** The court was also wrong that, even taken individually, none of the three disclosures could plausibly be said to "reveal any new information that was previously concealed or obscured." A236.

**1.** As to the first Form 8-K, the district court ruled that the information was neither "new" nor "corrective" because it only summarized information NextEra had previously disclosed in its November 2022 10-Q filing. *Id.* But the Form 8-K did not just summarize earlier statements revealing the existence of an investigation. It disclosed the results and conclusion of an investigation—informing investors that, after months of review, the company could not clear FPL of wrongdoing. A88. And it was also "corrective." As market analysts immediately recognized, the statement revealed that NextEra could no longer "deny[] that the allegations had any basis" and reflected instead that it was "finally acknowledg[ing]" that it faced "legal and reputational risk." A93, A100-101.

**2.** The district court dismissed the second Form 8-K as just disclosing the generic "retirement of a CEO." A237. But, here again, the disclosure did more: It revealed that NextEra was temporarily replacing Silagy "with a retired [NextEra] executive." A100. And, again, market analysts immediately recognized that the announcement of Silagy's departure, coupled with a decision to temporarily bring a

30

former executive out of retirement to replace him, revealed that "the resignation was unplanned" and "rushed"—and therefore connected to the misconduct. A100; *see* A93, A95.

**3.** The district court also rejected the third disclosure—that Silagy's severance terms included a non-customary claw-back requirement—on the ground that it was "unclear if *all the terms* of Silagy's exit, including the claw back, are standard for FPL leaders." A237-238. That mischaracterizes the relevant information in the release—which explicitly described *other provisions* in Silagy's severance agreement as "customary" but declined to describe the claw-back provision in that way. And the article that reported on this development noted only that it was "unclear" whether the agreement's claw-back provision—and only this provision—was "standard for FPL leaders."A163.

**C.** The district court also held that the disclosures couldn't be considered "corrective" because they failed to explicitly "mention" the alleged misstatements. A234. But to be "corrective," a disclosure only needs to "share the same subject matter as the prior misstatement" and reveal the "relevant truth" of the fraud. *FindWhat*, 658 F.3d at 1311 n.28, 1312. There is no requirement that a disclosure specifically mention a previous misstatement or provide a "fact-for-fact" response. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).

**III**. Finally, corrective disclosures aside, the complaint alleged loss causation in another way—by showing that, when the risk of legal exposure that NextEra had previously concealed materialized, the market responded predictably. A94-96. Although almost every other circuit has held that this "theory of materialization of the risk" can establish loss causation, *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384-85, the district court did not reach it here. Even if the complaint failed to sufficiently allege the existence of a corrective disclosure, this Court should remand to allow the district court in the first instance to consider this alternative ground for establishing loss causation. *See Smith v. Bowen*, 792 F.2d 1547, 1549 (11th Cir. 1986).

## ARGUMENT

## I.    The complaint adequately pled that the defendants' fraudulent misstatements caused investors' losses.

### A.    The defendants' misstatements are a textbook example of "fraud on the market."

Section 10(b) of the Securities Exchange Act of 1934 prohibits making "any untrue statement of a material fact" or "omitting a material fact necessary to make the statements made not misleading" in connection with the purchase or sale of any security. *Macquarie Infrastructure Corp. v. Moab Partners*, 601 U.S. 257, 263 (2024); *see* 17 C.F.R. § 240.10b-5(b) (SEC Rule 10b-5 implementing this provision).

One common way that companies violate Section 10(b) and Rule 10b-5 is by committing "fraud on the market." *FindWhat*, 658 F.3d at 1310. Markets are presumed

32

to be "informationally efficient"—they "rapidly and efficiently digest[] all available information and translate[] that information into the 'processed form of a market price.'" *Id.* So, when a company knowingly disseminates a material misrepresentation, the market price of the company's stock will "include an artificial 'inflationary' value" equal to "the amount that the market mistakenly attributes to the stock based on the fraudulent misinformation." *Id.* Then, once "the truth underlying the falsehood is finally revealed"—often through what is called a "corrective disclosure"—the market "will digest the new information and cease attributing the artificial inflation to the price." *Id.* at 1312, 1314-15. And when that happens, investors who purchased a company's stock at inflated prices (and who still hold it) "will suffer economic loss" because "they will no longer be able to recoup the inflationary component of their purchase price by reselling their stock in the newly calibrated marketplace." *Id.* at 1315-16; *see also Schleicher v. Wendt*, 618 F.3d 679, 683-84 (7th Cir. 2010) (noting that an investor's "loss is realized when the truth turns out to be worse than the statement implied").

To state a claim on this theory, "a plaintiff must plausibly allege the following elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *MacPhee v. MiMedx Grp.*, 73 F.4th 1220, 1241 (11th Cir. 2023).

33

The funds' complaint here alleged each of these elements. It explained that the defendants' misrepresentations—repeated denials that FPL had any "potential connection to alleged political misconduct"—"artificially inflated" the company's stock because they "misl[e]d the market as to whether [NextEra] was in fact exposed to reputational and legal risks." A89-90. The complaint also alleged that the defendants knew the denials were false because they were in possession of the Robo Memo, which detailed the truth of the allegations. A40, A86. And it alleged that "corrective disclosures"—all made in one week in January 2023—revealed that NextEra in fact faced a "material risk" from the alleged political misconduct. A96. Once the market "digest[ed] the new information and cease[d] attributing the artificial inflation to [NextEra's stock] price," the company's stock plunged. *FindWhat*, 658 F.3d at 1315; A29, A94-96, A107. And because the funds had purchased NextEra stock after the misrepresentations—and therefore "at inflated prices"—they suffered economic loss. A89-96.

### B. The complaint sufficiently pled all three requirements for establishing loss causation.

Only one element—loss causation—is at issue in this appeal. Loss causation is synonymous with "the standard common law fraud rule" requiring a plaintiff to plead that "the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses." *FindWhat*, 658 F.3d at 1309. This familiar standard—which the Supreme Court has described as a "simple test"—is "not meant to impose a great

34

burden upon a plaintiff." *Dura Pharms.,* 544 U.S. at 346-47. It does not, for instance, require a plaintiff to "show that the defendant's misconduct was the sole and exclusive cause of its injury." *MacPhee*, 73 F.4th at 1242. Instead, it requires only providing "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.*

In fraud-on-the-market cases, loss causation is "frequently" met when a complaint pleads three factual allegations. *FindWhat*, 658 F.3d at 1311. *First*, it must identify "corrective disclosures"—statements made by the company that "reveal to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *Id.* At the pleading stage, so long as "the complaint supports the conclusion" that the disclosures plausibly had the effect of correcting a prior misstatement, and "the market" could likewise "plausibly have drawn this conclusion," a disclosure will be considered sufficiently corrective. *Mass. Ret. Sys. v. CVS Caremark, Inc.*, 716 F.3d 229, 240-41 (1st Cir. 2013). *Second*, the complaint must allege that "the stock price dropped soon after the corrective disclosure." *FindWhat,* 658 F.3d at 1311. And *third*, it must contain an allegation "eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of the price drop." *Id.* at 1311-12.

The pension funds' complaint included all three of these allegations.

***1. Corrective disclosures.*** The complaint specifically identified three corrective disclosures that, taken together, the market understood as revealing the falsity of the defendants' past claims that there was "no basis" to the reports of illegality. A81, A83-87. Previously, NextEra's executives had consistently denied that either NextEra or FPL had any involvement in, or exposure from, the illegal schemes. *See, e.g.*, A86 (assuring investors that there was "no evidence" and "no basis" to support such an allegation); *see also* A81, A83, A86-87, A92-93.

But on January 25, 2023, NextEra simultaneously issued two corrective disclosures. First, in a Form 8-K, it warned investors that FPL had been accused of "Florida state and federal campaign finance law violations" and that, after three months of investigation, it could "[]not provide assurance" that it would avoid liability for these violations. A88. And, rather than "refute the allegations" that it and FPL had "improperly routed" approximately $1.3 million "through dark money entities," the filing specifically acknowledged that FPL and NextEra could be found to have "violated federal campaign finance or other laws." A88, A91. Then, that same day, NextEra also disclosed in another Form 8-K that the lead executive at the center of the alleged misconduct, FPL's CEO Silagy, was abruptly resigning and would be temporarily replaced by a former NextEra executive who had agreed to come out of retirement. A88, A100.

36

A few days later, as the complaint detailed, NextEra made a third disclosure that further undermined its earlier denials. In a meeting with analysts, FPL executives revealed that Silagy's severance terms included a non-customary "muti-year 'claw back on compensation for any legal wrongdoing'"—a requirement that, it was reported, the company had not required in other recent "executive compensation policies." A29, A96; A161; *see also* A149 (conspicuously describing other severance provisions—but not the claw-back requirement—as "customary"). The disclosure of this non-customary claw-back requirement revealed—contrary to what NextEra had repeatedly maintained—that the company viewed Silagy as not wholly innocent of the misconduct allegations and recognized the real possibility that it would face significant liability for his wrongdoing.

**2. Stock price drop.** The complaint also alleged "that the stock price dropped soon after the corrective disclosure[s]." *FindWhat*, 658 F.3d at 1311. On the same day NextEra released its first two corrective disclosures, its stock responded with its largest independent decline in 25 years, wiping out over $14 billion in market capitalization in a single day. A94-95. And then, shortly after the third disclosure, the stock dropped again—losing another $850 million in market capitalization. A96. These dramatic drops—both coming immediately on the heels of NextEra's disclosures—revealed that "the fraud-induced inflation [had been] baked into the [stock] price." *MacPhee*, 73 F.4th at 1241-42.

**3.** ***Eliminating other possible explanations.*** Finally, the complaint's allegations "eliminat[ed] other possible explanations for this price drop." *FindWhat*, 658 F.3d at 1312. The first drop was one of the "five worst single-day drops in the Company's share price in 25 years." A95. And it was the only drop of more than 8% in the last 25 years that did not "coincide[] with a market-wide shock." A95-96. Just the opposite: As NextEra's stock sank, the market rose. *Id.* And that was true even though NextEra contemporaneously released "positive financial news." A95. As the complaint alleged, it was therefore not possible that the stock loss could plausibly be explained by "changed economic circumstances" or "firm-specific facts" unconnected to the fraud. *MacPhee*, 73 F.4th at 1242; *see also Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) (noting that a stock price drop that "comes immediately *after* the revelation of fraud can help to rule out alternative causes").

Market analysts' real-time reactions reinforced this understanding. Major stock market analysts—Bloomberg, RBC Capital Markets, Credit Suisse, Bank of America, Wolfe Research, Evercore ISI, Glenrock Associates—all recognized that NextEra's dramatic stock drops were the result of its corrective disclosures. A93-94; *see, e.g.*, A94-95 (Evercore ISI explaining that the drop was the result of the "update" and the market's "concerns about the timing of Silagy's retirement given the campaign finance allegations against FPL"; Glenrock Associates analyst attributing

38

decline to "unexpected" resignation and "update [NextEra] gave on their review into political activity"; Bank of America downgrading NextEra on "surprising" and "unexpected[]" news regarding political activity). And because expert reports "reflect[] the meaning of [the disclosures] in the market," *CVS Caremark*, 716 F.3d at 242-43, a factfinder could likewise "infer that it is more probable than not that it was the corrective disclosure[s]" that caused the price drop, *FindWhat*, 658 F.3d at 1312.

## II. The district court's dismissal relied on a flawed analysis of loss causation and "corrective disclosures."

The district court, however, concluded that the complaint failed to sufficiently plead loss causation and dismissed the claims on that basis. In so ruling, the court held that none of the three January 2023 disclosures could plausibly be considered "corrective." The court refused to consider the disclosures together—even though two were issued on the same day and the funds explicitly relied on the cumulative effect to demonstrate the existence of a "corrective disclosure"—and instead evaluated each disclosure "standing alone." A235. The court then narrowly parsed each disclosure and held that none plausibly "reveal[ed] any new information that was previously concealed or obscured." A235-236. And, finally, it faulted the disclosures for failing to specifically "mention any of the alleged misstatements upon which Plaintiffs base their claims of fraud." A234.

That was error three times over. *First*, in evaluating the disclosures in isolation, the district court failed to "explicitly consider[]" them "cumulatively"—even though

both the complaint and the market did exactly that. *MacPhee*, 73 F.4th at 1244 n.9 (instructing courts not to "strip[]" disclosures of their "context and timing" when assessing whether they plausibly revealed the truth of previous misstatements). *Second*, in narrowly construing each disclosure, the court failed to accurately characterize the content of the disclosures and draw inferences about the significance of the disclosures in the funds' favor, as it was required to do. *See FindWhat*, 658 F.3d at 1296. And *third*, the court mistakenly believed that, to be considered "corrective," a disclosure must explicitly "mention" the alleged misstatements. No authority supports such a hyper-technical requirement.

### A.    The disclosures should have been considered "cumulatively."

The district court's first misstep was in not evaluating the relevant disclosures "cumulatively," as it was required to do. *MacPhee*, 73 F.4th at 1244 n.9. Instead, it isolated the three disclosures and evaluated whether each, "standing alone," was sufficient "to establish a corrective disclosure." A235.

But this Court has repeatedly held that a corrective disclosure can be made *either* by a "single" disclosure *or* "a series of partial disclosures." *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013). When a plaintiff alleges that multiple disclosures "cumulatively disclosed [a company's] allegedly fraudulent practices"—as the fund did here—it is not necessary to show that one "alone shows proof of fraud." *Luczak*, 812 F. App'x at 922. Instead, the question is whether the relevant statements, taken

together, "collectively constitute and culminate in a corrective disclosure." *Amedisys*, 769 F.3d at 324. That's because "the appropriate inquiry" is whether the statements, "taken as a whole, plausibly revealed to the market" the truth of a company's misstatements. *In re Harman Int'l Indus. Sec. Litig.*, 791 F.3d 90, 110 (D.C. Cir. 2015); *see Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695-96 (6th Cir. 2017) (instructing that multiple disclosures should be "[t]aken together" to determine ixf it is "at least plausible that the disclosures had something to do with the … losses").

The district court ran afoul of this rule. It refused to treat the disclosures collectively even though the "timing" strongly counseled in favor of doing so—NextEra released two *on the same day* and all three during the same week in January 2023. *MacPhee*, 73 F.4th at 1244 n.9 (recognizing that the "timing" of disclosures bears on whether they should be construed "cumulatively"). And the court failed to consider the disclosures together even though their "context" likewise strongly counseled in favor of doing so—all three focused, in one way or another, on disclosing information related to FPL's involvement in, and potential liability for, the illegal political and campaign-finance activity. *Id.* (same, for the "context" of the disclosures).

And although the district court failed to even mention, let alone address, the significance of market analysts' real-time reactions to the disclosures, those analysts uniformly interpreted the disclosures cumulatively. *See CVS Caremark*, 716 F.3d at

41

242-43 (recognizing that analyst "reports reflect[] the meaning of [the disclosures] in the market"). For example, an analyst noted that the simultaneous timing of the two Form 8-Ks—one disclosing the results of an investigation into FPL's involvement in the underlying wrongdoing and the other announcing that FPL's CEO Silagy was abruptly resigning—made it "difficult to separate" the resignation from the results of the investigation. A28. "[T]he simultaneous release" of the new risk disclosure and the announcement of Silagy's departure "supported the conclusion that the two items were causally related." A93. And others reasoned that Silagy was being pushed out because NextEra recognized the merit of the allegations that he was involved in campaign finance violations. A26; *see, e.g.*, A93-94 (Evercore ISI, RBC Capital, Credit Suisse reports).

The district court, in short, should have considered the three disclosures together. Had it done so, it would have recognized—consistent with what market analysts explicitly understood—that the disclosures revealed the undisclosed truth that NextEra not only faced legal risk related to the alleged wrongdoing but also that the lead FPL executive alleged to have "orchestrated the conduct that gave rise to the scandals" was out. A26. The court's failure to conduct such an analysis is, on its own, reversible error. *See Luczak*, 812 F. App'x at 922-23.

**B.    Each of the disclosures plausibly provided new, corrective information regarding past statements.**

But even taken individually, each of the disclosures plausibly provided new, corrective information that, at the pleadings stage, was sufficient to be considered a corrective disclosure. To qualify as a corrective disclosure, a disclosure "must disclose new information" and reveal the "relevant truth" of "at least some aspect" of the alleged fraud. *FindWhat*, 658 F.3d at 1311 n.28. But there is no one-size-fits-all definition. A "corrective disclosure can come from any source, and can take any form"—so long as it can plausibly be shown that "the market … absorb[ed] the information and react[ed]." *Id.* The three disclosures in this case all easily meet this standard.

**1.** Start with the first Form 8-K. The district court held that the information provided in the 8-K was not "new" because it summarized information NextEra had previously disclosed in its November 10-Q. *See* A236 (focusing on similar language in the 10-Q that the underlying allegations may "have an adverse impact"). But the November 10-Q just told investors that, although the company was initiating an investigation, it could "[]not predict" the "outcome of the review." *Id.* Without more, the announcement of an investigation often will "not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure." *Meyer*, 710 F.3d at 1201 n.13.

43

The Form 8-K was crucially different. For starters, an 8-K, unlike the routine 10-Q, is required for "major events that shareholders should know about." *Hubbard v. BankAtlantic Bancorp*, 688 F.3d 713, 718 n.7 (11th Cir. 2012). So if all NextEra was doing was summarizing previously disclosed information regarding the existence of an investigation, it would not have needed to issue the 8-K. But it did. And that's because it had new information to disclose to investors—namely that, after three months of reviewing the evidence, the company *could not* clear FPL of wrongdoing. A88.

The Form 8-K was also undoubtedly "corrective." In the district court's view, the disclosure, at most, recognized a "potential *future* risk" because it did "nothing more" than reveal the existence of "an investigation." A235. That mischaracterizes the disclosure. The Form 8-K admitted that, after three months of review, NextEra could not "assur[e]" investors that either it or FPL were innocent of any wrongdoing for past misconduct. A28. And that statement squarely contradicted NextEra's previous blanket assurances that there was "no evidence" to support, and "no basis" to conclude, that FPL had any involvement in Matrix's illegal political activity. A86; *see* A83, A86-87. Reading this disclosure "in the light most favorable to the [funds] and draw[ing] all reasonable inferences in [their] favor," that recognition plausibly revealed the "relevant truth" of "at least some aspect" of NextEra's alleged misrepresentations. *FindWhat*, 658 F.3d at 1307, 1312.

Indeed, the "plausibility" that this information was both new and corrective "is evidenced" by the near universal response market analysts had to it. *Singer v. Reali*, 883 F.3d 425, 447 (4th Cir. 2018); *CVS Caremark*, 716 F.3d at 243 (recognizing that when determining whether a disclosure is "corrective" "it is appropriate to look for indications of the market's contemporaneous response" as revealed by "contemporaneous analyst reports"). Here at least a half-dozen leading analysts understood NextEra's Form 8-K to provide "new," "surprising" "information," A93-95, "warn[ing]" that the company was now admitting that the alleged misconduct "could have a material impact on the company," A93 (RBC Capital); *see id.* (Bloomberg report describing the Form 8-K's statement as attempting to quantify the new "scope of potential exposure"); *id.* (Credit Suisse report recognizing "new risk disclosures" and concerns identified in the Form 8-K regarding the "campaign finance law allegations"); A94 (Evercore ISI report raising new "concerns about … the campaign finance allegations against FPL"). Once again, however, the district court failed to consider these contemporaneous reactions at all.

The drop in NextEra's stock in the immediate aftermath of these disclosures likewise reinforces this understanding. As this Court put it in *FindWhat*, allegations of loss causation will typically survive the pleadings stage if the complaint shows that the company's "share price fell significantly after the truth became known" because information that is either already known or not significantly corrective "will not

cause a change in the stock price." 658 F.3d at 1310, 1312. And that is all the more true when the stock drops *immediately* after the disclosures. *Norfolk Cnty. Ret. Sys.*, 877 F.3d at 695-96 (noting that the "speed" of a stock drop can matter for determining the existence of a corrective disclosure). An immediate stock drop helps show that the information is both "new" and "corrective"—because the market has yet to "process[] and react[]" to it—and therefore "make[s] it at least plausible that the disclosures had something to do" with the drop. *Id.*; *see also In re Williams Sec. Litig.*, 558 F.3d 1130, 1137 (10th Cir. 2009) (recognizing that a disclosure is likely "corrective" where, after "reveal[ing] fraud to the public," the stock "price subsequently drops").

That is precisely what the complaint showed here. On the *same day* that NextEra made its first two disclosures, its stock suffered the largest independent loss in twenty-five years, A95-96—and it suffered this loss even though the rest of the market rose and NextEra simultaneously released positive financial news. *Id.* And it then lost another $850 million in market capitalization immediately after the third disclosure was released a week later. A96.

**2.** NextEra's simultaneous disclosure of Silagy's resignation likewise provided new and corrective information.

The district court disagreed, characterizing this disclosure (at 14) as little more than a generic announcement of "the retirement of a CEO." But that cramped reading fails to acknowledge that NextEra was not only announcing Silagy's

46

resignation in this disclosure. It also publicly disclosed that it chose to replace Silagy temporarily with a retired NextEra executive. A100. That provided the market with new, relevant information because, as market analysts contemporaneously recognized, it "indicated a lack of a permanent succession plan in place," "suggesting the resignation was unplanned" and "rushed." *Id.*; *see also* A93 (market analyst observing that NextEra's decision to bring back a retired executive to replace Silagy suggested there was no "near-term succession plan" in place); A28, A95 (Bank of America report explaining that "if the turnover had been planned, the ability to articulate and promote a new [CEO] would have been conveyed earlier," and calling Silagy's abrupt departure "surprising" and "rushed"). As before, the district court did not even mention, let alone address, the significance of these contemporaneous market analyst views. As other courts have recognized, when a "retirement c[o]me[s] as a surprise," it can "alert[] the market to problems with" the retiree's work. *CVS Caremark*, 716 F.3d at 241. That's precisely what the disclosure did here.[2]

---

[2] The district court appeared to simply reject the complaint's allegations that the resignation was a surprise, crediting NextEra's claim that Silagy's resignation was due to a long-planned retirement. *See* A238; A125-126, A133. But the complaint alleged that, given the timing of the announcement, NextEra's explanation was pretextual. And it reinforced this allegation by showing that market experts uniformly dismissed NextEra's claim and found it to be pretextual. *See* A89, A93-95. At this stage in the proceedings, the court was required to accept these well-pleaded factual allegations and "draw all reasonable inferences in [the plaintiffs'] favor." *FindWhat,*, 658 F.3d at 1307. It failed to do so.

**3.** Finally, the district court was wrong to hold that the January 31 disclosure provided no new or corrective information. The court dismissed this disclosure, which was reported in a Bank of America analyst report and a news article, for failing to explicitly "classify" Silagy's claw-back provision "as unique or not customary." A238. In the court's view, it was "unclear if *all the terms* of Silagy's exit, including the claw back, are standard for FPL leaders." *Id.* (emphasis added) (holding that any other inference would be too "strained and speculative").

Just as with the other disclosures, however, the court failed to analyze the entirety and context of this disclosure. On January 30, 2023 Bank of America reported two key terms of Silagy's severance agreement that analysts had learned about in a meeting with FPL executives. A89. The report referred to the first term— the non-compete—as "customary," but it did not extend that description to the claw-back provision. A149; *see* A96. Then, the following day, a *Times-Union* article described the report's description as leaving it "unclear" whether the agreement's "claw back" provision—and only this provision—was "standard for FPL leaders." A163. Contrary to the district court's characterization, that statement did not suggest that it was "unclear" whether *all the terms* of Silagy's exit package were "standard"— it only said that was the case for the claw-back provision. And that was true not because NextEra had failed to explain one way or the other, but because the analyst's report omitted "customary" from its description of the claw-back provision.

The district court's interpretation of this disclosure was thus "too narrow at this stage in the proceedings." *Luczak*, 812 F. App'x at 923. As this Court has explained, it is "improper" for a district court to reject a plaintiff's reading of a disclosure on a motion to dismiss so long as "the truth of general allegations in a complaint" are not "contradicted by specific factual details in attached exhibits." *Id.* Just as in *Luczak*, "it was not proper for the district court to assume, at the motion to dismiss stage," what the "article's use of [a specific] word meant." *Id.* Instead, the court should have recognized that the complaint plausibly alleged that NextEra's disclosure of a non-customary claw-back provision requiring Silagy to compensate the company "for costs associated with 'any legal wrongdoing'" "tacitly acknowledg[ed]" that the company recognized a "material risk" that it would face "legal exposure" as a result of "Silagy's conduct"—precisely what, in their prior misstatements, "Robo, Reuter and Silagy had strongly denied existed." A96.

**C.  The disclosures did not need to explicitly "mention" the alleged misstatements.**

The district court was also wrong to hold that the disclosures could not be considered "corrective" because they failed to explicitly "mention" the previous misstatements. A234. For instance, according to the court, although the first Form 8-K "reference[d] the existence of allegations that FPL and [NextEra] committed campaign finance law violations" that could not be considered corrective because it did not "correct[]" the specific details of "the prior alleged misstatements"—

49

including "ghost candidates; creating or funding Grow United; funding structures for contributing to political campaigns; the job offer to [a city councilman]; the surveillance of reporters like Nate Monroe; and control over the website the *Capitolist*." *Id.*; *see also* A238 (faulting the second Form 8-K for not disclosing any "new negative facts about the underlying fraud").

That level of specificity is not required. As this Court has explained, to be corrective, a disclosure need not "precisely mirror the earlier misrepresentation." *MacPhee*, 73 F.4th at 1243. Instead, it need only "share the same subject matter as the prior misstatement" and reveal the "relevant truth" of the fraud. *FindWhat*, 658 F.3d at 1311 n.28. This "same subject matter" requirement is not particularly onerous. It only requires that a corrective disclosure "relate back to the misrepresentation" rather than just providing "some other negative information about the company." *Meyer*, 710 F.3d at 1197; *see Amedisys*, 769 F.3d at 321-22 (holding that a corrective disclosure "can be demonstrated circumstantially" and only needs to be "related to or relevant to" the misstatements). And that holds true even when a company "d[oes] not attribute" its disclosures as arising from or relating to a prior misstatement. *CVS Caremark*, 716 F.3d at 240-41. Were it otherwise, and "a fact-for-fact disclosure were required to establish loss causation," a defendant "could defeat liability by refusing to admit the falsity of its prior misstatements." *Flowserve*, 572 F.3d at 230.

The disclosures here comfortably meet this standard. Recall that the misstatements all related to FPL and NextEra executives categorically denying claims regarding "FPL's potential connection to alleged political misconduct." A89-90. As the complaint alleged, these statements were made "to mislead the market as to whether the Company was in fact exposed to reputational and legal risks." *Id.* For instance, NextEra's Chief Communications Officer (Reuter) asserted that "[a]ny report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false." A81. NextEra's CEO (Robo) similarly claimed that there was "no basis" and "no evidence" of the "allegations that have been in the press" about "illegality or any wrongdoing on the part of FPL or any of its employees." A86. And NextEra's CCO (Reuter) and FPL's CEO (Silagy) issued similar "categorical" assertions that there was no evidence or basis for the reports possibly connecting FPL and any of its employees to allegations of campaign finance violations and hidden political spending. A83, A86-87, A92-93.

The corrective disclosures squarely contradicted these categorical denials. In its January 2023 Form 8-K, NextEra revealed that, after substantially completing an investigation into the allegations of illegality, it could "not provide assurance that" the "allegations of legal violations … will not result in" "a finding that FPL or [NextEra] violated federal campaign finance or other laws." A88. And it also

51

disclosed, at the same time, that Silagy was being replaced. *Id.* Together, these disclosures told the market something new that "relate[d] back" to the previous misrepresentations, *Meyer*, 710 F.3d at 1197—including that Silagy, the executive who "orchestrated the conduct that gave rise to the" allegations, was being replaced because NextEra could not "deny[] that the allegations had any basis." A26, A88, A90-91, A93.

And the same is no less true for NextEra's third disclosure regarding the inclusion of the non-customary claw-back provision. The district court held that there were no "allegations to suggest that the claw-back provision itself" revealed "any undisclosed fact regarding the specific misrepresentations." A238. That is incorrect. The complaint alleged that the non-customary claw-back provision reflected "a tacit concession of the link between [Silagy's] resignation and the risks he created for [NextEra] because of his orchestration of the unethical and allegedly unlawful misconduct engaged in." A101. The disclosure of the non-customary claw-back provision, in other words, further confirmed to the market that the company's repeated denials that FPL had improperly funneled political donations while Silagy had been its CEO, was, in fact a misstatement. A84.

Reading the disclosures cumulatively and in context—precisely the way the market read them—demonstrates that the three January 2023 disclosures plausibly revealed, contrary to NextEra's past statements, that FPL could not be cleared of

wrongdoing and therefore the disclosures were sufficiently "corrective" to plausibly allege loss causation. Because the district court failed to properly apply the standards governing the analysis at the pleading stage of the sufficiency of a complaint's allegations regarding the existence of "corrective disclosures," this Court should reverse.[3]

## III. The complaint also sufficiently alleged loss causation by showing that, when the risk the defendants concealed materialized, the stock dropped.

Although the complaint sufficiently alleged a theory of loss causation based on the three corrective disclosures, pleading loss causation does not require a corrective disclosure. *See* 15 U.S.C. § 78u-4(b)(4). Instead, courts have held that loss causation can be established by alleging "proximate cause on the ground that negative investor inferences, drawn from a particular event or disclosure, caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement." *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384-85.

The complaint alleged that this is exactly what happened here. By insisting that the allegations against FPL and Silagy were baseless, NextEra concealed a risk

---

[3] Assuming this Court reverses the district court's dismissal of the pension funds' claims under Section 10(b) and Rule 10b-5 of the Securities Exchange Act, it should likewise reverse the dismissal of the claims under Section 20(a) because, as the district court held, they are derivative. *See* A239 (dismissing the Section 20(a) claims because the predicate Section 10(b) claim had already been dismissed).

that materialized when Silagy was forced to resign prematurely. A94, A96. As the complaint alleged, the market perceived Silagy's rushed resignation as an implicit acknowledgement of NextEra's potential liability and exposure for his past wrongdoing. *Id.* And, the complaint likewise explained, it was foreseeable that the market would then devalue NextEra's stock when Silagy resigned amid allegations of his and FPL's wrongdoing. *Id.*

The district court did not consider this theory of loss causation at all. In its briefing on the motion to dismiss, the defendants pushed the court to ignore the theory because this Court has yet to adopt it, A219—even though almost every other circuit has recognized that the "theory of materialization of the risk" can establish loss causation. *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 385 (collecting cases from the Third, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and D.C. Circuits); *Meyer v. Greene*, 710 F.3d 1189, 1197 n.8 (11th Cir. 2013) (noting that the Second Circuit has also "permitted" this theory (citing *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 513 (2d. Cir. 2010))). That is ultimately what the court did. Although it noted in its decision that the complaint presented a "materialization of the risks" theory, A237, it failed to address the theory on its merits.

That was error. Because this Court is a court of review not first view, district courts are expected "to consider [] arguments in the first instance." *Jackson v. Wal-Mart Stores, Inc.*, 753 F. App'x 866, 870 (11th Cir. 2018). Should this Court affirm

54

the district court's decision regarding the sufficiency of the alleged corrective disclosures, it should remand to allow the district court to consider the alternative ground for establishing loss causation "raised by" the funds in the first instance. *Smith v. Bowen*, 792 F.2d 1547, 1549 (11th Cir. 1986).

## CONCLUSION

This Court should reverse the district court's order granting the motion to dismiss and vacate the judgment entered in the defendants' favor.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
DEEPAK GUPTA
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(202) 888-1741
*jessie@guptawessler.com*

JEFFREY CRAIG BLOCK
JACOB WALKER
MARK BYRNE
BRENDAN JARBOE
Block & Leviton, LLP
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600

55

February 26, 2025                              *Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,858 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

February 26, 2025                          */s/ Matthew W.H. Wessler*
                                           Matthew W.H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler