No. 24-13372

# In the United States Court of Appeals
# for the Eleventh Circuit

---

CITY OF HOLLYWOOD POLICE OFFICERS RETIREMENT SYSTEM
AND THE PEMBROKE PINES FIREFIGHTERS AND POLICE OFFICERS
PENSION FUND, PLAINTIFFS-APPELLANTS

*v.*

NEXTERA ENERGY, INC., ET AL.,
DEFENDANTS-APPELLEES

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA (CIV. NO. 23-80833)
(THE HONORABLE AILEEN M. CANNON, J.)*

---

**CORRECTED BRIEF OF DEFENDANTS-APPELLEES**

---

DANIEL J. KRAMER
AUDRA J. SOLOWAY
JOSHUA HILL
DAVID P. FRIEDMAN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
BENJAMIN M. MILLER-GOOTNICK
REGINA C.E. FAIRFAX
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

ANNA M. STAPLETON
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *535 Mission Street, 25th Floor*
  *San Francisco, CA 94105*

**No. 24-13372**

*City of Hollywood Police Officers Retirement System, et al.,*
v. *NextEra Energy, Inc., et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, defendants-appellees provide the following list of interested persons:

- AEGIS Insurance Services, Inc., *insurer for defendant-appellee NextEra Energy, Inc.*

- Block & Leviton, LLP, *counsel for plaintiffs-appellants*

- Cannon, Aileen M., *United States District Judge*

- City of Hollywood Police Officers Retirement System, *plaintiff-appellant*

- Edelsberg Law, PA, *counsel for plaintiffs-appellants*

- Fairfax, Regina C.E., *counsel for defendants-appellees*

- Florida Power & Light Company, *defendant-appellee and wholly owned subsidiary of defendant-appellee NextEra Energy, Inc.*

- Friedman, David P., *counsel for defendants-appellees*

- Hernandez, Andy, *counsel for defendants-appellees*

- Hill, Joshua, *counsel for defendants-appellees*

- Klausner Kaufman Jensen & Levinson, *counsel for plaintiffs-appellants*

- Kramer, Daniel J., *counsel for defendants-appellees*

- Madden, Kevin P., *counsel for defendants-appellees*

- Marks, William T., *counsel for defendants-appellees*

C-1 of 2

**No. 24-13372**
***City of Hollywood Police Officers Retirement System, et al.,***
**v. *NextEra Energy, Inc., et al.***

- Martinez-Cid, Jordi, *counsel for defendants-appellees*

- Martinez-Cid Law, *counsel for defendants-appellees*

- Matthewman, William, *United States Magistrate Judge*

- Miller-Gootnick, Benjamin M., *counsel for defendants-appellees*

- NextEra Energy, Inc. (NYSE: NEE), *defendant-appellee*

- Paul, Weiss, Rifkind, Wharton & Garrison LLP, *counsel for defendants-appellees*

- Pembroke Pines Firefighters and Police Officers Pension Fund, *plaintiff-appellant*

- Reuter, David P., *defendant-appellee*

- Robo, James, *defendant-appellee*

- Shanmugam, Kannon K., *counsel for defendants-appellees*

- Silagy, Eric, *defendant-appellee*

- Soloway, Audra J., *counsel for defendants-appellees*

- Stapleton, Anna M., *counsel for defendants-appellees*

Defendant-appellee NextEra Energy, Inc., has no parent corporation, and no publicly held company owns 10% or more of its stock.

Defendant-appellee Florida Power & Light Company is a wholly owned subsidiary of NextEra Energy, Inc.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

C-2 of 2

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully submit that oral argument is unnecessary because this appeal involves the straightforward application of established principles of loss causation for federal securities-fraud claims.

# TABLE OF CONTENTS

Page

Certificate of interested persons and corporate disclosure statement .........C-1

Statement regarding oral argument .................................................................i

Table of contents...........................................................................................ii

Table of citations......................................................................................... iii

Introduction...................................................................................................1

Statement of the issue ..................................................................................4

Statement of the case ...................................................................................5

    A.     Factual background .................................................................5

    B.     Proceedings below.................................................................13

Standard of review......................................................................................18

Summary of argument ................................................................................18

Argument.....................................................................................................22

    I.     The district court correctly held that appellants failed to identify a corrective disclosure ...................................................23

          A.    The Form 8-K report regarding the status of NextEra's second investigation was not corrective............26

          B.    The Form 8-K report regarding Silagy's intent to retire was not corrective..................................................39

          C.    The *Florida Times-Union* article was not corrective........44

    II.    Appellants' remaining arguments lack merit ...............................47

          A.    The district court was not required to consider the alleged corrective disclosures cumulatively but did so in any event.........................................................47

Page

Table of contents—continued:

      B.     The district court properly considered the failure of the alleged corrective disclosures to mention the earlier alleged misstatements ........................................... 50

      C.     Appellants cannot proceed on their alternative theory of loss causation ....................................................... 51

Conclusion ........................................................................................ 54

Certificate of compliance ............................................................. 55

## TABLE OF CITATIONS

### CASES

*Espy* v. *J2 Global, Inc.*, 99 F.4th 527 (9th Cir. 2024) ............................ 28, 29, 37

*FindWhat Investor Group* v. *FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) .................................................... *passim*

*Hubbard* v. *BankAtlantic Bancorp, Inc.*,
   688 F.3d 713 (11th Cir. 2012) .............................................................. 52

*Katyle* v. *Penn National Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ...................................................... *passim*

*Lavigne* v. *Herbalife, Ltd.*, 967 F.3d 1110 (11th Cir. 2020) ............................ 52

*MacPhee* v. *MiMedx Group, Inc.*, 73 F.4th 1220 (11th Cir. 2023) .......... *passim*

*Merck & Co., Inc., Securities Litigation, In re*,
   432 F.3d 261 (3d Cir. 2005) ................................................................ 44

*Meyer* v. *Greene*, 710 F.3d 1189 (11th Cir. 2013) ...................................... *passim*

*Omnicare, Inc.* v. *Laborers District Council Construction
   Industry Pension Fund*, 575 U.S. 175 (2015) ........................................ 34, 37

Page

Cases—continued:

*Omnicom Group, Inc. Securities Litigation, In re,*
  597 F.3d 501 (2d Cir. 2010) ...................................................40, 53

*Public Employees Retirement System of Mississippi* v.
  *Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014) .........................42, 43

*Sapssov* v. *Health Management Associates, Inc.*,
  608 Fed. Appx. 855 (11th Cir. 2015)................................................52

*Williams Securities Litigation, In re*, 558 F.3d 1130 (10th Cir. 2009)...........48

## STATUTES AND RULE

Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78rr:

  15 U.S.C. § 78j(b) (Section 10(b))..............................................*passim*

  15 U.S.C. § 78t(a) (Section 20(a)) .............................................14, 17

15 U.S.C. § 78u-4(b) ....................................................................23

17 C.F.R. § 240.10b-5.................................................................*passim*

## MISCELLANEOUS

Lisa Monaco, Department of Justice, Memorandum,
  *Further Revisions to Corporate Criminal Enforcement*
  *Policies Following Discussions with Corporate Crime*
  *Advisory Group* (Sept. 15, 2022) <tinyurl.com/monacodojmemo>...........45

*Stephen J. Easterbrook, In re*, SEC Release No. 11,144,
  2023 WL 143292 (Jan. 9, 2023) ........................................................45

Certification, *In re Unknown Respondents*,
  MUR 8082 (FEC Feb. 8, 2024) ........................................................10

iv

## INTRODUCTION

This case involves a straightforward and narrow question of whether three alleged public disclosures constituted "corrective disclosures" for purposes of pleading the loss-causation element of a claim for securities fraud. The district court correctly held that the identified disclosures did not correct the earlier alleged misstatements because the disclosures did not speak to the same subject matter as the earlier alleged misstatements or reveal new information the market did not already know.

Appellee NextEra Energy, Inc., is an energy company and the parent of appellee Florida Power and Light Company (FPL). In 2021, reporters began publishing articles suggesting that a political consulting firm had engaged in questionable political activity on behalf of FPL. During 2021 and 2022, NextEra undertook two separate investigations—conducted by two different outside law firms—into those allegations. It also made public statements responding to specific allegations and noting that it had not uncovered any wrongdoing by FPL.

On January 25, 2023, NextEra and FPL filed an SEC Form 8-K report regarding the second investigation. NextEra disclosed that it had substantially completed the investigation and did not believe that either it or FPL should be found liable for violating state campaign-finance law and that a then-pending complaint alleging violations of federal campaign-finance law should not move forward. The filing included a customary risk disclosure that warned

(1)

that the allegations could nevertheless lead to specified adverse consequences for NextEra and FPL—similar to a warning included in an SEC Form 10-Q filing two months earlier.  On that same day, NextEra and FPL disclosed in a separate Form 8-K report that FPL's chief executive officer planned to retire after 12 years in that role.  The report described plans for the CEO's succession and the terms of his retirement agreement, including a clawback provision that allowed NextEra to recoup his compensation if he was determined to have engaged in certain wrongdoing during his tenure.  A copy of the retirement agreement was attached as an exhibit to the filing.  Several days later, a news article reported, based on a passing comment in a market-analyst report, that it was unclear whether the clawback provision was standard for FPL officers.

Appellants are NextEra stockholders who sued NextEra, FPL, and others for securities fraud after NextEra's stock declined in value.  The complaint alleged that appellees made eight public misstatements about the allegations or investigations.  According to the complaint, the January 2023 Form 8-K reports and news article "corrected" those misstatements and caused NextEra's stock to decline in value.  The district court disagreed.  It held that the alleged corrective disclosures neither spoke to the subject matter of the alleged misstatements nor provided the market with new information.  It thus dismissed the complaint for failure to plead loss causation.

The district court's decision was entirely correct. Under established precedent, a disclosure to the market does not "correct" an earlier alleged misstatement unless it reveals the truth by speaking to the same subject matter as the alleged misstatement and provides information the market did not already know. But none of the three alleged corrective disclosures satisfied those requirements. The Form 8-K report concerning the second investigation did not speak to the specific media allegations discussed in the eight alleged misstatements; to the contrary, the report stated generally that, after substantially completing the second investigation, NextEra and FPL did not expect to be found liable for state campaign-finance violations and did not believe that the federal complaint should move forward. And although that report warned of legal and business risk from the media allegations, NextEra had already warned the market about those very risks in the Form 10-Q report filed two months earlier. The second Form 8-K report concerning the FPL CEO's intent to retire also did not "correct" the earlier misstatements: a retirement announcement does not correct earlier statements about the truth of specific media allegations or the status of an investigation. As for the news article about the clawback provision in the CEO's retirement agreement, it did not reveal any new information to the market, because NextEra had publicly filed the entire agreement six days earlier. Accordingly, none of the three

3

identified public disclosures could have "corrected" the eight alleged misstatements.

Appellants resist that conclusion by asserting that the district court improperly considered the alleged corrective disclosures "in isolation" and not "cumulatively." But no precedent required the sort of "cumulative" analysis appellants envision, and the district court performed the analysis appellants are demanding in any event. And contrary to appellants' further assertion, the plain text of the three alleged corrective disclosures—when compared to each of the eight alleged misstatements—demonstrates that the alleged disclosures did not reveal any new information about the earlier statements.

At bottom, appellants have merely identified a decline in stock price and are wanting for a theory of securities fraud to recover their losses. But as this Court has repeatedly held, the federal securities laws are not a system of insurance against market losses. The district court correctly dismissed the complaint for failure to plead loss causation, and its judgment should be affirmed.

## STATEMENT OF THE ISSUE

Whether the district court properly dismissed appellants' claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-

5, for failure to plead loss causation, where the three alleged corrective disclosures, either individually or collectively, did not reveal the falsity of any earlier statement by appellees or provide the market with any new information.

## STATEMENT OF THE CASE

### A.    Factual Background

1.    NextEra is a leading energy company headquartered in Florida. App. 32. FPL, a subsidiary of NextEra, is an electric utility company that sells power to consumers across much of the State of Florida. *Id.* Defendants-appellees James L. Robo and David P. Reuter were officers of NextEra during the relevant time period, and defendant-appellee Eric Silagy was the chief executive officer of FPL during the relevant time period. *Id.*

2.    In 2021, the founder of a political consulting firm called Matrix LLC became embroiled in contentious litigation with the firm's longstanding and recently departed CEO. App. 34. In connection with that litigation, Matrix's founder initiated an investigation into potential wrongdoing by the former CEO in order to support the founder's pending lawsuit against him. App. 34, 36-37. According to the complaint, the memo that resulted from Matrix's investigation described a scheme under which FPL used Matrix to make allegedly improper political expenditures designed to benefit FPL's business interests. App. 36-37; *see* App. 225 n.3. Among other things, the memo alleged that Matrix's former CEO, using a Matrix-controlled nonprofit named Grow

5

United, channeled FPL corporate resources to the campaigns of "ghost" political candidates who ran for office only to siphon votes from legitimate candidates that FPL viewed as unfavorable. App. 37. The memo also alleged that Matrix organized a "phony job offer" at Grow United for Jacksonville City Councilor Garrett Dennis, who opposed NextEra's acquisition of the Jacksonville Electric Authority. App. 27, 40-41. The memo was sent to Robo at NextEra in November 2021, and a version was shared with media outlets. App. 34-36, 80-81.

In December 2021, the Orlando Sentinel published an article reporting that Grow United was controlled by Matrix and contributed funds to political committees that paid for advertisements for ghost political candidates. App. 80; Supp. App. 14. Reuter, who was NextEra's chief communications officer, was quoted in the article as stating that NextEra had "found absolutely no evidence of any legal wrongdoing by FPL or its employees" regarding the alleged scheme. App. 81; Supp. App. 14.

Later that month, the Sentinel and Florida Times-Union published articles describing the job offer to Garrett Dennis. App. 81-83. The same day those articles were published, Reuter publicly denied FPL's involvement in the alleged job offer, stating that "FPL flatly rejected the plan and communicated our lack of interest." App. 85. Reuter further stated that "FPL had no

6

involvement in the creation of Grow United" and that, "[o]ver this past summer, through both questioning from media and our own subsequent investigation, we learned that [Matrix] was responsible for the origins of this non-profit [Grow United]."  App. 83.

Shortly thereafter, the Sentinel published another article describing two memos that Matrix and its counsel had prepared and allegedly shared with Silagy regarding a proposed funding structure for FPL's political activities in connection with the 2020 election.  App. 84.  Reuter told the Sentinel that FPL had "found no evidence that FPL or [its] employees used this proposal to support our communication and outreach activities during the 2020 election cycle." *Id.*

In response to the allegations concerning Matrix, NextEra retained a law firm to conduct an internal investigation.  App. 86.  In January 2022, Robo explained on a call with investors and market analysts that the investigation had yielded no evidence of illegality or wrongdoing by FPL or its employees. *Id.*  He also expressed his personal confidence in the investigation.  *Id.*

3.      Later that year, media outlets reported additional allegations concerning Matrix and FPL.  In June 2022, articles in the Sentinel and Times-Union reported that Matrix had allegedly surveilled a Times-Union reporter named Nate Monroe; in response to questions from Monroe and others regarding the alleged surveillance, Silagy stated that FPL "did not engage in

7

any activities having to do with following people like you, Nate, or taking pictures." App. 86-87.  That same day, a reporter at the Sentinel presented Reuter with e-mails and text messages and suggested that a private investigator paid by Matrix had followed Monroe; Reuter stated that FPL had "no digital record of these exchanges and cannot prove their veracity," and, "[t]aken individually or collectively, none of the information you have in your possession demonstrates any wrongdoing by FPL or our employees."  App. 87.

In August 2022, the Miami Herald alleged that FPL controlled The Capitolist, a news website; in response, an FPL representative stated to reporters that "FPL does not have an ownership interest in the Capitolist—either directly or indirectly  .  .  .  .  We also do not have editorial control over what the Capitolist writes or publishes."  App. 87.

After those additional allegations, NextEra engaged an additional law firm to conduct a second investigation regarding Matrix.  Supp. App. 77.

In October 2022, nonprofit "watchdog" Citizens for Responsibility and Ethics in Washington filed a complaint with the Federal Election Commission (FEC) against Grow United and its alleged affiliates based on the media allegations.  In addition to several named respondents, the complaint listed several "Unknown Respondents" that the complaint speculated "may or may not include" appellees.  Supp. App. 48.  The complaint alleged that the purported scheme resulted in nearly $1.3 million in contributions to federally registered

independent expenditure committees (or "super PACs") in 2020.  Supp. App. 31.

Although omitted from appellants' complaint, on November 3, 2022, NextEra filed a Form 10-Q report with the SEC.  *See* Supp. App. 71-79.  Addressing both the media allegations and the FEC complaint, the report stated:

> Media articles have been published that allege, among other things, campaign finance violations by FPL and certain of its executives.  In addition, on October 27, 2022, a complaint referencing these media articles was filed with the [FEC] by a non-profit corporation alleging certain violations of the Federal Election Campaign Act by various entities and individuals named as respondents in the complaint.  While the complaint does not expressly name FPL or any of its executives as respondents, the complaint identifies FPL as an alleged source of funds to certain Super PACs identified in the complaint. [NextEra] has engaged outside counsel to conduct a review of potential state and federal campaign finance violations, including the allegations raised in the media articles and the FEC complaint.  The review is ongoing and [NextEra] and FPL cannot predict, as of the date of this report, the outcome of the review.  These allegations could also result in regulatory, investigative and enforcement inquiries by law enforcement or other governmental authorities and any ultimate findings of violations could result in the imposition of fines, penalties or other sanctions or impacts on [NextEra] or FPL.

Supp. App. 77.  NextEra did not experience a decline in share value after filing that report.  *See* Supp. App. 86-87.

5.　　Three months later, before the opening of markets on January 25, 2023, NextEra made three public disclosures.  *See* App. 91-93.

*First*, NextEra released its financial results for the fourth quarter and full year of 2022. *See* Supp. App. 98-99. The accompanying press release acknowledged the existence of a "challenging macro environment." Supp. App. 99. An analyst report described the release as a "cautious" update and acknowledged that "protracted uncertainty in Florida" had affected NextEra's ability to increase or maintain existing growth. Supp. App. 113.

*Second*, NextEra filed a Form 8-K report with the SEC disclosing that its second investigation into the media allegations was "substantially complete." Supp. App. 128. In the report, NextEra expressed the belief that "FPL would not be found liable for any of the Florida campaign finance law violations" and that it did not "believe it [was] appropriate for" the FEC complaint, which was still pending at the time, "to move forward." *Id.* (The FEC ultimately issued an order dismissing the complaint. *See* Certification, *In re Unknown Respondents*, MUR 8082 (Feb. 8, 2024)). NextEra also provided a risk disclosure with the header: "Allegations of violations of law by FPL or [NextEra] have the potential to result in fines, penalties, or other sanctions or effects, as well as cause reputational damage for FPL and [NextEra], and could hamper FPL and [NextEra's] effectiveness in interacting with government." Supp. App. 128. The disclosure stated in relevant part:

> [M]edia articles have been published that allege, among other things, Florida state and federal campaign finance law violations

10

> by FPL. These articles are referenced in a complaint subsequently filed with the [FEC] that alleges certain violations of the Federal Election Campaign Act. FPL and [NextEra] cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or [NextEra] violated federal campaign finance or other laws, that applicable federal or state governmental authorities may not investigate or take enforcement actions with respect to the allegations or assert that legal violations by FPL or [NextEra] have occurred, or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred . . . FPL and [NextEra] cannot provide assurance that any of the foregoing will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or [NextEra].

*Id.*

*Third*, NextEra filed a second Form 8-K report stating that Silagy had notified the company of his intention to step down as FPL's CEO and then, later in the year, to retire after 20 years at FPL. App. 92; Supp. App. 132. On an earnings call on that same day, Silagy explained that he had served as FPL's CEO for 12 years, long beyond the tenure of most chief executives, and that he had planned to remain for at least one year after John Ketchum was announced as the new NextEra CEO in January 2022. Supp. App. 164. Ketchum acknowledged on the same call that the past year had been difficult on Silagy, citing challenges including hurricanes, high natural-gas prices, inflation, supply-chain issues, and the media allegations, although he clarified that NextEra was "not making a connection" between Silagy's retirement and the allegations. Supp. App. 169. The Form 8-K report explained that Silagy

11

would continue as CEO into February 2023 and remain as an executive through May 2023 to assist with the transition. *See* Supp. App. 132.

The Form 8-K report further detailed Silagy's retirement agreement, which was filed as an exhibit to the report. Supp. App. 132, 135-153. The report explained that Silagy's "payments and benefits under the [a]greement are subject to forfeiture and recoupment in certain circumstances" specified in the agreement. Supp. App. 132; App. 92. In particular, the agreement included a clawback provision allowing NextEra to recover compensation from Silagy if, among other things, Silagy was convicted of, or admitted to, the commission of a serious criminal offense based on acts taken in his role as FPL's CEO. *See* App. 92; Supp. App. 146. NextEra's stock dropped 8.7% that day. App. 94.

6. Five days later, on January 30, 2023, Bank of America published an analyst report following a meeting with NextEra's management. The report mentioned Silagy's retirement agreement, noting that it "pays Silagy's full 2022 annual compensation, enables a multi-year claw back on compensation for any legal wrongdoing, and establishes a two-year non-compete." App. 149. The report further stated that "[t]his customary non-compete limits Silagy's ability to position himself at an adjacent utility." *Id.*

The following day (January 31), the Florida Times-Union published an article entitled, "'Legal Wrongdoing' Could Lead to Claw Back of FPL CEO's Pay." App. 161. The article reported that the Bank of America report had

stated that Silagy's retirement agreement included the clawback provision that allowed FPL to recover Silagy's compensation if certain legal wrongdoing was found to have occurred. App. 161-162. The article noted that the report had described the non-compete provision in Silagy's agreement as "customary" and stated that it was "unclear if all the terms of Silagy's exit, including the claw-back provision, are standard for FPL leaders." App. 162-163. The article incorrectly reported that "the terms of Silagy's exit . . . had not [been] previously shared in public statements"; it did not acknowledge that NextEra had filed Silagy's retirement agreement with the Form 8-K report announcing the retirement on January 25. App. 162. NextEra's share price decreased 0.56% that day. App. 96.

### B.    Proceedings Below

1.    On May 26, 2023, a NextEra shareholder filed a class action complaint against appellees in the United States District Court for the Southern District of Florida. App. 8-9. Appellants City of Hollywood Police Officers' Retirement System and Pembroke Pines Firefighters and Police Officers Pension Fund were appointed as lead class plaintiffs. Supp. App. 1. The operative second amended complaint, filed on behalf of a putative class of investors who purchased NextEra securities between December 1, 2021, and February 1, 2023, alleged that appellees had made false and misleading statements and omissions related to FPL's dealings with Matrix, in violation of Section 10(b)

13

of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  App. 104-105, 108-111.  The complaint also alleged control-person claims against Robo, Silagy, and Reuter under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  App. 110-111.

The complaint identified eight of appellees' public statements as false or misleading:

1.  Reuter's statement on December 2, 2021, that FPL was not involved in the "ghost candidate scheme" and did not provide funding to Grow United in connection with Florida state-level political campaigns, App. 81-83;

2.  Reuter's statement on December 10, 2021, that FPL was not involved in the creation of Grow United, App. 83-85;

3.  Reuter's statement on December 10, 2021, acknowledging that Matrix had approached FPL about offering Garrett Dennis a job but stating that FPL had rejected that proposal, App. 85-86;

4.  Reuter's statement on December 17, 2021, that neither FPL nor Silagy requested Matrix to set up a "funding structure" for political contributions during the 2020 election, App. 84;

5.  Robo's statement on January 25, 2022, that NextEra conducted an extensive investigation into the media allegations and found no evidence of illegality or wrongdoing, and that he felt there was no basis to the allegations, App. 86;

6.  Silagy's statement on June 24, 2022, that FPL did not engage in any activities related to the surveillance of journalists, App. 86-87;

14

7.  Reuter's statement in June 2022 that FPL did not have digital records of certain exchanges concerning Matrix's alleged surveillance of Florida Times-Union reporter Nate Monroe, App. 87; and

8.  An FPL spokesperson's statement on August 13, 2022, that FPL did not have a direct or indirect ownership interest in The Capitolist and did not have editorial control over its reporting, App. 87-88.

The complaint further alleged that three subsequent disclosures revealed the falsity of those eight statements:

1.  NextEra's Form 8-K report of January 25, 2023, regarding the status of the second investigation by outside counsel concerning the media allegations;

2.  NextEra's separate Form 8-K report of January 25, 2023, regarding Silagy's intent to retire; and

3.  The Florida Times-Union article of January 31, 2023, discussing the terms of Silagy's retirement agreement.

App. 88-93.  The complaint alleged that those disclosures caused the decreases in NextEra's share value on January 25 and January 31, 2023.  App. 93-96.

2.  Appellees moved to dismiss the complaint for failure to state a claim.  *See* App. 114-144.  As is relevant here, appellees argued that appellants had failed to plead loss causation because none of the disclosures identified by the complaint "corrected" any of the alleged misstatements.  *See* App. 137-143.

The district court agreed with appellees and granted the motion to dismiss.  *See* App. 223-239.  In reaching that conclusion, the district court closely analyzed the collective contents of all three of appellants' challenged public

15

disclosures.  With respect to the Form 8-K report regarding the status of NextEra's second investigation:  the court first noted that the report did not specifically refer to any of the topics discussed in the alleged misstatements, but instead referred only to the existence of campaign-finance-related allegations and potential associated penalties, without providing a guarantee against an adverse outcome.  *See* App. 234.  The court also noted that, although the disclosure mentioned a "potential *future* risk" caused by the allegations, "references to future risk, standing alone, are insufficient to establish a corrective disclosure."  App. 235.  The court further concluded that the statements disclosed in NextEra's November 2022 Form 10-Q were "substantially similar to the statements in the January 25, 2023 purported corrective disclosure," such that the later Form 8-K report "did not reveal any new information that was previously concealed or obscured."  App. 235-236.

With respect to the Form 8-K report regarding Silagy's retirement:  the district court noted that, "[a]s [appellants] acknowledge[d], the retirement of a CEO, by itself, is insufficient to establish loss causation."  App. 237.  The court further concluded that "[n]othing in [the Form 8-K report] tie[d] back to the challenged fraudulent statements" or disclosed "new negative facts about the underlying fraud."  App. 238.  For that reason, the court concluded that "any supposed connection between Silagy's departure and the underlying alleged conduct" was too attenuated to make the retirement announcement a

16

corrective disclosure.  App. 237-238.  The court further stated that "the balance of the January 25, 2023 disclosure" (*i.e.*, the other Form 8-K report) could not "fill the gap in missing loss-causation allegations, for all of the reasons already stated."  App. 238.  The court also confirmed that the article had not changed its view of the Form 8-K disclosures, concluding at the end of its analysis of the article that appellants "have not sufficiently alleged loss causation to withstand [appellees'] motion to dismiss."  *Id.*

With respect to the Florida Times-Union article published six days later: the district court rejected appellants' "strained and speculative" argument regarding the clawback provision in Silagy's retirement agreement, noting that "the cited article does not classify the provision as unique or not customary."  App. 238.  The court explained that appellants had failed to "offer any allegations to suggest that the clawback provision itself revealed facts about the specific alleged misrepresentations."  *Id.*  The court added that the Florida Times-Union article did not "reveal any undisclosed fact regarding the specific misrepresentations alleged."  *Id.*

Because the district court concluded that none of the alleged corrective disclosures was corrective in nature, the court dismissed the claims under Section 10(b) and Rule 10b-5, as well as the corresponding control-person claims under Section 20(a).  *See* App. 239.

17

## STANDARD OF REVIEW

This Court reviews the district court's order dismissing the complaint de novo. *Meyer* v. *Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013).

## SUMMARY OF ARGUMENT

This case involves a straightforward application of this Court's precedents on loss causation. The district court correctly applied those precedents by holding that the complaint failed to identify any disclosure that was corrective in nature.

I.    Appellants' claims are premised on the "fraud on the market" theory of securities fraud, under which the price of a security traded in an efficient market is presumed to incorporate false or misleading public statements by the issuer. To satisfy the required element of loss causation, a plaintiff must show that the alleged misstatements artificially inflated the price of the issuer's stock and that one or more subsequent "corrective disclosures" eliminated the inflation, causing losses to the plaintiff shareholder. A plaintiff seeking to prove loss causation in a fraud-on-the-market case must therefore identify a corrective disclosure; show that the stock dropped soon after the corrective disclosure; and eliminate other possible explanations for the price drop. An alleged disclosure does not qualify as corrective unless it revealed to the market the previously concealed truth by speaking to the same subject matter as the alleged misstatement and provided new information not previously disclosed to the market.

18

Applying those principles here, the district court correctly held that appellants had failed to plead loss causation because the three alleged corrective disclosures do not qualify as corrective.

A.    The first alleged corrective disclosure is the Form 8-K filing of January 25, 2025, regarding the status of NextEra's second investigation by outside counsel regarding the media allegations.  It does not qualify as a corrective disclosure for three reasons.  *First*, it did not address the particular allegations from any of the alleged misstatements, so it did not speak to the subject matter of those alleged misstatements.  *Second*, a disclosure of potential future risks does not qualify as a corrective disclosure as a matter of law. *Third*, NextEra had already disclosed, in a Form 10-Q filing made in November 2022, that the media allegations could lead to adverse legal and business consequences.

Appellants' contrary arguments lack merit.  To begin with, the fact that a Form 8-K report serves the purpose of announcing new information does not mean that the report here contained new information *that revealed the falsity of an earlier statement*.  The new information was that the second internal investigation had been substantially completed.  The fact that NextEra restated, as it had said in its Form 10-Q filing in November 2022, that it could not guarantee that the media allegations would not ultimately lead to adverse legal or business consequences does not constitute a corrective disclosure.  No

19

business can ever guarantee that adverse allegations will not lead to adverse consequences. NextEra did not report that it had engaged in any of the conduct it had previously denied. Nor could the risk disclosure have demonstrated the falsity of the eight alleged misstatements, because none of those statements asserted that no such risk existed. Appellants are also wrong to suggest that the opinions of market analysts and the decrease in NextEra's share value prove their interpretation of the report. The question is whether the new information revealed the falsity of the earlier statements; the speculation of market analysts and the mere fact of a stock drop do not suffice to make that showing.

B.    The second alleged corrective disclosure is the Form 8-K filing announcing Silagy's notice that he intended to retire later in the year. It likewise did not reveal the falsity of any alleged false or misleading statements. The generic announcement that a CEO notified his employer that he intended to retire after a transition period does not inform the market that any past wrongdoing occurred or that the company's previous statements regarding specific allegations of wrongdoing were false. That is particularly true where, as here, the announcement did not discuss the topics of the earlier misstatements. Appellants' speculation that the retirement was rushed, in addition to being unsupported, falls far short of showing that the earlier alleged misstatements were in fact false.

C.    The third alleged corrective disclosure is the Florida Times-Union article.  It also did not reveal any new non-public information.  Although the article reported on the clawback provision in Silagy's retirement agreement, NextEra had described the agreement in, and appended the entire agreement as an exhibit to, a Form 8-K report filed with the SEC *six days earlier*.  And the article did not actually say, as appellants suggest, that the clawback provision was unusual; it simply stated that the reporter lacked knowledge of whether the provision was customary.  Accordingly, none of the alleged corrective disclosures suffices to plead loss causation, and the district court correctly dismissed the complaint on that basis.

II.    Aside from their arguments as to why each of the alleged corrective disclosures was corrective, appellants challenge the district court's decision on three broader grounds.  Those challenges also lack merit.

A.    Appellants first attempt to elide their failure to identify a corrective disclosure by suggesting that the district court failed to consider the disclosures "cumulatively."  But appellants cite no authority requiring a cumulative analysis here.  Nor can appellants wedge the facts here into the shape of a case involving a series of partial disclosures.  In any event, the district court did consider the disclosures together:  it correctly decided that, even taken together and in the context of each other, the statements did not contradict NextEra's previous alleged misstatements.

21

B.     Appellants next argue that the district court erred by requiring the alleged corrective disclosures specifically to mention the earlier alleged misstatements.  But the district court did not impose such a requirement.  Instead, the court simply applied the familiar rule that an alleged corrective disclosure must share the same subject matter as the alleged misstatement in order to reveal any false or misleading aspect of that misstatement.  The court thus properly concluded that, because none of the three alleged corrective disclosures here addressed the same subject matter as any of the eight alleged misstatements, plaintiffs failed to plead loss causation.

C.     Finally, appellants argue that, even if the alleged corrective disclosures were not actually corrective in nature, they can alternatively prove loss causation by showing that the decrease in share value in response to Silagy's retirement was the materialization of a risk that appellees had concealed from the public.  But appellants did not adequately preserve that argument below; this Court has never endorsed that theory of loss causation; and the theory would in any event fail as applied here.

## ARGUMENT

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation

22

or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *MacPhee* v. *MiMedx Group, Inc.*, 73 F.4th 1220, 1241 (11th Cir. 2023); *see* 15 U.S.C. § 78u-4(b).  The only issue in this appeal is whether the district court properly dismissed appellants' complaint for failing to plead loss causation.

The answer is clearly yes under this Court's established precedents. None of the alleged corrective disclosures revealed the falsity of any earlier statement made by appellees or provided any new information to the market regarding the subject matter of those earlier statements.  The district court thus correctly held that appellants had failed to plead any corrective disclosures, and it properly dismissed the complaint on that basis. The judgment below should be affirmed.

## I. THE DISTRICT COURT CORRECTLY HELD THAT APPELLANTS FAILED TO IDENTIFY A CORRECTIVE DISCLOSURE

To plead loss causation, a plaintiff must plausibly allege facts showing "a causal connection between the misrepresentation and the investment's subsequent decline in value." *MacPhee*, 73 F.4th at 1241.  The element of loss causation plays an essential role in securities-fraud litigation, ensuring that only declines in share value actually attributable to fraud are cognizable.  *See id.* Without that requirement, the federal securities laws would devolve into "a system of investor insurance that reimburses investors for any decline in the value of their investments."  *Id.* at 1242 (internal citation omitted).

23

Appellants' claims are premised on the "fraud on the market" theory of securities fraud. *See* Br. 32-33. Under that theory, the price of a security traded in an efficient market is presumed to incorporate all publicly available information, including any false or misleading public statements made by the issuer. *See MacPhee*, 73 F.4th at 1241; App. 106-107. Relying on that theory, a plaintiff can proceed by demonstrating that the issuer's public misstatements artificially inflated its stock price and that a subsequent "corrective disclosure" revealed the truth of the matter, resulting in a decrease in stock price and losses to investors who purchased the stock at the inflated price. *See MacPhee*, 73 F.4th at 1242.

To prove loss causation in a fraud-on-the-market case, a plaintiff must show "not only that a fraudulent misrepresentation artificially inflated the security's value but also that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff." *MacPhee*, 73 F.4th at 1242 (internal quotation marks and citation omitted). That requires the plaintiff to identify a "corrective disclosure"; "show that the stock's price dropped soon after that corrective disclosure"; and "eliminate other possible explanations for the price drop." *Id.* (internal citation omitted).

A public disclosure does not qualify as "corrective" unless it "reveals to the market the pertinent truth that was previously concealed or obscured by

24

the company's fraud." *Meyer* v. *Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013).

Thus, a corrective disclosure must "share the same subject matter as the prior

misstatement; only then can the disclosure be said to have a '*corrective* effect,'

rather than merely a '*negative* effect.'" *FindWhat Investor Group* v. *Find-*

*What.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011); *see MacPhee*, 73 F.4th at

1243. The information must also deliver "facts to the market that are new, that

is, publicly revealed for the first time." *Meyer*, 710 F.3d at 1198. That is so

because, in an efficient market, "the disclosure of confirmatory information—

or information already known by the market—will not cause a change in the

stock price." *MacPhee*, 73 F.4th at 1243. Accordingly, a failure to show that

the alleged corrective disclosure provided the market with new information is

"fatal" to proof of loss causation in a fraud-on-the-market case. *Meyer*, 710

F.3d at 1198.

Applying those established principles here, appellants failed to plead

loss causation. Appellants identified three alleged corrective disclosures in

their complaint: the Form 8-K filing concerning the status of the second in-

vestigation by outside counsel; the Form 8-K filing concerning Silagy's an-

nounced intent to retire; and the Florida Times-Union article concerning the

terms of Silagy's retirement agreement. But none of those three disclosures

shared the same subject matter as the alleged misstatements or revealed new

information to the market concerning NextEra's involvement with Matrix.

25

The district court correctly analyzed each of the purported disclosures and determined that none of them, whether individually or collectively, was "corrective" in nature.  App. 233-239.  Appellants' contrary arguments lack merit.

### A.    The Form 8-K Report Regarding The Status Of NextEra's Second Investigation Was Not Corrective

The Form 8-K report of January 25, 2023, discussing the status of NextEra's second investigation into the media allegations (Supp. App. 126) was not a corrective disclosure.  It did not relate to the specific subject matter of the alleged misstatements and contained no new information that could have corrected the alleged misstatements. The district court's determination was thus correct.  *See* App. 235-236.

1.    The eight alleged misleading statements identified in the complaint concerned specific allegations made in the media against appellees: FPL's alleged involvement in supporting ghost political candidates; the creation of Grow United; the job offer extended to Jacksonville City Councilor Garrett Dennis; the use of a particular funding structure proposed by Matrix to contribute to political campaigns; the outcome of NextEra's first investigation by outside counsel; the surveillance of Florida Times-Union reporter Nate Monroe; the existence of digital records detailing the alleged surveillance; and FPL's relationship to The Capitolist website.  *See* App. 80-88.  But the Form 8-K report regarding the second investigation did not discuss any of those topics.

26

The Form 8-K report stated only in general terms that there had been media reports of campaign-finance related violations; that NextEra had substantially completed its second investigation and did not believe FPL should be found liable for any Florida campaign-finance violations; that an FEC complaint alleging violations of federal campaign-finance law should not move forward; and that NextEra could not guarantee that the allegations would not result in any legal or business consequences for NextEra. *See* Supp. App. 128. Those general statements did not "correct" the earlier alleged misstatements, because the later statements did not reveal that FPL had funded ghost political candidates; helped to create Grow United; agreed to extend a job offer to Garrett Dennis; used the funding structure proposed by Matrix to contribute to political campaigns; found any evidence of wrongdoing in its first investigation; surveilled Nate Monroe; possessed electronic records evidencing the surveillance; or owned or controlled The Capitolist website. In short, the alleged corrective disclosures did not "share the same subject matter" as the alleged misstatements. *FindWhat*, 658 F.3d at 1311 n.28.

The fact that the content of the Form 8-K report bore a general relationship with the contents of the earlier alleged misstatements does not make it "corrective." A statement must instead "relate back" to an earlier misstatement with sufficient specificity. The Fourth Circuit's decision in *Katyle* v. *Penn National Gaming, Inc.*, 637 F.3d 462 (2011), is instructive. In *Katyle*,

27

the plaintiffs asserted that news of regulatory delays pushing back the defend-ant's acquisition of another company proved the falsity of earlier assertions that the deal would close. *See id.* at 474. But the Fourth Circuit rejected that assertion, noting that the disclosure of delays "did not even inferentially sug-gest that [the defendant's] prior press releases were fraudulent and that the [deal] would not close." *Id.* at 475. Although the news of regulatory delays related *generally* to the question of whether the deal would close, it did not specifically correct any of the company's earlier statements. So too here. The Form 8-K addressed an investigation related to the media allegations, but its contents "did not even inferentially suggest" that any of the earlier statements addressing those allegations was false. *Id.*

*Espy* v. *J2 Global, Inc.*, 99 F.4th 527 (9th Cir. 2024), is to the same effect. There, the plaintiffs alleged that the defendant company had concealed the underperformance of two specific acquired assets by omitting key information from relevant press releases, earnings calls, proxy statements, and SEC dis-closures. *See id.* at 534, 541-542. But the supposedly corrective disclosure—an analyst report discussing the company's need for acquisitions and its efforts to make them—did not specifically address either of those two assets and "so could not have revealed information correcting the omission that is the basis for [the plaintiff's] action." *Id.* at 542 (internal quotation marks and citation omitted).

Appellants here face the same problem as the plaintiffs in *Katyle* and *Espy*. The Form 8-K report concerning the second investigation could not have revealed information correcting the earlier statements about the media allegations because it did not even address the content of those allegations or findings. The Form 8-K report thus did not "reveal[] to the market the pertinent truth that was previously concealed or obscured" and accordingly did not constitute a corrective disclosure. *Meyer*, 710 F.3d at 1196. Even assuming, *arguendo*, that the first and second investigations covered the same issues, NextEra's statements in the Form 8-K report regarding the second investigation were consistent with the earlier statements regarding the first investigation. *See* App. 86.

2.     The fact that the Form 8-K report disclosed the existence of future risk related to FPL's dealings with Matrix also did not make it a corrective disclosure. Statements that merely warn of a "risk of future corrective action" do not themselves "reveal to the market that [a defendant's] previous statements were false or fraudulent." *Meyer*, 710 F.3d at 1201. That is precisely what happened here: the Form 8-K report warned only that the company faced a risk of future corrective action from the FEC complaint and media allegations. That warning reveals no falsity in appellees' eight alleged misstatements concerning the media allegations and is also not new in light of the

29

warnings in the November 2022 Form 10-Q report.  Moreover, the eight alleged misstatements also could not have contemplated any specific outcome of the FEC complaint, because that complaint was not filed until October 2022—well after each of the alleged misstatements had been made.

3.    Even if the Form 8-K report had contained corrective information, a statement that "only repeat[s] information already in the public domain" cannot qualify as a corrective disclosure.  *MacPhee*, 73 F.4th at 1246.  Just so with the statements in the Form 8-K report about the possibility of adverse consequences related to the media allegations.

The risks that the Form 8-K report warned about were indistinguishable from the ones NextEra had already disclosed in its Form 10-Q report over two months earlier.  The Form 10-Q report stated that "[m]edia articles have been published that allege, among other things, campaign finance violations by FPL and certain of its executives" and that "a complaint referencing these media articles was filed with the Federal Election Commission."  Supp. App. 77.  The report further stated that NextEra had "engaged outside counsel to conduct a review of potential state and federal campaign finance violations" and that "[NextEra] and FPL cannot predict, as of the date of this report, the outcome of the review."  *Id.*  Finally, the report explained that the allegations "could also result in regulatory, investigative and enforcement inquiries  .  .  .  [and]

30

could result in the imposition of fines, penalties or other sanctions or impacts on [NextEra] or FPL." *Id.*

The Form 8-K report said nothing further of substance. It noted that "media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL." Supp. App. 128. It further noted that "FPL and [NextEra] cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws . . . or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred." *Id.* The report also declined to "provide assurance that any of the [allegations] will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or [NextEra]." *Id.*

NextEra thus warned about the same risks in both the earlier Form 10-Q report and the later Form 8-K report, cautioning in both places that it could not rule out the possibility of efforts to pursue enforcement actions based on the allegations. Indeed, the only new information in the Form 8-K report was that NextEra had substantially completed its second investigation and believed that "FPL would not be found liable for any of the Florida campaign finance law violations" and that it was "[not] appropriate for" the FEC complaint "to move forward." Supp. App. 128. But that information could not be

31

said to have revealed the falsity of appellees' earlier statements; it simply suggests that NextEra's second investigation had not found violations of campaign-finance laws. Because the Form 8-K report did not provide pertinent new information to the market on the subjects of the alleged false statements, it did not constitute a corrective disclosure. *See MacPhee*, 73 F.4th at 1246.

4.    Appellants offer several contrary arguments, but each is incorrect.

a.    In the complaint, appellants alleged that the Form 8-K report addressing the second investigation "formally informed investors" "for the first time" that NextEra could not "guarantee" or "provide assurances" that the media allegations would not lead to adverse legal or business consequences. App. 91. That of course was incorrect: the Form 10-Q report filed in November 2022—which appellants omitted entirely from their complaint—warned of the same possibility of adverse consequences. *See* pp. 30-31, *supra*.

Now on appeal, appellants shift to a new argument. They contend that, "if all NextEra was doing was summarizing previously disclosed information regarding the existence of an investigation, it would not have needed to issue the 8-K." Br. 44. And the new information in the Form 8-K report, appellants contend, is that, following the second investigation, NextEra "could not clear FPL of wrongdoing," or "'assur[e]' investors that either it or FPL were innocent of any wrongdoing." *Id.* (emphasis omitted). That new argument fails for several reasons.

For starters, the Form 8-K report did not say that NextEra "could not 'assur[e]' investors that either it or FPL were *innocent of any wrongdoing for past misconduct*." Br. 44 (emphasis added). Those are appellants' words, not NextEra's. Rather, the report first informed investors that NextEra's second investigation was "now substantially complete" and that NextEra believed that "FPL would not be found liable for any of the Florida campaign finance law violations" and that it was not "appropriate" for the FEC complaint "to move forward." Supp. App. 128. That was the new information contained in the Form 8-K report. The report then provided a risk disclosure similar to the one NextEra had provided in the November 2022 Form 10-Q report. It stated that NextEra and FPL could not "guarantee" that the FEC complaint process would not "result in a finding that FPL or [NextEra] violated federal campaign finance or other laws," or that "applicable federal or state government authorities may not investigate or take enforcement actions" resulting in findings of legal violations. *Id.* The risk disclosure further stated that NextEra and FPL could not provide "assurance" that any such investigations, enforcement actions, or findings would not result in "the imposition of material fines, penalties, or otherwise result in sanctions or effects on FPL or [NextEra]." *Id.*

Refocusing their argument on just a couple of words from the risk disclosure, appellants now contend that the language declining to "guarantee" or

"assur[e]" investors that no adverse legal or business consequences would result from the allegations was somehow a new disclosure that FPL could not be cleared of wrongdoing. *See* Br. 44. But nowhere did NextEra communicate, as appellants contend, FPL's lack of "innocen[ce]" or otherwise say that the second investigation had uncovered "past misconduct." *Id.* To the contrary, NextEra communicated the opposite: namely, that, based on its second investigation, it did *not* believe it would be found liable for illegality. *See* Supp. App. 128.

No reasonable investor would interpret NextEra's warnings about future legal or business risk as an admission that wrongdoing in fact occurred. *See Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 186 (2015). To state the obvious, a company cannot guarantee what will or will not happen in the future, particularly with respect to the decisions of governmental actors over which the company has no control. Even if a company's investigation (or, indeed, multiple investigations) finds no evidence of wrongdoing, no company would guarantee to investors that no adverse legal consequences could occur—particularly when an FEC complaint related to the allegations of wrongdoing, which ultimately did not move forward, remained pending. *See* Supp. App. 128. A reasonable investor would understand as much and would have recognized that NextEra's decision not

to guarantee against adverse legal or business consequences was merely an acknowledgment that the company is neither omniscient nor omnipotent.

Accordingly, by arguing that the Form 8-K report disclosed that NextEra "could not clear FPL of wrongdoing," Br. 44 (emphasis omitted), appellants are effectively seeking to prove loss causation by pointing to the *absence* of information in the report: namely, the absence of a statement that the second investigation cleared FPL of any wrongdoing. In other words, appellants are arguing that, by failing to provide such a statement, the market would have understood NextEra tacitly to have disclosed that FPL had engaged in some wrongdoing. But as just explained, no reasonable investor would interpret the Form 8-K report that way, and the "non-announcement of positive news" does not "constitute a corrective disclosure." *Katyle*, 637 F.3d at 476-477.

And to repeat, NextEra had, in the November 2022 Form 10-Q report, already warned about the very risks of regulatory investigations or potential adverse legal and business consequences from the media allegations. That part of the Form 8-K was not new information. Both reports stated that media reports of campaign-finance violations had been published; that an FEC complaint had been filed; that NextEra and FPL could be subject to governmental investigations or enforcement actions; and that ultimate findings of a violation

35

could result in fines, penalties, or other adverse consequences. If that disclosure ever constituted a corrective truth, it was fully disclosed by the earlier-filed Form 10-Q report.

Finally, even if appellants were correct that the Form 8-K report informed the market for the first time that NextEra could not clear FPL of wrongdoing, plaintiffs still could not rely on the report to prove loss causation. That is because there would still be a mismatch between the Form 8-K report and the alleged misstatements. None of the alleged misstatements guaranteed—or even suggested—that FPL would eventually be cleared of all wrongdoing related to the media allegations. To the contrary, seven of the alleged misstatements concerned specific media allegations, and, even under appellants' interpretation, the Form 8-K report did not speak to the subject matter of any particular allegation. *See FindWhat*, 658 F.3d at 1312 n.28.

The only broader alleged misstatement is Robo's statement that, after the first investigation, NextEra "found no evidence of . . . any illegality" and that "I feel very good that there is no basis to any of these allegations." App. 86. But even there, a hypothetical disclosure that NextEra could not clear FPL of wrongdoing after the *second investigation* would not correct an earlier statement that the *first investigation* uncovered no evidence of wrongdoing. That is particularly true given that NextEra had disclosed months earlier that it was conducting a second investigation into the media allegations

36

and that those allegations posed legal and reputational risks to NextEra. Nor would such a disclosure correct Robo's statement that he "felt good" that the allegations had no basis. To correct that statement, the Form 8-K report would have needed to disclose that Robo did not in fact feel that the allegations were meritless. *See Omnicare*, 575 U.S. at 186.

Accordingly, it is clear that the risk disclosure could not have corrected any of the eight alleged misstatements. Properly interpreted, the only new information in the Form 8-K report was that NextEra had substantially completed its second investigation and did not expect it or FPL to be found liable for campaign-finance violations. But even under appellants' incorrect interpretation, the Form 8-K report would not have corrected any earlier misstatements by disclosing that NextEra could not clear FPL of wrongdoing. And that is because none of the alleged misstatements said that FPL would eventually be cleared of wrongdoing.

b.    Appellants next fall back (Br. 45) on the refrain that a few analysts' "surprised" reactions to the Form 8-K report must mean that the report disclosed new information. But the mere fact that some analysts found a statement "surprising" does not render old information new. That subjective description is nothing more than opinion, and "[i]f every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets

could sue under [Section] 10(b) using an analyst's negative analysis of public filings as a corrective disclosure." *Meyer*, 710 F.3d at 1199.

For that reason, only those analyst reports that add something *new* to previously available information, such as by applying expertise and effort to locate or analyze that information, can constitute a corrective disclosure. *Espy*, 99 F.4th at 541. But none of the analyst reports identified in the complaint does anything more than offer a subjective reaction to NextEra's risk disclosure. And analysts' failure to anticipate that the risk of adverse consequences related to the media allegations may continue after the completion of the second investigation does not render false any of NextEra's earlier statements regarding those allegations.

c.     Appellants separately suggest (Br. 45-46) that the decrease in value of NextEra's stock itself confirms that the market interpreted the Form 8-K report addressing the second investigation to reveal the falsity of appellees' alleged misstatements. That proves too much. If the mere fact of a decrease in share value demonstrated that some recent disclosure revealed earlier fraud, then nearly every decrease in share value would be actionable as securities fraud. But federal securities law is not insurance against market losses. *See Meyer*, 710 F.3d at 1196. This Court's decision in *FindWhat* does not suggest otherwise, *see* Br. 45-46. To the contrary, *FindWhat* makes clear that, even when a stock declines in price near the time of an alleged corrective

38

disclosure, the plaintiff still must show that "it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a substantial amount of the price drop." 658 F.3d at 1312 (internal quotation marks and citation omitted).

The fact that NextEra's stock price decreased after the announcement that FPL's CEO of 12 years had provided notice of his intent to retire later in the year is also unsurprising. Although plaintiffs allege that the decrease was NextEra's fifth-largest decline in the last 25 years, the next-largest decrease—just one year earlier—followed the announcement that Robo was retiring as NextEra's CEO. *See* Supp. App. 91. The decrease in share value thus does not prove that the Form 8-K report regarding NextEra's second investigation revealed previous fraud.

**B.      The Form 8-K Report Regarding Silagy's Intent To Retire Was Not Corrective**

The Form 8-K report of January 25, 2023, regarding Silagy's notice of his intent to retire (Supp. App. 13), also did not qualify as a corrective disclosure. *See* App. 237-238.

1.      The Form 8-K report regarding Silagy's intent to retire did not speak to the subject matter of the alleged misstatements. *See FindWhat*, 658 F.3d at 1311 n.28. It stated only that Silagy intended to retire after 20 years at FPL; that he would continue as CEO into February; and that he would remain as an executive through May to assist with the transition. *See* App. 237.

39

It made no reference to the FEC investigation or to any of the subjects of the alleged misstatements. *See* pp. 14-15, *supra*. The Form 8-K report thus could not have "reveal[ed] to the market the pertinent truth that was previously concealed or obscured." *Meyer*, 710 F.3d at 1196.

To be sure, a handful of analyst reports speculated that Silagy's retirement was related to the ongoing investigation into FPL's dealings with Matrix. App. 93. But such speculation cannot establish loss causation, and the Second Circuit's decision in *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2010), explains why not. There, the company filed a Form 8-K report disclosing that an outside director and chair of the company's audit committee had resigned from the company's board of directors following an allegedly fraudulent transaction. *Id.* at 505. The plaintiffs, a group of shareholders, argued that the director's resignation revealed the fraudulent nature of the transaction and that the resultant negative publicity caused a decline in the company's share price. *Id.* at 511.

The Second Circuit rejected those arguments. *See* 597 F.3d at 511-512. It reasoned that the director's resignation and resulting negative press coverage did not support liability where none of the alleged corrective disclosures "even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *Id.* at 511. The court concluded that plaintiffs had "[a]t best" shown that "the market may have reacted

40

as it did because of concerns" regarding the resignation but that "the conclusory suspicions" of those analyzing the resignation "added nothing to the public's knowledge" about the underlying transaction. *Id.* at 512.

So too here. The mere fact that NextEra's stock dropped after Silagy's announcement of his intent to retire does not mean the announcement corrected alleged misstatements concerning the media allegations. Appellants instead needed to identify disclosures on the same subject matter as the company's earlier statements that revealed the falsity of those statements. *See FindWhat*, 658 F.3d at 1311 n.28; *Meyer*, 710 F.3d at 1196. That is not Silagy's announcement of his intent to retire.

2.      NextEra and Silagy also provided legitimate reasons for his intent to retire, and appellants did not plead facts to support a contrary inference. Silagy had served as CEO of FPL for 12 years, far longer than most chief executives. *See* Supp. App. 164. He had previously agreed to remain for at least one more year after John Ketchum became CEO of NextEra in January 2022. *See id.* Having done so, he decided it was "best for the transition to take place now." *Id.* Indeed, Ketchum acknowledged it had been a difficult year for Silagy because of events including hurricanes, high natural-gas prices, inflation, supply-chain issues, and media attacks. Supp. App. 169.

Nor do the analyst reports speculating about a connection between Silagy's announcement of his intent to retire and the media allegations reveal

41

any falsity as to any of the challenged statements.  Silagy's intent to retire was announced alongside positive news about the second investigation into the media allegations.  *See* pp. 10-11, *supra*.  That context makes clear that the public commentary about Silagy's retirement possibly being linked to the investigation was based solely on speculation.  And "[s]peculation of wrongdoing cannot by itself arise to a corrective disclosure." *Public Employees Retirement System of Mississippi* v. *Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014).  In addition, the analyst reports were far more circumspect than appellants make them out to be.  For example, the Evercore report stated that, while some investors had expressed concern "about the timing of Silagy's retirement," NextEra "stated that his retirement is not related to that"; "Silagy had already been planning to retire for a year"; and NextEra "announced that after its internal investigation it believes that FPL would not be found liable for any of the campaign finance law violations" alleged.  Supp. App. 177.  The reports do not indicate that NextEra's disclosure contained any new information or that it corrected appellees' earlier statements regarding FPL's involvement with ghost political campaigns, Grow United, and the like.

3.     Appellants also argue that the contents of the Form 8-K report showed that NextEra did not have a solid succession plan in place, which must have meant the resignation was rushed, which "alert[ed] the market to problems with the retiree's work."  Br. 47 (internal quotation marks and citation

omitted). That reasoning relies on a series of embedded assumptions: namely, that having Silagy remain to support his successor showed that NextEra did not have a solid succession plan in place; the lack of a solid succession plan meant that the retirement was rushed; and the retirement must have been rushed because NextEra's second investigation had discovered some truth to the media allegations. That speculative chain of reasoning does not make a corrective disclosure. *See Amedisys*, 769 F.3d at 322. And even with that speculation, appellants still have a mismatch between the alleged corrective disclosure and the alleged misstatements: the release of new information to the market about "problems with the retiree's work" does not show that a company's previous denials of particular allegations of specific conduct were false; indeed, it does not even show that the resignation was related to the alleged wrongdoing.

Appellants argue that the district court erred by "crediting NextEra's claim that Silagy's resignation was due to a long-planned retirement." Br. 47 n.2. But the district court did not blindly accept appellee's argument. Rather, the court was summarizing the contents of the announcement, which it did in order to show that "[n]othing in those statements ties back to the challenged fraudulent statements." App. 238. As the court noted, there was "no allegation that investors were ever told that the alleged misconduct had in fact occurred in connection with Silagy's departure." *Id.* (internal quotation marks

and citation omitted). Appellants (and some market analysts) may have relied on speculation, but that does not make the basis of their speculation a corrective disclosure.

### C.    The Florida Times-Union Article Was Not Corrective

The district court also correctly determined that the Florida Times-Union article regarding Silagy's retirement agreement, published on January 31, 2023, did not qualify as a corrective disclosure. *See* App. 237-238. Although the Times-Union article incorrectly reported that the details about Silagy's retirement agreement "had not [been] previously shared in public statements," App. 162, the entire agreement had been appended to NextEra's second Form 8-K report filed six days earlier. *See* Supp. App. 135-153. And appellants cannot deny that the market would have already incorporated the terms of the retirement agreement into NextEra's stock price by the time the Times-Union article was published. After all, appellants are proceeding on the theory that the market for NextEra's stock is efficient. *See* pp. 23-24, *supra*. And "[a]n efficient market for good news is an efficient market for bad news." *In re Merck & Co., Inc., Securities Litigation*, 432 F.3d 261, 271 (3d Cir. 2005). Because the efficient market for NextEra's stock would have incorporated all of the information about Silagy's retirement first made available by the Form 8-K report, the article's recapitulation of that information cannot have caused any decrease in share value. *See MacPhee*, 73 F.4th at 1243.

Even setting that problem aside, the article did not actually state that the clawback provision was unusual or non-customary, as appellants suggest (Br. 48). *See* App. 161-164. Instead, it observed only that it was "unclear if all the terms of Silagy's exit, including the claw back, are standard for FPL leaders." App. 163; *see* App. 238. The Bank of America analyst report to which the Times-Union article referred likewise noted that the retirement agreement "pays Silagy's full 2022 annual compensation, enables a muti-year claw back on compensation for any legal wrongdoing, and establishes a two-year non-compete," and it cited the "customary non-compete limit[ing] Silagy's ability to position himself at an adjacent utility." App. 149. Although the report described the non-compete provision as "customary," it did not suggest that the clawback provision was either standard or unusual. (In fact, clawback provisions are routine and endorsed by regulators. *See*, *e.g.*, Lisa Monaco, Department of Justice, Memorandum, *Further Revisions to Corporate Criminal Enforcement Policies Following Discussions with Corporate Crime Advisory Group* 10 (Sept. 15, 2022) <tinyurl.com/monacodojmemo>; *In re Stephen J. Easterbrook*, SEC Release No. 11,144, 2023 WL 143292, at *7 (Jan. 9, 2023).) The already public presence of a clawback provision in Silagy's severance agreement thus did not reveal any fraud to the market.

\*    \*    \*    \*    \*

All told, none of the three alleged corrective disclosures, whether taken individually or collectively, was corrective.  The first Form 8-K report informed the market that the second internal investigation was substantially complete, and it simply repeated an earlier disclosure of the possibility that the allegations reported in the media could result in adverse legal consequences or business harm.  The second Form 8-K report informed the market that Silagy notified the company the he intended to retire later that year and provided the details of his retirement agreement.  And the Florida Times-Union article commented on a provision of the retirement agreement that had already been described and made public six days earlier.  Those statements did not reveal that appellees had previously lied about FPL's involvement in ghost political candidacies; the formation or activities of Grow United; the use of Matrix-proposed funding structures to conceal political contributions; the results of the first investigation by outside counsel into FPL's dealings with Matrix; NextEra's relationship with The Capitolist; or the surveillance of Nate Monroe.  Because the alleged corrective disclosures did not actually correct the earlier alleged misstatements, the district court correctly dismissed the complaint for failure to plead loss causation.

46

## II.    APPELLANTS' REMAINING ARGUMENTS LACK MERIT

Aside from their responses in defense of their specific alleged corrective disclosures, appellants offer three broader arguments in support of reversal. None withstands scrutiny.

### A.    The District Court Was Not Required To Consider The Alleged Corrective Disclosures Cumulatively But Did So In Any Event

Appellants first contend (Br. 40-42) that the district court erred by considering their alleged corrective disclosures individually, rather than "cumulatively." Appellants are attempting to manufacture a legal error where none exists.

The primary authority appellants cite for the proposition that a court must evaluate alleged corrective disclosures "cumulatively" is a footnote in *MacPhee*. *See* Br. 40. But this Court did not say there that "cumulative" analysis is required. To the contrary, it rejected the argument that analyzing alleged corrective disclosures in discrete categories "completely strip[s] them of their context and timing." *MacPhee*, 73 F.4th at 1244 n.9 (quotation marks omitted). The Court proceeded to "explicitly consider[] all the alleged partial disclosures cumulatively" merely to dispense with the contrary argument. *Id.*

Nor does the doctrine of partial disclosures help appellants here. *See* Br. 40. Under that doctrine, a plaintiff may "show that the truth gradually leaked out into the marketplace through a series of partial disclosures." *Meyer*, 710 F.3d at 1197 (citation omitted). But even then, the complaint "must

47

state facts that show [that] those disclosures gradually revealed to the market the undisclosed truth." *Katyle*, 637 F.3d at 472-473.  After all, "[a]ny reliable theory of loss causation that uses corrective disclosures will have to show both that corrective information was revealed and that this revelation caused the resulting decline in price." *In re Williams Securities Litigation*, 558 F.3d 1130, 1140 (10th Cir. 2009).

The concept of partial disclosures is inapposite where, as here, none of the alleged corrective disclosures spoke to the subject matter of the alleged statements or revealed any new information.  If none of the identified disclosures is corrective, it matters not whether they are analyzed separately or together—zero plus zero still equals zero.

In any event, the district court *did* consider the three alleged corrective disclosures here in context.  The court began by analyzing the Form 8-K report regarding the second investigation and then considered "Silagy's retirement announcement and clawback provision" in the same section of its opinion. App. 237 (capitalization omitted).  In so doing, the court discussed the Form 8-K report regarding Silagy's retirement and the Florida Times-Union article together.  The court expressly acknowledged that appellants were arguing that Silagy's retirement announcement—"viewed in conjunction with the remainder of the January 25, 2023 disclosure"—constituted a corrective disclosure.  App. 237 (emphasis added).  And in discussing the retirement, the court

48

explicitly stated that "the balance of the January 25, 2023 disclosure"—*i.e.*, the Form 8-K disclosure on the substantial completion of the second investigation—could not "fill the gap in missing loss-causation allegations, for all of the reasons already stated." App. 238. The district court thus did not fail to consider the statements together; it merely determined that the statements did not rise to the level of a corrective disclosure.

Appellants focus (Br. 40) on the district court's statement that references to future risk in the first Form 8-K report, "standing alone," did not constitute a corrective disclosure. *See* App. 235. But that part of the district court's opinion was merely highlighting that the report disclosed only the "prospective possibility" of future exposure and thus did not disclose any corrective information. The fact that the district court, in that particular context, stated that the Form 8-K report was insufficient to constitute a corrective disclosure does nothing to overcome the thorough and contextualized analysis reflected in the order as a whole.

Appellants further contend that the district court erred because it "failed to even mention" the reactions of market analysts to the disclosures. Br. 41. But the question for purposes of loss causation is not whether some analysts speculated about connections between Silagy's retirement and the FEC investigation. The question is whether new facts revealed the falsity of

the company's previous statements. *See Meyer*, 710 F.3d at 1200. They clearly did not here.

**B.    The District Court Properly Considered The Failure Of The Alleged Corrective Disclosures To Mention The Earlier Alleged Misstatements**

Appellants separately argue (Br. 49) that the district court erred by requiring the corrective disclosures specifically to mention the earlier alleged misstatements. But appellants provide only one example in the district court's opinion where they believe the court applied that rule: namely, where the court stated that the Form 8-K report regarding NextEra's second investigation "does not reference" the specific misstatements it purports to correct (in the course of concluding that the report does not "correct[] the prior alleged misstatements on which [appellant] relies or suggest[] that any such prior statements were false or fraudulent"). App. 234. At the same time, the district court independently held that the report was not corrective because it merely duplicated information in the November 2022 Form 10-Q report and because it disclosed only potential future risks.

In any event, the district court's analysis was appropriate. As explained above, *see* pp. 24-25, a corrective disclosure must "share the same subject matter as the prior misstatement; only then can the disclosure be said to have a '*corrective* effect,' rather than merely a '*negative* effect.'" *FindWhat*, 658 F.3d at 1311 n.28; *see MacPhee*, 73 F.4th at 1243. Here, as already explained, *see*

50

pp. 26-27, the Form 8-K report regarding the second investigation did not discuss the subject matter of the alleged false or misleading statements.  The Form 8-K report thus did not reveal any factual information about that subject matter that "was previously concealed or obscured by the company's fraud." *Meyer*, 710 F.3d at 1196.  And without any such factual connection, appellants cannot establish that the report actually corrected the allegedly false or misleading information in the earlier statements.

## C.     Appellants Cannot Proceed On Their Alternative Theory Of Loss Causation

Finally, appellants fleetingly propose an alternative theory of loss causation (Br. 53-55):  namely, that the decrease in NextEra's stock price constituted the materialization of a previously concealed risk.  Under that theory of loss causation, no corrective disclosure would be required to cause the drop in stock price; instead, plaintiffs could rely on price drops supposedly caused by "negative investor inferences" untethered to any actual disclosure.  Br. 53.

Appellants contend that, "[b]y insisting that the allegations against FPL and Silagy were baseless," NextEra "concealed a risk that materialized" when Silagy retired.  Br. 53-54.  To support their contention, appellants point to the market's alleged perception of the retirement as "an implicit acknowledgement of NextEra's potential liability and exposure for his past wrongdoing." Br. 54.  Appellants argue that "it was foreseeable that the market then would devalue NextEra's stock when Silagy resigned." *Id.*

51

As a threshold matter, appellants did not adequately raise that theory of loss causation before the district court. They identified it only in a footnote in their opposition to the motion to dismiss, which is insufficient. *See* App. 196 n.9; *Lavigne* v. *Herbalife, Ltd.*, 967 F.3d 1110, 1120 n.7 (11th Cir. 2020). In addition, this Court has never adopted that theory of loss causation. *See Hubbard* v. *BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 726 n.25 (11th Cir. 2012); *Sapssov* v. *Health Management Associates, Inc.*, 608 Fed. Appx. 855, 861 n.7 (11th Cir. 2015). A case in which the plaintiff forfeited that theory (and briefed it only fleetingly on appeal) should not be the first case in which the Court adopts it.

In any event, appellants have failed adequately to plead facts supporting the materialization-of-the-risk theory. They identify Silagy's announced intent to retire and the clawback provision in his retirement agreement only as *evidence* of FPL's purported fraudulently concealed wrongdoing; they do not identify the retirement *itself* as fraudulently concealed wrongdoing. In other words, appellants are not arguing that the retirement was a concealed risk that subsequently materialized. And because neither the fact of Silagy's intent to retire nor the existence of the clawback provision revealed any information that had previously been concealed, *see* pp. 23-24, *supra*, appellants have failed

52

to link the stock decline to any disclosure related to the subjects of the challenged statements—under any theory of loss causation.  *See Omnicom*, 597 F.3d at 514.

*   *   *   *   *

All told, appellants failed to identify any public disclosures that could have "corrected" appellees' alleged misstatements.  The alleged corrective disclosures did not speak to the subject matter of the misstatements or provide the market with any new and corrective information.  That leaves appellants with nothing more than decrease in stock value.  But as this Court has made clear, a loss in value does not automatically imply fraud, and the federal securities laws do not provide insurance against market losses.  Because appellants failed to identify any true corrective disclosures, they failed to plead loss causation.  That failure was fatal to their claims.

53

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Kannon K. Shanmugam

DANIEL J. KRAMER
AUDRA J. SOLOWAY
JOSHUA HILL
DAVID P. FRIEDMAN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
BENJAMIN M. MILLER-GOOTNICK
REGINA C.E. FAIRFAX
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

ANNA M. STAPLETON
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *535 Mission Street, 25th Floor*
  *San Francisco, CA 94105*

MAY 29, 2025

54

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, a member of the Bar of this Court and counsel for appellees, hereby certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and 32(a)(7), that the attached brief is proportionately spaced, has a typeface of 14 points or more, and contains 12,165 words.

MAY 29, 2025

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

55