# In the United States Court of Appeals for the Eleventh Circuit

---

CITY OF HOLLYWOOD POLICE OFFICERS RETIREMENT SYSTEM and
THE PEMBROKE PINES FIREFIGHTERS AND POLICE OFFICERS PENSION FUND,
individually and on behalf of all others similarly situated,
*Plaintiffs-Appellants,*

v.

NEXTERA ENERGY, INC., et al.,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 9:23-cv-80833-AMC (The Hon. Aileen Cannon)

---

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

---

JEFFREY CRAIG BLOCK
JACOB A. WALKER
BRENDAN JARBOE
MARK BYRNE
Block & Leviton, LLP
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600

MATTHEW W.H. WESSLER
DEEPAK GUPTA
ROBERT FRIEDMAN
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(202) 888-1741
*jessie@guptawessler.com*

July 18, 2025                                    *Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26(b) and Eleventh Circuit Rule 26.1, NextEra Energy, Inc. (NYSE: NEE), is the parent company for Defendant-Appellee Florida Power & Light. Plaintiffs-Appellants City of Hollywood Police Officers Retirement System and the Pembroke Pines Firefighters and Police Officers Pension Fund are both private entities with no parent corporations and therefore have nothing to declare in a Corporate Disclosure Statement pursuant to FRAP 26.1(a) and/or Eleventh Circuit Rule 26.1-2(a).

Pursuant to 11th Cir. R. 26.1-3(b), counsel for plaintiffs-appellants certify that, in addition to those set forth in its principal brief and defendants-appellees' brief, the following persons and entities may have an interest in the outcome of this appeal:

1.    Robert D. Friedman

Dated: July 18, 2025

/s/ Matthew W.H. Wessler
Matthew W.H. Wessler

# TABLE OF CONTENTS

Table of citations ................................................................................................ ii

Introduction ....................................................................................................... 1

Argument ........................................................................................................... 3

    I.    NextEra wrongly frames the issue as about proof of wrongdoing rather than risk exposure...................................................................... 3

    II.    NextEra's counterarguments are divorced from the purpose of alleging a corrective disclosure and are at odds with the record........... 7

        A.    This Court's precedents require a cumulative analysis............... 7

        B.    Disclosures need not reference prior misstatements to be corrective................................................................................ 10

        C.    There is no per se rule that risk-based disclosures cannot be corrective. ........................................................................... 16

        D.    The timing of a stock drop can inform whether a disclosure is corrective............................................................. 19

        E.    The disclosures revealed new information. ............................... 22

    III.    To dodge the funds' alternative loss-causation theory, NextEra asks this Court to split from ten circuits and ignore the complaint's allegations. ................................................................... 25

Conclusion ....................................................................................................... 27

# TABLE OF CITATIONS

## Cases

*Alaska Electrical Pension Fund v. Flowserve*,
　572 F.3d 221 (5th Cir. 2009) ............................................. 11

*Espy v. J2 Global, Inc.*,
　99 F.4th 527 (9th Cir. 2024) ........................................ 12, 13

*FindWhat Investor Group v. FindWhat.com*,
　658 F.3d 1282 (11th Cir. 2011) ................................ 5, 9, 10, 11

*Grigsby v. BofI Holding, Inc.*,
　979 F.3d 1198 (9th Cir. 2020) ................................ 3, 4, 11, 17

*Hubbard v. BankAtlantic Bancorp, Inc.*,
　688 F.3d 713 (11th Cir. 2012) ...................................... 22, 25

*In re Genius Brands International, Securities Litigation*,
　97 F.4th 1171 (9th Cir. 2024) ...................................... 11, 18

*In re Gilead Sciences Securities Litigation*,
　536 F.3d 1049 (9th Cir. 2008) .......................................... 12

*In re Harman International Industries Securities Litigation*,
　791 F.3d 90 (D.C. Cir. 2015) .......................................... 8, 9

*In re Omnicom Group*,
　597 F.3d 501 (2d Cir. 2010) ........................................ 15, 24

*In re Vivendi, S.A. Securities Litigation*,
　838 F.3d 223 (2d Cir. 2016) ..................................... 3, 4, 17

*In re Williams Securities Litigation*,
　558 F.3d 1130 (10th Cir. 2009) ......................................... 11

*Katyle v. Penn National Gaming, Inc.*,
　637 F.3d 462 (4th Cir. 2011) ...................................... 12, 13, 18

*Lloyd v. CVB Financial Corp.*,
　811 F.3d 1200 (9th Cir. 2016) ............................... 4, 17, 20, 24

*Luczak v. National Beverage Corp.*,
　812 F. App'x 915 (11th Cir. 2020) ..................................... 8

*MacPhee v. MiMedx Group, Inc.*,
73 F.4th 1220 (11th Cir. 2023) ........................................................ 8, 9, 11

*Massachusetts Retirement System v. CVS Caremark Corp.*,
716 F.3d 229 (1st Cir. 2013) .......................................................... 12, 14, 24

*McDonald's Corp. v. Easterbrook*,
2021 WL 351967 (Del. Ch. 2021) ................................................................ 25

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ................................................ 8, 11, 17, 23, 24

*Mineworkers' Pension Scheme v. 1st Solar*,
881 F.3d 750 (9th Cir. 2018) ................................................................... 9

*Norfolk County Retirement System v. Community Health Systems, Inc.*,
877 F.3d 687 (6th Cir. 2017) .............................................................. 8, 20

*Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*,
830 F.3d 376 (6th Cir. 2016) .................................................................. 26

*Public Employees Retirement System v. Amedisys*,
769 F.3d 313 (5th Cir. 2014) ........................................................... 8, 14, 15

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) .................................................................. 24

*United States v. Stein*,
889 F.3d 1200 (11th Cir. 2018) ................................................................ 27

## Rules and Regulations

17 C.F.R. § 229.105 ........................................................................... 22

## Other Authorities

Kovvali & Macey,
*The Corporate Governance of Public Utilities*, 40 Yale J. on Regul. 569 (2023) .......... 19

McClam,
*NextEra Shares Post Biggest Drop on S&P 500 After CEO Exit*, Bloomberg:
First Word, Jan. 25, 2022 .................................................................... 21

SEC,
*Investor Bulletin: How to Read an 8-K*, https://perma.cc/F4DE-C54S ................. 22

# INTRODUCTION

The central question in this appeal is whether the funds have adequately alleged a "corrective disclosure." Put differently, did the market receive new information that allowed it to understand, for the first time, the falsity of NextEra's prior statements downplaying the legal exposure and reputational risk it faced from allegations of election interference? To answer that question in the affirmative, the funds have pointed to NextEra's admission of a material change in its "risk factor" related to the public allegations; the "unexpected" announcement that the CEO at the center of those allegations would be retiring—an announcement that analysts described at the time as "difficult to separate" from the election allegations; and the revelation that his retirement package included a "unique" claw-back provision if he were found to have engaged in wrongdoing. It's hard to say, at the pleading stage, that it's not *plausible* that the market understood that information, collectively, to mean that NextEra's risk of legal exposure was greater than previously known.

So NextEra tries to render that conclusion irrelevant. It claims (at 36) that it never "even suggest[ed]" anything about its risk (only that it didn't engage in the alleged conduct), so there is a "mismatch" between the disclosures and its statements. *That* is implausible. As NextEra admits, its statements must be viewed from the vantage of the "reasonable investor," and any reasonable investor would understand the company's repeated assertions that the allegations of wrongdoing were "patently

false" and had "no basis" to convey a message about risk. The complaint squarely alleges as much—and so NextEra's January 2023 disclosures that remedied the markets' misperception of the company's risk were "corrective."

None of NextEra's remaining arguments, even if applied to the funds' actual theory, undermines that conclusion. Most ask this Court to depart from a fact-specific inquiry in favor of categorical rules that would do little to help a reviewing court evaluate what actually matters: whether the market plausibly learned the truth from a disclosure. NextEra urges the Court to review the disclosures in isolation, without regard to how the market evaluates them—together. It contends that, to be corrective, a disclosure must expressly mention the misstatement at issue, a rule that would deny that a sophisticated and efficient market is capable of reading between the lines. It argues that disclosures about "potential future risk" cannot "qualify as a corrective disclosure as a matter of law," even though downplaying risk can artificially inflate stock prices just as much as any other misstatement. And it says the close timing of a stock drop is somehow per se irrelevant to determining whether the market understood disclosures as innocent or corrective. After that, all that's left is the company's flawed assertion that its disclosures added nothing new to the market despite the disclosures appearing as Form 8-Ks—SEC filings required for new material changes.

This Court should reverse.

## ARGUMENT

### I. NextEra wrongly frames the issue as about proof of wrongdoing rather than risk exposure.

**1.** NextEra's defense of the judgment below turns on a false premise. The company repeatedly asserts that, to prevail, the funds must show that a disclosure "admi[tted] that wrongdoing in fact occurred." NextEra Br. 34; *id.* at 20 (contending that the disclosures are not corrective because they did not "report that [NextEra] had engaged in any of the conduct it had previously denied"); *id.* at 27 (arguing that the first 8-K is not corrective because it did not "reveal that FPL had funded ghost political candidates").

That gets the issue wrong. The funds need not show that the disclosures conclusively revealed NextEra's wrongdoing to properly plead loss causation. Although that, too, would be entirely plausible based on the complaint, all that the funds must allege is that the disclosures revealed that NextEra's risk was materially greater than it had previously led the investing public to believe. To state the obvious: If a company "lie[s] about its risk" to inflate its stock price, and then later disclosures "revealing the truth about the company's *risk* … cause[] investors to lose money," the fraud caused the investors' loss. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 263 (2d Cir. 2016).

Consider, for example, *Grigsby v. BofI Holding*, 979 F.3d 1198, 1208 (9th Cir. 2020). There, the defendant-bank, faced with media scrutiny, denied any knowledge of a

federal investigation into money-laundering at the bank, lulling the market into a rosier understanding of its potential risk. *Id.* at 1203, 1208. When a subsequent article revealed that the bank had, in fact, been under investigation for 16 months and thereby revealed the true extent of the company's legal exposure, that (along with the stock dropping 4.57% the same day) was sufficient to show loss causation—even though the article never revealed, as NextEra puts it, that "wrongdoing in fact occurred." *See id.*; *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (announcement that SEC had issued subpoena was a corrective disclosure because it revealed that company's statements that it had "no serious doubts" about debtor's ability to repay loans were misleading). That's basic common sense. False statements about risk, just like false statements about wrongdoing, can artificially inflate a stock price and, as a result, once revealed, "cause[] investors to lose money." *Vivendi*, 838 F.3d at 263.

**2.** To justify its position that the funds must point to disclosures revealing "wrongdoing in fact occurred," NextEra claims (at 20, 36) that any change in its risk outlook revealed by the January disclosures suffers from a "mismatch" with the company's prior statements. As NextEra sees it (at 36), its prior statements only denied wrongdoing without ever "even suggest[ing]" that "FPL would eventually be cleared of all wrongdoing related to the media allegations." In other words, NextEra

contends that there was nothing to "correct" because it never conveyed anything to the market about its risk.

That cannot be reconciled with the complaint. As our opening brief recounted (at 24), the funds squarely alleged that NextEra's misstatements, collectively, "served to mislead the market" regarding whether NextEra "was in fact exposed to reputational and legal risks" and, as a result, "artificially inflated" the stock price with an "unrealistically positive assessment." A89-90. In other words, the complaint alleges that the company's denials very much—and contrary to NextEra's self-serving characterization—"suggested" that the company's risk was nonexistent.

To see why, consider the message the company's misstatements sent. As NextEra acknowledges (at 34), what message has been conveyed is judged by how a "reasonable investor" would understand it. *See FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1306 (11th Cir. 2011). And here, the reasonable NextEra investor heard over and over—from NextEra's CEO (Robo), its chief communications officer (Reuter), and the CEO of its principal subsidiary (Silagy)—that there was no factual basis at all to the allegations of election interference. To take just a few examples, NextEra executives stated that (1) the allegations pertaining to ghost candidates were "patently false"; (2) the company had "no involvement" with Grow United, the shell set up to facilitate covert expenditures; and (3) there was "no evidence of any issues *at all*, *any* illegality or *any* wrongdoing on the part of FPL or *any* of its employees." A81-86

(emphasis added). Any reasonable investor hearing these repeated denials—flat-out *categorical* denials—would understand them to convey that the risk of exposure was nonexistent or, at a minimum, quite low. If nothing else, a reasonable investor would understand the denials from Silagy about his *own* alleged wrongdoing to convey that there was no risk: When a person says "*I* didn't do it," no reasonable listener thinks that means "I have seen no evidence I did it, but there may be some risk that I did." NextEra is thus wrong to assert that the misstatements at issue in this case did not concern the company's risk outlook.

**3.** With the issue properly framed, it is clear that the funds have adequately alleged a corrective disclosure. As just described, for over a year, NextEra categorically denied the existence of any evidence of meddling with local elections, severely downplaying the company's risk. A89-90. The January 2023 disclosures, however, painted a far different picture. With its investigation "substantially complete," the company found it necessary to file a Form 8-K reporting a new "risk factor" due to the possibility of enforcement and finding of a violation of law. A124-25; Supp.App.128. For the first time, that disclosure also contained a "tacit admission" that NextEra had made nearly $1.3 million in dark-money contributions. A91. And a separate same-day disclosure revealed the retirement of the executive at the center of the allegations of wrongdoing along with an unusual claw-back provision in his retirement package for illegal activity—"unexpected" news that the market

understood as "difficult to separate from recent political controversies." *See* A28, A93-94. The complaint thus plausibly alleges that the new disclosures corrected the market's misunderstanding of NextEra's risk profile. And along with the uncontestable stock drop and the absence of any alternative explanation for the stock-price freefall, that is sufficient to plead loss causation.

## II. NextEra's counterarguments are divorced from the purpose of alleging a corrective disclosure and are at odds with the record.

None of NextEra's arguments, even if redirected at the proper target, undercut that conclusion. At the outset, the company, like the district court, improperly attacks the disclosures in isolation, rather than confronting their cumulative effect—as this Court's precedent requires and as the market, in the real world, interprets disclosures. From there, the company marshals four faulty arguments. First, NextEra wrongly contends that, to be corrective, a disclosure must reference the prior misstatements. Second, it asserts that disclosures about future risks can *never* be "corrective." Third, NextEra insists that no inference can be drawn from the close timing of its share price plummeting. And fourth, NextEra argues that the information in the disclosures could not be corrective because it was not "new." All fail.

### A. This Court's precedents require a cumulative analysis.

NextEra's initial attempt to write off the significance of the disclosures suffers from the same flaw the district court committed—isolating each of the disclosures

and analyzing them individually. As our opening brief described (at 40-41), this Court has repeatedly explained that a "series of partial disclosures" may supply the market with "corrective" information just as much as a single disclosure. *See Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013); *MacPhee v. MiMedx Grp.*, 73 F.4th 1220, 1244 n.9 (11th Cir. 2023); *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 922 (11th Cir. 2020). Court after court agrees. *See Pub. Emps. Ret. Sys. v. Amedisys*, 769 F.3d 313, 324 (5th Cir. 2014); *In re Harman Int'l Indus. Sec. Litig.*, 791 F.3d 90, 110 (D.C. Cir. 2015); *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys.*, 877 F.3d 687, 695-96 (6th Cir. 2017). That's because, when the market (like any reasonable person) processes information, "the whole" can be "greater than the sum of its parts." *Amedisys*, 769 F.3d at 323-24.

NextEra responds to this uniform precedent largely by ignoring it. It has nothing to say about the consensus approach of other circuits. And all it can muster (at 47) in response to this Court's understanding is that *MacPhee* analyzed disclosures cumulatively but never expressly said that doing so "is required."

That's wrong on its own terms. *MacPhee* explained that a court "err[s]" by analyzing a series of partial disclosures in a way that "strip[s] them of their context and timing." *MacPhee*, 73 F.4th at 1244 n.9. And it also ignores *Luczak*, which applies that teaching and which NextEra never mentions. 812 F. App'x at 923 (reversing for "fail[ure] to analyze [the plaintiff's] complaint as alleging a series of partial disclosures").

More fundamentally, NextEra's unpersuasive parsing of *MacPhee* misses the point of alleging a corrective disclosure. A corrective disclosure is not a requirement of a 10b-5 claim. *See Mineworkers' Pension Scheme v. 1st Solar*, 881 F.3d 750, 754 (9th Cir. 2018). Instead, it is a tool that courts use to assess the element of loss causation. *Id.* If the stock dropped at the same time as the market learned the truth about the fraud (that is, at the same time as a "corrective disclosure"), that supports the conclusion that it was the fraud that generated the plaintiffs' injuries. By contrast, if the stock dropped long after the market learned the truth, or when the truth had not yet been revealed, the stock drop—and the plaintiff's injury—is surely attributable to something other than the fraud. A corrective disclosure, in other words, is "circumstantial[]" evidence of loss causation. *FindWhat*, 658 F.3d at 1311. That circumstantial proof is no less forceful when the truth is revealed in multiple disclosures—especially, as here, two issued minutes apart on the same day and a third within a week. That's why every court to consider the issue has concluded that the "appropriate inquiry" is whether the disclosures "taken as a whole, plausibly revealed to the market" the truth of a company's misstatements. *Harman*, 791 F.3d at 110.[1]

_____

[1] NextEra briefly asserts (at 48) that the district court did assess the disclosures cumulatively. Even if true, that wouldn't salvage NextEra's flawed arguments in this Court, which take a disclosure-by-disclosure approach. Regardless, NextEra's reimagining of the district court's opinion doesn't withstand scrutiny. NextEra first

**B.    Disclosures need not reference prior misstatements to be corrective.**

In addition to improperly assessing each disclosure in isolation, NextEra also tries to apply the wrong legal rules to them. That begins with its strained interpretation of this Court's requirement that a disclosure "share the same subject matter as the prior misstatement … to have a '*corrective* effect.'" *FindWhat*, 658 F.3d at 1311 n.28. According to NextEra (at 27), to satisfy this requirement, it isn't enough if a later disclosure bears "a general relationship with the contents of the earlier alleged misstatements"; it must "relate back" with "sufficient specificity." Although NextEra is initially circumspect about what precisely this means, its arguments make clear that its standard is the same as the district court's: For a disclosure to be corrective, it must "mention the earlier alleged misstatements." NextEra Br. 50; (asserting that it was "appropriate" for the district court to impose this requirement); *id.* at 39-40 (arguing that the 8-K was not corrective because it did not "reference" misstatements). So, to take one example, in NextEra's view (at 50), because the

─────────────────────

asserts (at 48) the court considered the disclosures "in the same section of its opinion." But that just shows a brief analysis, not a cumulative one. Nor does the district court's comment that "the balance of the" first Form 8-K could not "fill the gap in missing loss-causation allegations" in the second Form 8-K show otherwise. According to the court, the first 8-K did not "fill the gap" only for the "reasons already stated." A238. In other words, the district court concluded that, because the first 8-K didn't do the trick on its own ("the reasons already stated"), it couldn't save the (purported) failure of the second 8-K to do it on its own either. *See id.* That's also not a cumulative analysis—it's a restating of a disclosure-by-disclosure analysis.

complaint alleges that NextEra falsely denied that FPL funded ghost candidates, a corrective disclosure, to "share the same subject matter," must expressly address ghost candidates. The result of NextEra's theory is that only disclosures expressly refuting prior misstatements qualify; disclosures that only impliedly reveal falsehoods don't. NextEra's heightened standard finds no support in the law.

**1.** Our opening brief explained (at 50) that this Court has said—three times—that corrective disclosures "need not precisely mirror the earlier misrepresentation." *FindWhat*, 658 F.3d at 1312 n.28; *MacPhee*, 73 F.4th at 1243 (same); *Meyer*, 710 F.3d at 1197. Courts around the country agree. *See, e.g.*, *In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009); *Grigsby*, 979 F.3d at 1207-08; *Alaska Elec. Pension Fund v. Flowserve*, 572 F.3d 221, 230 (5th Cir. 2009). The point of requiring that the disclosure share the same subject matter is just to ensure that it's not introducing "some *other* negative information about the company," *MacPhee*, 73 F.4th at 1243 (emphasis added), not to impose a formalistic pleading requirement.

That is because, to repeat, the question courts are ultimately trying to answer is whether the disclosure plausibly revealed the truth. To be sure, that's more easily satisfied when the disclosure expressly refutes the prior misstatement. But as courts routinely recognize, it can be done when "the market understood," given the context of the disclosure, that it impliedly reveals the falsity of the prior statements, too. *In re Genius Brands Int'l, Sec. Litig.*, 97 F.4th 1171, 1188 (9th Cir. 2024) (announcement of "key

business development" that said nothing about a sale caused "investors [to] underst[an]d" that prior statements that the company may be bought were false); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (poor financial report following FDA warning letter months earlier about illegal marketing served as corrective disclosure of company's false claims of legal marketing); *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013) (disclosure was corrective because it "impl[ied] problems with" prior misstatement).

**2.** Although we explained in our opening brief (at 50) that the case law rejects NextEra's (and the district court's) rule, NextEra has nothing to say about those decisions. Instead, NextEra points (at 26-27) to two other cases—*Espy v. J2 Global*, 99 F.4th 527 (9th Cir. 2024), and *Katyle v. Penn Nat'l Gaming*, 637 F.3d 462 (4th Cir. 2011)—that it claims support its invented heightened specificity requirement. But both cases, in fact, recognized that a corrective disclosure "need not precisely mirror the earlier misrepresentation." *Espy*, 99 F.4th at 540; *Katyle*, 637 F.3d at 472 (a corrective disclosure need not be a "fact-for-fact disclosure of the relevant truth").

And nothing in either court's reasoning is to the contrary. *Espy* concerned a company that used an "acquisition model to grow its business." 99 F.4th at 533. Over time, it acquired 186 businesses and placed them into one of two divisions, reporting the financials for each division at an aggregate level rather than acquisition-by-acquisition, a practice known as consolidated accounting. When a short-seller report

criticized the company for using consolidated accounting and a "legacy eFax business to prop the financials," the plaintiffs sued, claiming that was a corrective disclosure that revealed two particular acquisitions had underperformed. *Id.* at 541. *Espy*'s rejection of that claim didn't turn on a general requirement that corrective disclosures must specifically mention the misstatements at issue; it instead reflected the unremarkable conclusion that "generalized criticism" of a business's consolidated financials could not plausibly be understood to specifically impugn two of 186 different acquisitions. *Id.*

*Katyle* is just as off-base. It involved the termination of a planned leverage buyout announced before the 2008 financial crisis and abandoned in the midst of it. The plaintiffs claimed that, for months, the target company (to prop up the stock price) gave false hope to the market that the transaction would be completed by issuing a series of press releases announcing state-regulatory approvals. The plaintiffs then argued that the market learned the truth (that the target knew months earlier that the deal would never close) when other states delayed determining whether to approve the deal. *Id.* at 468-69. The Fourth Circuit unsurprisingly held that regulatory delays in the middle of a burgeoning financial crisis did not expressly or "even inferentially suggest" that the deal was already off months earlier when the company issued its press releases about other states. *Id.* at 474-76. That does not support NextEra's proposed rule. To the contrary, *Katyle*, just like *Espy*, stands for the

routine application of the plausibility standard. Here the disclosures both expressly and "inferentially" refute NextEra's prior messaging about risk.

**3.** NextEra's flawed attempt to apply its rule to the disclosure of Silagy's retirement illustrates both the absence of support for the rule and the problems with it. NextEra claims (at 39-41) that the retirement announcement cannot be corrective because it did not "reference" any misstatements. Without such a "reference," NextEra contends, any inference of fraud drawn from the resignation would be impermissible "speculation" that "cannot establish loss causation."

That again misses the point of the corrective disclosure inquiry. There is no reason why, in the real world, a suspiciously timed retirement (announced at the same time as a change in risk factor with a suspicious claw-back clause in the retirement package) cannot permit an inference that a company's risk is greater than previously let on. Courts have thus recognized that, depending on context and timing, "resignations" of key executives *can* disclose "possible fraud" to the market. *Amedisys*, 769 F.3d at 322. And that approach means that allegations that a retirement is "corrective" are plausible when, as here, contemporaneous analyst commentary shows that the market found it suspicious that the executive at the center of the alleged fraud retired "sudden[ly]" to the "surprise" of the market without "a successor" in place. *Caremark*, 716 F.3d at 241.

NextEra points to two more cases as support for its contrary and categorical rule, but neither applies it. Certainly, neither demands that a resignation "reference" misstatements to be corrective. And although NextEra correctly observes that, in *In re Omnicom Group*, the Second Circuit concluded that two professors' "suspicions" about the timing of a resignation did not support loss causation in that case, the reason was that the problems the resignation supposedly revealed "were known a year before"—not because resignations are per se irrelevant. 597 F.3d 501, 514 (2d Cir. 2010).

NextEra also cites (at 42) *Amedisys* for the proposition that "speculation of wrongdoing cannot by itself arise to a corrective disclosure," but *Amedisys* decisively undercuts NextEra's rule. Not only does that language address the plaintiffs' reliance on a short-seller report that *declined* to conclude that the company was committing fraud, the very next section of the opinion expicitly holds that the close timing between resignations and a stock drop, even if not sufficient on its own, "may constitute a portion of the totality" to be considered in assessing when the market learned the truth. 769 F.3d at 322-23. That's all the funds ask for here.

**4.** Assessed under the proper standard, the disclosures here sufficiently relate to NextEra's misstatements to satisfy this Court's "same subject matter" requirement, including its underlying purpose: ensuring that the disclosures did not merely introduce entirely unrelated negative information. The company's

misstatements all concern denials of any attempt to interfere with local elections, including statements specifically refuting media coverage of allegations about that interference. A81-87. And, the funds allege, those statements, collectively, misled the market about the extent of NextEra's risk. A89-90. The first 8-K, in turn, disclosed a "risk factor" that NextEra may face fines and reputational damage related to those very same allegations of "Florida state and federal campaign finance law violations," "among other things," discussed in "media articles." Supp.App.128; A125. And market analysts uniformly understood that the disclosure of Silagy's retirement, so closely timed with the disclosed risk of enforcement action, related back to those denials as well, *see infra* 21-23, further ruling out the possibility that the disclosures were viewed as completely distinct negative information. In short, by disclosing the true extent of NextEra's risk, the disclosures addressed the same issue (the extent of NextEra's risk) as the original statements.

**C.  There is no per se rule that risk-based disclosures cannot be corrective.**

NextEra also tries to escape the consequences of the corrective effect of its new risk disclosures by proposing (at 19) a bright-line rule for disclosures of risk: that they cannot, "as a matter of law," be corrective because they only disclose a "risk of future corrective action." But as described above, far from failing "as a matter of law," allegations that a company disclosed a risk following false statements understating

that risk are a widely accepted means of establishing loss causation. *See, e.g., Grigsby*, 979 F.3d at 1208; *Lloyd*, 811 F.3d at 1210; *Vivendi*, 838 F.3d at 262.

NextEra invites this Court to adopt its outlier proposal in two ways. Both are wrong.

First, NextEra claims at (29-30) that this Court already held as much in *Meyer*. That misunderstands the decision. In *Meyer*, the plaintiffs claimed that the defendant's accounting "overstated its real estate holdings." 710 F.3d at 1193. To prove loss causation, the plaintiffs pointed to the commencement of an SEC investigation, emphasizing that the stock dropped after the investigation was disclosed. *Id.* at 1201. This Court rejected the plaintiffs' reliance on the announcement of an investigation as a corrective disclosure because, "standing alone," it said nothing about the defendant's accounting practices. *Id.* 1201-02 & n.13. In other words, the "announcement of an investigation reveals just that—an investigation—and nothing more." *Id.* at 1201.

This case is nothing like *Meyer*. To start, the disclosures here followed NextEra's repeated denials of any wrongdoing and, thus, of risk—a fact entirely missing from *Meyer*. And the disclosures here did not merely reveal, as in *Meyer*, the *commencement* of an investigation. They revealed the *outcome*: NextEra announced a change in risk factor; the CEO of its most important subsidiary—and a figure at the center of the investigation—revealed he was resigning with no long-term successor

in place; and the company included an unusual provision in his severance package that allowed it to claw-back funds after findings of wrongdoing.

Second, NextEra claims (at 34-35) that "no reasonable investor" would infer from an acknowledgment of risk that the company's prior statements were false. Pointing once more to *Katyle*, NextEra claims that such an inference would, in effect, seek to "prove loss causation by pointing to the absence of information," but, NextEra asserts, the "non-announcement of positive news" cannot be "corrective."

That's wrong. To start, the funds aren't asserting that the market drew an inference from silence. They allege, instead, that the market took at face value NextEra's express change in its risk factor and further took into account other new indications of risk, namely, the company's acknowledgement, for the first time, of nearly $1.3 million in local campaign contributions and Silagy's "rushed" resignation. A91, 100.

NextEra also misunderstands *Katyle*. The plaintiffs in that case (advancing an alternative theory from the one discussed above) argued that the decision not to issue a press release about a regulatory success was indicative of fraud. 637 F.3d at 476. In other words, they sought to draw an inference from *actual* positive news that had not been shared. But when, as here, a disclosure on the relevant subject matter does not include positive news because *no such news exists*, courts have concluded that the disclosure *can* be corrective. *See, e.g.*, *Genius Brands*, 97 F.4th at 1188 (announcement of

"key business development" that said nothing about a previously—and falsely—hinted-at sale was corrective).

* * *

Bottom line: Section 10b-5 claims exist to allow stockholders to seek redress when a company makes false statements to artificially inflate its share price. False statements about risk exposure can yield that injury just as much as any other false statement. That's especially true here because, as the complaint alleges, utilities like NextEra are attractive investments precisely because they are supposed to be "safe, secure, and non-volatile"—a quality that is necessary given their frequent interaction with regulators. A26-27. A risk of misconduct therefore threatens the profitability of utilities more than the average of company. *See* Kovvali & Macey, *The Corporate Governance of Public Utilities*, 40 Yale J. Regul. 569, 592 (2023). There is no carveout for claims, like the one here, that lie at the core of what the securities laws are designed to address simply because the misstatement concerns risk.

### D. The timing of a stock drop can inform whether a disclosure is corrective.

NextEra proposes (at 38-39) one more categorical rule: that the drop in a company's stock—here, a same-day $14 billion dive—cannot serve as circumstantial evidence that the disclosures at issue are corrective. Pointing to a decrease in share value, NextEra says, "proves too much" because it would mean that every stock drop would be actionable.

Here, too, NextEra loses sight of the ultimate inquiry: determining whether the funds plausibly alleged that the market learned the truth through the disclosures. Common sense teaches that the close timing of a drop in value can inform whether disclosures revealed the truth to the market. While NextEra is correct that a drop in value is insufficient on its own, courts don't hesitate to look to how the market reacted to a disclosure to ascertain whether it was corrective. *See, e.g.*, *Norfolk*, 877 F.3d at 696 ("Taken together, these disclosures—*and the speed at which Community's share price fell after them*—make it at least plausible that the disclosures had something to do with the Funds' losses." (emphasis added)); *Lloyd*, 811 F.3d at 1210-11 (holding plaintiffs adequately alleged the market understood disclosure of subpoena corrected misstatements about a debtor's ability to pay because stock had dropped at that point rather than when company directly wrote off the loan).

Falling back, NextEra suggests (at 39) that there is an innocent explanation for the stock drop, pinning it all on the market's purported disappointment that Silagy was retiring. After all, NextEra says, the stock also dropped when Robo's retirement was announced a year earlier.

That doesn't work. To make that argument, NextEra reaches outside the complaint, which never mentions Robo's retirement announcement. And because of that, the complaint also never addresses the reasons why the two announcements are different, starting with the fact that, on the same day Robo's retirement was

announced, NextEra reported financial results that were 14.6% short of investor expectations. McClam, *NextEra Shares Post Biggest Drop on S&P 500 After CEO Exit*, Bloomberg: First Word, Jan. 25, 2022. By contrast, when Silagy's retirement was announced, the company shared "solid [financial] numbers" "in-line with expectations"—yet Silagy's still caused a greater drop. A93.

Nor does NextEra fare any better in its conclusory assertion (at 41) that the funds have not pleaded any facts to support an inference that Silagy's retirement was anything but "legitimate." The *market* drew that precise inference, A28, 94, 100, and it was certainly plausible given the same-day risk-factor change and the absence of a long-term successor. NextEra claims that the contemporary analyst reports were more "circumspect" than the funds suggest, pointing (at 42) to the Evercore report's observation that "NextEra 'stated that his retirement is not related'" to the political activity. But NextEra omits what came at the beginning of that sentence in Evercore's report: that investors had "concerns about the timing of Silagy's retirement given the campaign finance allegations against FPL, *even though* NextEra stated" it was unrelated. Supp.App.177 (emphasis added). NextEra of course said that, but the market didn't buy it.

In any event, NextEra will have an opportunity to prove its conjecture that the market cared about Silagy's exit and nothing more, but it is not the most plausible, let alone the *only*, inference to be drawn from the complaint.

### E.     The disclosures revealed new information.

NextEra also contends that the disclosures, even if corrective, weren't new. This, too, fails.

**1.** NextEra argues (at 25) that the 8-K addressing its investigation revealed nothing to the market because everything in it had already been disclosed in a Form 10-Q quarterly report the preceding November. That's simply wrong.

The company's 10-Q explicitly disclaimed the existence of any risk factors worth reporting. It announced that "[t]here have been *no material changes* from the risk factors disclosed" in 2021 and 2022. Supp.App.77 (emphasis added). So while NextEra offered boilerplate that it could not "predict … the outcome" of the investigation, it expressly refrained from altering its risk profile. *Id.*

The 8-K, however, reversed course. After substantially completing the investigation, the company found it necessary to file a Form 8-K—by definition, a filing reserved for "major events that shareholders should know about," *Hubbard v. BankAtlantic Bancorp*, 688 F.3d 713, 718 n.7 (11th Cir. 2012)—declaring that the company faced a new "risk factor." Supp.App.128.[2] In other words, while the 10-Q—consistent with Robo's, Reuter's, and Silagy's prior denials—assured investors there was no

---

[2] The SEC mandates disclosure of "material" factors making an investment "speculative or risky," 17 C.F.R. § 229.105(a), and has explained that "[t]he types of information required to be disclosed on Form 8-K are generally considered to be 'material.'" SEC, *Investor Bulletin: How to Read an 8-K*, at 1, https://perma.cc/F4DE-C54S.

material risk from the allegations of wrongdoing, the 8-K said the opposite. And on top of that, the 8-K acknowledged—publicly and for the first time—the nearly $1.3 million spent on local elections. Supp.App.128.

The market's reaction confirms this information was new. As our opening brief recounted (at 38), the consensus view among major market analysts— Bloomberg, RBC Capital Markets, Credit Suisse, Bank of America, Wolfe Research, Evercore ISI, and Glenrock Associates—was that NextEra's dramatic stock drops resulted from the corrective nature of its disclosures. For example, Credit Suisse explained that the "*new* risk disclosures" "[o]vershadow[ed]" NextEra's positive financial results. A93 (emphasis added). RBC attributed its decision to issue a "Negative" note on NextEra to NextEra "warn[ing] that these allegations could have a material impact on the company." *Id.* Bank of America described the disclosure of risk as "surprising" and "unexpected[]." A95. And Glenrock Associates stated that NextEra's stock decline was "driven substantially by the unexpected management change and the update they gave on their review into political activity." A94.

NextEra seeks (at 38) to downplay the significance of these contemporaneous accounts by pointing to this Court's statement in *Meyer* that analyst "opinion[s] based on already-public information" generally cannot "form the basis for a corrective disclosure." That misunderstands either *Meyer* or the role of analyst commentary in the funds' complaint here. In *Meyer*, the plaintiffs tried to identify one corrective

disclosure as an "analyst's negative analysis of public filings." 710 F.3d at 1197-99. This Court held that an assessment of public information could not serve any corrective effect in an efficient market because the market would have already "digested" the information. *Id.* at 1198. That simply reflects, as this Court put it, that "[t]he efficient market theory … cuts both ways." *Id.*

Unlike in *Meyer*, the funds do not argue that the analyst reports are the corrective disclosures. Rather, they cite the reports as evidence of *how* the market "digested" NextEra's disclosures. In other words, "[t]he plausibility of [the funds'] interpretation of the facts revealed in the Form 8-K[s] … is evidenced by the analyst report's opinion[s]." *Singer v. Reali*, 883 F.3d 425, 447 (4th Cir. 2018); *Lloyd*, 811 F.3d at 1210 ("investors' understanding of [a] disclosure is relevant, because the pertinent inquiry" is what is a "plausible understanding of a given disclosure at the time it was made"); *Caremark*, 716 F.3d at 243 ("it is appropriate to look for indications of the market's contemporaneous response to [alleged corrective] statements").[3]

**2.** NextEra also argues that the Bank of America report's description of Silagy's claw-back clause was not "new" because the clause was disclosed in the 8-

---

[3] This also shows why NextEra is wrong (at 40-41) to cite *Omnicom* to argue that these analyst reports did not "add[]" to the "public's knowledge." The funds never argued they did.

K.[4] But what was new in the report wasn't the existence of the clause, but that it was "unique to Silagy." A101. That is what allowed the market to learn that the company's risk was greater than previously understood.[5]

At any rate, NextEra's argument proves too much. If the market understood that the claw-back was unusual when it was first made public as an attachment to the announcement of Silagy's retirement, that only makes it more likely that the $14 billion drop in value was attributable to the corrective effect of the 8-Ks.

## III. To dodge the funds' alternative loss-causation theory, NextEra asks this Court to split from ten circuits and ignore the complaint's allegations.

Finally, NextEra asks this Court (at 51-52) to reject the funds' alternative loss-causation theory based on a "materialization-of-the-risk" because "this Court has never adopted that theory of causation" in the past. That this Court "has never" before "need[ed to] reach" the argument, *Hubbard*, 688 F.3d at 726 n.25, is not a

---

[4] NextEra argues that the *Florida Times-Union* article also cannot be "new" because it post-dates the Bank of America report. The funds don't claim otherwise; the Bank's report is the relevant disclosure. *See* Opening Br. 48.

[5] NextEra briefly contends (at 45) that the report could not have been corrective because claw-backs are, in fact, "routine." NextEra's extra-record sources fail to substantiate that claim. One, a DOJ best-practices memorandum, simply endorses claw-backs without commenting on their prevalence. The other, a suit to recover severance pay, relied on tort claims, not a claw-back clause. *See McDonald's Corp. v. Easterbrook*, 2021 WL 351967, at *1 (Del. Ch. 2021). Regardless, what matters is not whether claw-back clauses are "routine" in general but whether they are not "routine" *within NextEra*, as the complaint alleges. A96.

reason to reject it. That's especially true since ten other circuits have accepted it and none have rejected it. *See* Opening Br. 54.

NextEra thus retreats to insisting (at 52-53) that the funds didn't properly plead this theory of causation because they did not "identify the retirement *itself* as fraudulently concealed wrongdoing." But the funds didn't identify the retirement as a "concealed wrongdoing" because that's not their theory. The concealed risk is that FPL's political misconduct and the concomitant legal exposure—which NextEra denied existed—carried the potential to force the company into a management change, leading to complications in its business structure and relationships with regulators. See A94, A96. And *that* risk materialized when Silagy "unexpected[ly]" resigned and "the market began to absorb the revealed and materialized risks previously concealed by Defendants' material misstatements and omissions." A26, 90, 94; *see Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384-85 (6th Cir. 2016).

NextEra also asserts (at 25) that the funds waived this theory by raising it in a footnote. Any waiver was NextEra's. The funds pled the theory in their complaint. *See, e.g.*, A90, 94 (alleging loss caused by "materialization of the risks"); A91 (specifying when "concealed risks materialized"). NextEra chose not to challenge the theory in its motion to dismiss. *See* A196 n.9. And because the theory was not challenged, the funds' concise argument in their opposition was enough to preserve it. NextEra

recognized as much in its reply brief, A219, yet the district court still failed to address the issue.

If this Court rejects the funds' argument about corrective disclosures, it will need to address this alternative theory. It should accept it or at least remand to allow the district court "to consider [the theory] in the first instance." *United States v. Stein*, 889 F.3d 1200, 1201 (11th Cir. 2018).

## CONCLUSION

This Court should reverse.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
DEEPAK GUPTA
ROBERT FRIEDMAN
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(202) 888-1741
*jessie@guptawessler.com*

JEFFREY CRAIG BLOCK
JACOB WALKER
MARK BYRNE
BRENDAN JARBOE
Block & Leviton, LLP

260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600

July 18, 2025

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,496 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

July 18, 2025

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler