No. 24-13372

# In the United States Court of Appeals for the Eleventh Circuit

———————

CITY OF HOLLYWOOD POLICE OFFICERS RETIREMENT SYSTEM
AND THE PEMBROKE PINES FIREFIGHTERS AND POLICE OFFICERS
PENSION FUND, PLAINTIFFS-APPELLANTS

*v.*

NEXTERA ENERGY, INC., ET AL.,
DEFENDANTS-APPELLEES

———————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF FLORIDA (CIV. NO. 23-80833)*
*(THE HONORABLE AILEEN M. CANNON, J.)*

———————

**PETITION FOR REHEARING EN BANC BY APPELLEES**

———————

DANIEL J. KRAMER
AUDRA J. SOLOWAY
JOSHUA HILL
DAVID P. FRIEDMAN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
ANNA J. GOODMAN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

ANNA M. STAPLETON
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*535 Mission Street, 25th Floor*
*San Francisco, CA 94105*

No. 24-13372

*City of Hollywood Police Officers Retirement System, et al.,*
v. *NextEra Energy, Inc., et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, defendants-appellees provide the following list of interested persons:

- AEGIS Insurance Services, Inc., *insurer for defendant-appellee NextEra Energy, Inc.*

- Block & Leviton, LLP, *counsel for plaintiffs-appellants*

- Cannon, Aileen M., *United States District Judge*

- City of Hollywood Police Officers Retirement System, *plaintiff-appellant*

- Edelsberg Law, PA, *counsel for plaintiffs-appellants*

- Florida Power & Light Company, *defendant-appellee and wholly owned subsidiary of defendant-appellee NextEra Energy, Inc.*

- Friedman, David P., *counsel for defendants-appellees*

- Goodman, Anna J., *counsel for defendants-appellees*

- Hernandez, Andy, *counsel for defendants-appellees*

- Hill, Joshua, *counsel for defendants-appellees*

- Klausner, Kaufman, Jensen & Levinson, *counsel for plaintiffs-appellants*

- Kramer, Daniel J., *counsel for defendants-appellees*

- Madden, Kevin P., *counsel for defendants-appellees*

No. 24-13372

*City of Hollywood Police Officers Retirement System, et al.,*
v. *NextEra Energy, Inc., et al.*

- Marks, William T., *counsel for defendants-appellees*

- Martinez-Cid, Jordi, *counsel for defendants-appellees*

- Martinez-Cid Law, *counsel for defendants-appellees*

- Matthewman, William, *United States Magistrate Judge*

- NextEra Energy, Inc. (NYSE: NEE), *defendant-appellee*

- Paul, Weiss, Rifkind, Wharton & Garrison LLP, *counsel for defendants-appellees*

- Pembroke Pines Firefighters and Police Officers Pension Fund, *plaintiff-appellant*

- Reuter, David P., *defendant-appellee*

- Robo, James, *defendant-appellee*

- Shanmugam, Kannon K., *counsel for defendants-appellees*

- Silagy, Eric, *defendant-appellee*

- Soloway, Audra J., *counsel for defendants-appellees*

- Stapleton, Anna M., *counsel for defendants-appellees*

Defendant-appellee NextEra Energy, Inc., has no parent corporation, and no publicly held company owns 10% or more of its stock.

Defendant-appellee Florida Power & Light Company is a wholly owned subsidiary of NextEra Energy, Inc.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

C-2 of 2

## STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that the panel's decision is contrary to the following decision of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court:  *Meyer* v. *Greene*, 710 F.3d 1189 (11th Cir. 2013).

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

# TABLE OF CONTENTS

Page

Certificate of interested persons and corporate disclosure statement .........C-1

Statement of counsel ...................................................................................i

Table of contents.......................................................................................ii

Table of citations......................................................................................ii

Introduction...............................................................................................1

Statement of the issue ...............................................................................1

Statement of the case ................................................................................2

Statement of facts .....................................................................................2

Argument...................................................................................................8

    A.    The panel's new rule conflicts with prior circuit precedent...........9

    B.    The panel's decision conflicts with decisions of other courts of appeals .................................................................12

    C.    The question presented is exceptionally important.....................16

Conclusion...............................................................................................18

Certificate of compliance ........................................................................19

# TABLE OF CITATIONS

## CASES

*BofI Holding, Inc. Securities Litigation*, *In re*,
    977 F.3d 781 (9th Cir. 2020)..............................................................15

*Curry* v. *Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017)...............................15

*Loos* v. *Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014) ........................14, 15, 16

Page

Cases—continued:

*Luczak* v. *National Beverage Corp.*,
   812 Fed. Appx. 915 (11th Cir. 2020) ...............................................10

*MacPhee* v. *MiMedx Group, Inc.*, 73 F.4th 1220 (11th Cir. 2023) ...................10

*Meyer* v. *Greene*, 710 F.3d 1189 (11th Cir. 2013) .....................................*passim*

*Omnicom Group, Inc. Securities Litigation, In re*,
   597 F.3d 501 (2d Cir. 2010) .......................................................13, 16

*Public Employees' Retirement System of Mississippi*
   v. *Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014)......................................13, 14

## STATUTE AND REGULATION

15 U.S.C. § 78j(b) ...........................................................................2

17 C.F.R. § 240.10b-5.........................................................................2

## INTRODUCTION

In a precedential decision issued without oral argument, the panel in this securities-fraud case dramatically broadened this Court's standard for pleading loss causation.  Losses caused solely by market speculation—untethered to any allegedly misrepresented facts—can now sustain a securities-fraud claim in this circuit.  That approach is irreconcilable with this Court's precedents and, if allowed to stand, will leave this Court with the Nation's most permissive loss-causation standard.  By equating speculation about facts unknown to the market with revelation of the truth, the panel's new rule undermines the loss-causation requirement and, in so doing, converts the securities laws into insurance for market losses unrelated to the alleged false statements.  That rule will force publicly traded companies to choose between complying with their obligations to disclose certain forward-looking risks and avoiding the speculation-driven liability that such disclosures may now bring.  And the denial of early dismissal will place disproportionate settlement pressure on public companies that cannot afford to gamble on the ruinous liability that securities class actions can impose.  The panel's decision is deeply flawed, and the full Court's intervention is badly needed.

## STATEMENT OF THE ISSUE

Whether a securities-fraud plaintiff may plead loss causation based on a series of alleged partial disclosures by alleging that investors began to "second-guess" the "truth" of a defendant company's earlier statements.

(1)

## STATEMENT OF THE CASE

This case involves claims for securities fraud based on decreases in the stock price for defendant-appellee NextEra Energy, Inc.  App. 110; *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  The district court dismissed those claims for failure to plead loss causation, but a panel of this Court reversed. Op. 2-3.

## STATEMENT OF FACTS

1.      Defendant Florida Power & Light Company (FPL), a subsidiary of defendant NextEra Energy, Inc., is an electric utility company that sells power to consumers across Florida.  App. 32.  Defendants James L. Robo and David P. Reuter were officers of NextEra, and defendant Eric Silagy was the chief executive officer of FPL, during the relevant time period.  *Id.*

In 2021, newspapers published reports suggesting that a political consulting firm, Matrix, had engaged in questionable political activity on behalf of FPL.  The reporting asserted, as relevant here, that Matrix directed FPL funds through a Matrix-controlled nonprofit, GrowUnited, to support "ghost" political candidates who ran for office only to siphon votes from legitimate candidates that FPL opposed, App. 80; Supp. App. 14; that Matrix organized a "phony" job offer to a Jacksonville city councilor who opposed NextEra's bid to acquire the Jacksonville Electric Authority, App. 81-85; that Matrix shared with Silagy a potential campaign-finance structure for FPL in 2020, App. 84;

that Matrix surveilled a journalist, App. 86-87; and that FPL controlled The Capitolist news website, App. 87.

In 2021, NextEra engaged an outside law firm to conduct an investigation into those allegations. Following that investigation, the company reported that no evidence of wrongdoing had been found. App. 86. The company also made discrete statements to reporters, responding to specific inquiries about certain allegations. App. 83-87.

After additional allegations were made in 2022, the company engaged another law firm to conduct a second investigation. Supp. App. 77. In November 2022, NextEra filed a Form 10-Q with the Securities and Exchange Commission (SEC), which addressed both the media allegations and a complaint filed against GrowUnited (among others) with the Federal Election Commission (FEC). *See* Supp. App. 71-79. The 10-Q included a standard risk disclosure explaining that NextEra's investigation was ongoing; that the allegations could "result in regulatory, investigative, and enforcement inquiries"; and that "any ultimate findings of violations could result in the imposition of fines, penalties, or other sanctions or impacts on [NextEra] or FPL." Supp. App. 77.2.

On January 25, 2023, NextEra made three public disclosures.

*First*, NextEra released its financial results for the fourth quarter and full year of 2022. *See* Supp. App. 98-99.

3

*Second*, NextEra filed a Form 8-K disclosing that its second investigation was "substantially complete." Supp. App. 128. In the 8-K, NextEra disclosed that it believed the company would not be found liable for any Florida campaign-finance violations and that the FEC complaint should not move forward. *Id.* At the same time, the 8-K reaffirmed the company's warning from the November 2022 10-Q of the potential for future government investigations and findings of violations (none of which has occurred). Like the 10-Q, the 8-K warned that FPL and NextEra "could not guarantee" that no future investigations or findings of violations would result or otherwise "provide assurance" against future penalties and other sanctions. While the warning was updated in light of the substantial completion of the second investigation, the warning was substantively the same.

*Third*, NextEra filed a second 8-K stating that Silagy intended to step down as FPL's CEO and retire later that year. App. 92. That 8-K detailed Silagy's retirement agreement, which was filed as an exhibit to the report. Supp. App. 132, 135-153. Under that agreement, NextEra could claw back compensation from Silagy if, among other things, he was convicted of, or admitted to, having committed a serious criminal offense while in his role as FPL's CEO. *See* App. 92; Supp. App. 146. NextEra explained to investors that Silagy's decision to retire was previously planned and that the company

was not connecting Silagy's retirement with its investigations.  Supp. App. 164, 169.

NextEra's stock dropped 8.7% on the day of those disclosures.  App. 94.

Five days later, Bank of America published an analyst report observing that Silagy's "customary non-compete" "limits [his] ability to position himself at an adjacent utility."  App. 149.  The next day, the Florida Times-Union published an article noting that the Bank of America report had described the non-compete provision as "customary" and stated that it was "unclear if all the terms of Silagy's exit, including the claw back, are standard for FPL leaders."  App. 162-163.  NextEra's share price decreased 0.56% that day.  App. 96.

3.      In 2023, plaintiffs filed this action for securities fraud.  The operative complaint identified as false or misleading appellees' statements addressing some of the media reports published in 2022.  Specifically, Reuter told reporters that FPL had found no evidence that FPL "had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle," App. 81; had "provide[d] funding . . . to Grow United in support of Florida state-level political campaigns during the 2020 election cycle," id.; or had "involvement in the creation of Grow United," App. 83.  Reuter further stated that FPL rejected Matrix's proposal to offer a Jacksonville city councilor a job, App. 85-86; he later told a reporter that the inves-

tigation "found no evidence" that FPL had requested or used Matrix's "funding structure" to "support . . . communication and outreach activities during the 2020 election cycle," App. 84. Silagy stated that FPL did not engage in the surveillance of journalists. App. 86-87. Reuter also stated that FPL did not have digital records of certain exchanges concerning Matrix's alleged journalist surveillance and could not "prove their veracity." App. 87. An FPL spokesperson stated that FPL did not have an ownership interest in, or editorial control over, The Capitolist. App. 87-88. Robo stated that NextEra's first investigation had "found no evidence" of illegality or wrongdoing by FPL and that he "fe[lt] very good that there is no basis to any of these allegations." App. 86.

The complaint alleged that three subsequent disclosures revealed the falsity of those eight statements and caused NextEra's stock to decline: NextEra's 8-K reporting the completion of the second outside-counsel investigation; NextEra's separate 8-K report announcing Silagy's intent to retire; and the Florida Times-Union article discussing the terms of Silagy's already-public retirement agreement. App. 88-93.

4.     Appellees moved to dismiss the complaint for (among other grounds) failure to plead loss causation, explaining that none of the allegedly corrective disclosures revealed that any of the alleged misstatements was false

6

or misleading. *See* App. 137-143. The district court agreed and dismissed the amended complaint. *See* App. 223-239.

5.    Without holding oral argument, a panel of this Court reversed. For purposes of loss causation, the panel held that the truth is adequately revealed to the market when "enough truth has saturated the market to make investors second-guess the earlier fraud," Op. 26, and further held that "corrective disclosures can impact prices whenever they erode the market's trust in an earlier fraudulent statement," Op. 27. Applying that rule, the panel concluded that the operative complaint alleged facts that, "when read together, plausibly imply enough truth was illuminated to cause investors to seriously question [defendants'] earlier misstatements." *Id.*

In so holding, the panel did not identify how the proffered corrective disclosures were "corrective" of the alleged misstatements, either on their own or "*in toto.*" Op. 34. For example, the panel identified no revelation that the first investigation found evidence of wrongdoing, or that FPL contributed to GrowUnited, surveilled reporters, or owned The Capitolist. As to the warning in the 8-K, the panel recognized that the "disclosure is no admission of wrongdoing" but reasoned that "[a]cknowledging that past misconduct may give cause to future liability . . . necessarily reveals something about the earlier misconduct." Op. 31. As to Silagy's retirement announcement, the panel posited that investors might not "believe" Silagy's statement that his retirement

7

was previously planned.  Op. 32.  And addressing the clawback term in Silagy's severance agreement, the panel credited the Florida Times-Union article's "suggest[ion]" that "the provision tacitly implied a link between Silagy's departure and the political misconduct allegations."  Op. 33.

Finally, the panel considered the cumulative effect of the "abundance of statements by financial analysts who linked the full January 25, 2023, update with NextEra's political scandal."  Op. 34-35.  Those reports, the panel said, were "integral to the [loss-causation] analysis" because "they show that those with financial acumen made the connection" appellees allege, and because they "may have influenced the market's reaction."  Op. 36.  The opinion did not address how any of the analyst statements provided new information to the market that revealed the truth of any challenged statements.

## ARGUMENT

To plead loss causation, a securities-fraud plaintiff must allege facts plausibly showing a "causal connection between the misrepresentation and the investment's subsequent decline in value."  *Meyer* v. *Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013).  In a typical case, that involves identifying a "corrective disclosure," meaning a "release of information that *reveals* to the market the pertinent truth that was previously concealed or obscured by the company's fraud," followed by a decrease in the company's stock price.  *Id.* at 1196 (emphasis added).

Here, the panel held that the pertinent truth is adequately revealed whenever "enough truth has saturated the market to make investors second guess the earlier fraud." Op. 26. That rule is novel and manifestly erroneous. It cannot be reconciled with this Court's precedent; it leaves this Court with a far more permissive loss-causation standard than other courts of appeals; and it makes little policy sense. Rehearing en banc is warranted.

## A.    The Panel's New Rule Conflicts With Prior Circuit Precedent

1.    In *Meyer*, this Court stated that a disclosure is not corrective unless it reveals the "pertinent truth" underlying the alleged false statement. 710 F.3d at 1196. That case addressed allegations that a real-estate developer's failure to take impairment charges resulted in material overstatements. *See id*. at 1192-1193. The plaintiffs sought to allege loss causation through three purported corrective disclosures: (1) an analyst presentation suggesting that the relevant assets were significantly overvalued; (2) the company's disclosure of an informal SEC investigation; and (3) a subsequent announcement that the informal investigation had become formal. *Id*. at 1197. The district court dismissed for failure to plead loss causation. *Id*. at 1193.

This Court affirmed, holding that the plaintiffs had failed adequately to allege a corrective disclosure. A corrective disclosure, the Court explained, must deliver "facts to the market that are new, that is, publicly revealed for the first time." *Id*. at 1197-1198. The presentation, the Court concluded, was

9

not corrective because it merely offered opinions on previously available public information. While raising the possibility of "potential future action," the presentation was "not necessarily revelatory of any past fraud." *Id.* at 1998-2000. The two disclosures related to the SEC investigation, the Court continued, were also insufficient: while "the investigation can be seen to portend an added *risk* of future corrective action," such "investigations, in and of themselves," do not "reveal to the market that a company's previous statements were false or fraudulent." *Id.* at 1201.

*Meyer* thus provides that a complaint cannot survive a motion to dismiss unless it alleges that new information provided to the market actually revealed that an earlier statement was false or misleading. In so holding, the Court drew a clear line between statements that merely repeat existing information or cause investors to speculate about unknown facts, on the one hand, and statements that constitute corrective disclosures, on the other. By distinguishing between "negative" news that gives rise to investor speculation and "corrective" disclosures that actually reveal the falsity of earlier statements, *Meyer* ensures that the securities laws protect against only "those economic losses that misrepresentations actually cause." *Id.* at 1202; *accord, e.g.*, *MacPhee* v. *MiMedx Group, Inc.*, 73 F.4th 1220, 1242 (11th Cir. 2023); *Luczak* v. *National Beverage Corp.*, 812 Fed. Appx. 915, 926 (11th Cir. 2020).

2.     Contrary to *Meyer*, the panel here held that a plaintiff can adequately plead a corrective disclosure merely by alleging that new public information invited the market to "second-guess" the company's earlier statements. Op. 26. The problem with that approach is that investors may "second-guess" the truth of earlier statements even absent new factual disclosures correcting those statements. The announcement of an investigation is a ready example: investors may take the government's scrutiny to indicate that a company engaged in previously denied misconduct. But such announcements do not reveal the "pertinent truth" of anything. *Meyer*, 710 F.3d at 1201 & n.13. The panel's approach thus erases the line *Meyer* drew between revelation of the truth and speculation.

If the panel here had followed *Meyer*, it would have held that none of the alleged corrective disclosures provided new, corrective information to the market. The forward-looking risk disclosure in the 8-K announcing the substantial completion of the second investigation did not include any facts related to the content of the alleged misstatements; rather, it repeated the earlier 10-Q's warning that liability *could* potentially arise *in the future* based on already public information. *See* Br. of Appellees 27-32. The 8-K concerning Silagy's retirement likewise did not disclose any new, corrective information, stating only that Silagy intended to retire and providing the terms of his retirement

11

agreement.  *See id*. at 39-44.  And the company itself disclosed that the retirement was in fact unrelated to the media allegations of wrongdoing.

Nor do the 8-Ks become corrective disclosures under *Meyer* when combined with the Florida Times-Union article discussing Silagy's retirement agreement.  *See* Br. of Appellees 44-45.  The article disclosed no new facts about the eight challenged statements.  The reporting on the existence of that already public agreement could, at most, support market speculation.

The panel was aware of *Meyer*, quoting it for the proposition that a plaintiff can "show that the truth gradually leaked out into the marketplace 'through a series of partial disclosures'" rather than in a single, complete disclosure.  Op. 26 (quoting *Meyer*, 710 F.3d at 1197).  But the panel ignored *Meyer*'s primary holding that, whether through a series of partial disclosures or in a single disclosure, there must be new information that leads to market *knowledge* that previous statements were false, not mere *speculation* to that effect.  The resulting intracircuit conflict between the panel's decision and *Meyer* warrants the full Court's review.

### B.    The Panel's Decision Conflicts With Decisions Of Other Courts Of Appeals

If allowed to stand, the panel's decision will leave this Court with a standard for pleading loss causation that is far more permissive than that of any other court of appeals.

12

1.     In *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2010), the Second Circuit addressed two alleged corrective disclosures: *first*, the defendant company's director's resignation, which was reported to be "due to general concerns over an aggressive accounting strategy"; and *second*, comments by two accounting professors raising concerns with the company's accounting practices. *See id.* at 511-512. In holding that the plaintiffs had not adequately alleged loss causation, the Second Circuit emphasized that the securities laws are designed to "make sure that buyers of securities get what they think they are getting." *Id.* at 513 (internal quotation marks and citation omitted). The court acknowledged that the director's resignation may have "stirred investors' concerns," but it held that the resignation did not constitute a corrective disclosure absent any "allegation that investors were ever told that improper accounting had in fact occurred." *Id.* at 514. That investors may have inferred from those disclosures the possibility that "other unknown problems were lurking" was insufficient, *id.*, as were the reported "suspicions" of outside observers, *id.* at 512.

2.     The Fifth Circuit has also held that the release of information does not plead a corrective disclosure where the information is sufficient only to permit market speculation that fraud occurred. In *Public Employees' Retirement System of Mississippi* v. *Amedisys, Inc.*, 769 F.3d 313 (2014), the court held that a corrective disclosure occurs when the information disclosed to the

market "make[s] the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Id.* at 321.  When applying that standard to an analyst report that called for "deeper scrutiny" of the defendant's Medicare billing practices, but did not conclude that Medicare fraud had occurred, the court explained that "[s]peculation of wrongdoing cannot by itself arise to a corrective disclosure." *Id.* at 322.  The court likewise rejected the plaintiffs' assertion that the announcement of two executives' resignations constituted a corrective disclosure. *See id.*  While the court ultimately concluded that a corrective disclosure was pleaded based on the "totality" of partial disclosures, the *Amedisys* plaintiffs—unlike plaintiffs here—identified new and corrective information in the defendants' financial reporting allegedly revealing altered operations due to the alleged Medicare fraud. *See id.* at 323-325.  Under the panel's more lenient standard here, however, the *Amedisys* plaintiffs could have proceeded solely based on the analyst report and the resignations, because that could have allowed the market to "second-guess" whether the alleged misstatements were false.

3.    The Ninth Circuit has also drawn a firm boundary between market speculation and new, corrective information sufficient to plead loss causation.  In *Loos* v. *Immersion Corp.*, 762 F.3d 880 (2014), the Ninth Circuit expressly relied on this Court's holding in *Meyer*:  the announcement of an investigation "without any subsequent disclosure of actual wrongdoing" does not

14

qualify as a corrective disclosure because it does not "reveal to the market the pertinent truth of anything." *Id.* at 890 & n.3 (quoting *Meyer*, 710 F.3d at 1201 n.13). Absent a subsequent confirmation of fraud, the court explained, any decrease in stock price that follows such an announcement "can only be attributed to market speculation." *Id.* And such speculation about "*potential* future disclosure of fraudulent conduct*" "cannot form the basis of a viable loss causation theory." *Id.* Subsequent Ninth Circuit panels have continued to distinguish between disclosures of "*facts* that could call into question" the truthfulness of earlier statements and "speculation" about potential future revelations. *In re BofI Holding, Inc. Securities Litigation*, 977 F.3d 781, 793 (2020); *see Curry* v. *Yelp Inc.*, 875 F.3d 1219, 1225-1226 (2017).

4.      Contrary to the clear holdings of the Second, Fifth, and Ninth Circuits, the panel here held that the market's "second-guess[ing]" of the truth of earlier statements—that is, market speculation of fraud—was sufficient to plead loss causation. Under that standard, a plaintiff need not identify any actual facts of which the market became newly aware, nor demonstrate that those facts revealed the mistruth of any challenged statement. Instead, a plaintiff need only plead that the market had sufficient facts to speculate that fraud occurred and a corresponding decrease in stock price. If the Second and Ninth Circuits had applied that rule, each of the cases described above would have proceeded, because those plaintiffs identified events that spurred market

speculation and a corresponding stock drop.  *See Omnicom*, 597 F.3d at 514; *Loos*, 762 F.3d at 890 & n.3.

### C.    The Question Presented Is Exceptionally Important

As this Court has long recognized, the loss-causation requirement is crucial in preventing the federal securities laws from becoming a form of "investor insurance" against "any decline in the value of their investments." *Meyer*, 710 F.3d at 1196.  But the panel's decision relaxes the loss-causation standard so drastically that claims will proceed past the pleading stage whenever market speculation and a decrease in stock price coincide, regardless of whether there was any revelation that any facts actually were misstated.  That is what transpired here:  relying heavily on a set of analyst reports that "may have influenced the market[]," Op. 36, the panel determined that expressions of doubt among some observers could alone demonstrate that market losses were tied to earlier alleged misstatements.  And once early dismissal is denied, public companies often face tremendous pressure to settle for extortionate amounts.  The panel's expansive approach would thus transform securities claims in this circuit into the investor insurance that this Court has warned against.

The panel's approach to the risk disclosure in the 8-K regarding the second investigation is particularly concerning.  The panel indicated that a risk disclosure that does not confirm any wrongdoing and merely echoes a prior

warning about the same risk nevertheless can constitute a corrective disclosure. That will be true whenever a risk disclosure leads investors to speculate about the possibility of previous wrongdoing and coincides with a decrease in stock price. *See* Op. 31. That standard would strongly dissuade companies from making such disclosures in the first place.

The panel's approach is also manifestly wrong. That a company facing a government investigation should issue a forward-looking risk disclosure does not show that any earlier denials of wrongdoing were false. A public company often incurs financial liability associated with a government investigation even when it has not committed any wrongdoing (for example, when it settles a matter to avoid protracted proceedings). In addition, risk disclosures are not statements of historical fact: they are statements of what might transpire in the future. If the market later learned of new facts revealing the falsity of the company's earlier statements, the securities laws would impose liability at the time of that subsequent disclosure—not at the time of the warning.

In addition, as the panel recognized, there are some circumstances in which a company "would be subject to liability if [it] *did not* disclose such material risks." Op. 38. Yet the panel's decision would force a company to choose between potential liability for failing to make a disclosure or potential liability for market speculation around the disclosure. To avoid that deleterious result, the en banc Court should reconsider the panel's deeply problematic decision.

17

## CONCLUSION

The petition for rehearing en banc should be granted.

Respectfully submitted,

/s/ Kannon K. Shanmugam

| | |
|---|---|
| DANIEL J. KRAMER | KANNON K. SHANMUGAM |
| AUDRA J. SOLOWAY | WILLIAM T. MARKS |
| JOSHUA HILL | ANNA J. GOODMAN |
| DAVID P. FRIEDMAN | PAUL, WEISS, RIFKIND, |
| PAUL, WEISS, RIFKIND, | WHARTON & GARRISON LLP |
| WHARTON & GARRISON LLP | *2001 K Street, N.W.* |
| *1285 Avenue of the Americas* | *Washington, DC 20006* |
| *New York, NY 10019* | *(202) 223-7300* |
| | *kshanmugam@paulweiss.com* |

ANNA M. STAPLETON
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *535 Mission Street, 25th Floor*
  *San Francisco, CA 94105*

JANUARY 7, 2026

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, a member of the Bar of this Court and counsel for appellees, hereby certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and 32(a)(7), that the attached Petition for Rehearing En Banc is proportionately spaced, has a typeface of 14 points or more, and contains 3,843 words.

JANUARY 7, 2026                    /s/ Kannon K. Shanmugam
                                   KANNON K. SHANMUGAM