**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 24-13372
Non-Argument Calendar

————————————

MAHA JASTRAM,
    individually and on behalf of all others similarly situated,

*Plaintiff,*

CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT
SYSTEM AND THE
PEMBROKE PINES FIREFIGHTERS AND POLICE OFFICERS'
PENSION FUND,
    Lead-Plaintiff,
    a.k.a. the Retirement Funds,

*Plaintiff-Appellant,*

*versus*

NEXTERA ENERGY, INC.,
JAMES ROBO,
ERIC SILAGY,
DAVID P. REUTER,
FLORIDA POWER & LIGHT COMPANY,

*Defendants-Appellees.*

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:23-cv-80833-AMC

———————————————

Before BRANCH, KIDD, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

## I. INTRODUCTION

Investors sued NextEra Energy, Inc. ("NextEra"), claiming the company materially misrepresented its involvement in a Florida election-interference scheme. The scheme was allegedly orchestrated by NextEra's main subsidiary Florida Power & Light Company ("FPL") and FPL's CEO, Eric Silagy. The complaint has it all: corporate malfeasance, bribery, off-the-books recordkeeping, surveilling journalists, creating 'ghost' candidates, corrupting independent media outlets, and a failed acquisition that spiraled into two federal indictments.

When reporters began to uncover traces of the alleged conspiracy, NextEra and FPL executives were quick to put the claims to rest. They denied all direct and indirect involvement to the press and asserted the allegations had "no basis." NextEra relayed that same message to investors on an earnings call. But after some time, leadership began to backpedal. On January 25, 2023, FPL abruptly parted with its CEO and NextEra filed unscheduled disclosures about potential legal and reputational risk stemming from the

allegations. That very day, NextEra's stock plunged 8.7 percent, wiping out more than $14 billion in market capitalization.

Plaintiffs allege that NextEra executives knowingly lied to investors. They sued NextEra in the United States District Court for the Southern District of Florida. The District Court dismissed the complaint with prejudice, holding that plaintiffs failed to adequately plead loss causation. We disagree. For the following reasons, we reverse.

## II. BACKGROUND

On May 26, 2023, Maha Jastram, individually and on behalf of similarly situated investors, filed a complaint accusing defendants NextEra, James Robo, Eric Silagy, and David Reuter of securities fraud. Specifically, the complaint alleged violations of Section 10(b) and Section 20(a)[1] of the Securities Exchange Act of 1934 (the "Exchange Act"). The complaint has been amended twice and now includes defendant FPL. On October 26, 2023, the District Court granted a motion to appoint the City of Hollywood Police Officers Retirement System and the Pembroke Pines Firefighters & Police Officers Pension Fund (the "Retirement Funds") as lead plaintiffs.

---

[1] Section 20(a) establishes liability for "[e]very person who, directly or indirectly, controls" a person or entity that is liable under another provision of the Exchange Act. 15 U.S.C. § 78t(a). A claim under § 20(a), then, cannot stand on its own. *See id.* Because the District Court dismissed the predicate § 10(b) claim, it had no need to examine the § 20(a) claim. On remand, we direct the court to evaluate the merits of the Retirement Fund's § 20(a) claim consistent with this Opinion.

We begin with a discussion of the parties and the allegations made in the second amended complaint.

Defendant-Appellee NextEra is one of the largest power and utility holding companies in North America, with annual revenues exceeding $17 billion. Its stock is publicly traded and is listed on the New York Stock Exchange under the symbol "NEE." James Robo was NextEra's CEO from 2012 until 2022. David Reuter has served as NextEra's Vice President and Chief Communications Officer since 2018. FPL, a wholly owned subsidiary of NextEra, is the largest public utility in the State of Florida. Eric Silagy was FPL's CEO from 2014 until his sudden departure in 2023, the cause of which is disputed by the parties.

Lead-Plaintiff-Appellant Retirement Funds are each municipal pension funds, which exist to manage assets and administer retirement, death, and disability benefits for local government employees. Put together, the Retirement Funds manage over $1 billion in assets in trust for eligible beneficiaries. In this case, the beneficiaries are police officers, firefighters, and their covered family members. Each fund has provided certifications that they purchased and held NextEra stock throughout the period of Appellees' alleged securities fraud.

The Retirement Funds' second amended complaint alleges fraud on top of fraud. The first layer is Appellees' alleged scheme to sway state and local elections, target government officials, and intimidate journalists. The second layer regards Appellees' categorical denial of the underlying political scheme, which allegedly

misled investors. Whether NextEra, FPL or their employees violated election or other law is not the basis of this case; we focus on the alleged securities fraud. But, of course, the Retirement Funds must ultimately demonstrate that Appellees' denial of the election scheme was knowingly fraudulent.

## A. Political Meddling Allegations

The story alleged in the complaint proceeds as follows.[2] In December 2020, Jeff Pitts, long-time CEO of political consulting firm Matrix LLC ("Matrix"), departed Matrix to form his own firm. But Pitts left something behind. Matrix employees found a server that was bashed in by a hammer, in an apparent attempt to destroy its contents. Pitts, though, was no demolition expert. His old firm managed to access the server, where it uncovered personal files, a separate "set of books," and a "whole lot of money going into LLCs and disappearing," which were used to perpetrate various political campaign schemes.

Pitts, while at Matrix, provided political strategic advice to NextEra and FPL. He had a close relationship with FPL CEO Eric Silagy. And according to Matrix founder Dr. Joseph Perkins, the contents of Pitts' server heavily implicated both NextEra and FPL in Pitts' political campaign schemes. Many of the server documents were leaked to the press. Dr. Perkins did not state whether he was the source of the leak, but he verified the records' legitimacy

---

[2] We emphasize that all facts recited in this Opinion are allegations that have not yet been subjected to evidentiary scrutiny or considered by any finder of fact.

multiple times. Dr. Perkins now regards Pitts as a "rogue employee" and has sued him in Alabama court.

The server files, possessed by lead counsel for the Retirement Funds, are the source of numerous facts alleged in the complaint, like the ghost candidate scheme. The other key source is a memorandum entitled "Florida Power & Light Officers' Potentially Unlawful Conduct Through Third-Party Consultants and Vendors – Confidential," allegedly sent to Robo on November 3, 2021 ("the Robo Memorandum"). The Robo Memorandum includes Matrix' internal investigation and details FPL's scheme to "secretly divert corporate resources to off-the-books communications and political campaigns."

## 1. Failed JEA Acquisition

The Jacksonville Electric Authority ("JEA") is a not-for-profit, community-owned utility and an independent agency of the City of Jacksonville. It is governed by a seven-member board appointed by Jacksonville's Mayor and confirmed by the City Council. FPL, a for-profit subsidiary of NextEra, is Florida's largest utility and its service area encircles Jacksonville. JEA has been described as the "hole in FPL's donut."

In 2017, JEA began internal discussions of going private. By 2019, JEA issued an "Invitation to Negotiate" and began soliciting competitive bids. Perhaps unsurprisingly, FPL's bid came in highest at $11 billion. By law, JEA's privatization would require approval not only from its Board, but also from the Jacksonville City Council and a majority of city voters in a special referendum.

Recognizing these political hurdles, FPL and Silagy turned to Matrix for help.

According to the Retirement Funds, Matrix began by orchestrating hundreds of thousands in payments from FPL, via obscure entities, to a new organization entitled "Fix JEA Now." Fix JEA Now was established by Reverend Deves Toon. In 2019, Toon extended Jacksonville City Councilor Garret Dennis a unique employment opportunity. The offer was to work for "Grow United," an organization purportedly designed to advocate for the decriminalization of marijuana. It included a $180,000 annual salary and a $50,000 travel budget.

Acceptance was expressly conditioned on Dennis, a "staunch opponent of privatizing JEA," resigning from the City Council. Feeling optimistic, Toon once texted Pitts: "Dennis is willing to resign from the city Council call me." Dennis, though, never accepted the offer. According to Dennis, he recognized the offer was suspicious and quickly dismissed it as a scam.

The complaint alleges that Grow United was actually a front group controlled by Matrix and funded by FPL through Fix JEA Now. It explains that Matrix organized and incorporated the entity, and FPL was invoiced for all expenses. The Robo Memorandum describes Grow United as "a vehicle for covert financial transactions, including an attempted bribe of a public official." It explains its "dual purpose" as "creating an entity for political contributions and also an opening to allow Garrett Dennis . . . to leave the City Council." Shortly after the offer was made, FPL Vice President of

State Legislative Affairs Daniel Martell emailed Pitts with a list of "things to go over." The first item on the list was "JEA – DG," which is a reversal of Councilor Garret Dennis' initials.

Matrix also allegedly worked to surveil journalists opposing the FPL takeover of JEA. The Robo Memorandum shows thousands of dollars in payments made by Matrix to Clear Capture Investigations, a private investigation firm. One journalist, Nate Monroe, wrote a column criticizing the potential deal as a "hard sell" and likely to result in layoffs and cost cutting. Shortly thereafter, Matrix sent FPL a 72-page report containing Monroe's social security number, financial information, political affiliations, driver's license number, and the names and phone numbers of his relatives and neighbors. They also surveilled Monroe in public while he was on a trip to Pensacola. A Matrix operative expressed excitement when Monroe was apparently drinking alcohol, but later texted Martell: "He's in an Uber ☹." The Robo Memorandum includes a photograph of Monroe, his girlfriend, and his dog outside of his apartment.

Despite Appellees' best efforts, the JEA acquisition failed. The process became fatally entangled in JEA's own scandal, whereby JEA executives allegedly misled their board into executing agreements that would net themselves millions of dollars in a JEA privatization event. The United States Department of Justice ("DOJ") criminally indicted JEA's CEO and CFO for conspiracy and wire fraud. NextEra was subpoenaed by both the DOJ and the Jacksonville City Council. In their response to the City Council,

NextEra omitted Matrix on a list of firms that lobbied on its behalf in connection with the failed merger.

### 2. Ghost Candidate Scheme

The complaint next describes Matrix and FPL's significant interest in Florida state elections during the 2018 and 2020 cycles. According to the Retirement Funds, FPL orchestrated a conspiracy to prop up "ghost candidates" to derail the electoral prospects of candidates deemed adverse to FPL and its business interests.

In 2018, FPL allegedly funneled more than $14 million into "Mothers for Moderation," a tax-exempt 501(c)(4) entity. Mothers for Moderation communicated with FPL through Silagy's personal email account. According to the Robo Memorandum, the primary purpose of the nonprofit was to mask contributions from FPL. Emails show Silagy asked Pitts to ensure contributions could not be "triangulate[d]" back to FPL.

Mothers for Moderation funded attack ads against Kayser Enneking in an unsuccessful attempt to thwart her primary bid for Florida State Senate. The day after Enneking won her primary bid, Pitts allegedly formed a new 501(c)(4) entitled "Broken Promises" to oppose her in the general election. In a discussion regarding the structure of the new organization, Pitts allegedly texted Martell: "Bottom line is We are the one with the check books and control 100percent [sic]." Martell responded, "This text is self-destructing in 30 seconds."

Using funds from FPL, Broken Promises allegedly contributed more than $100,000 to the political action committee

supporting Charles Goston. The Retirement Funds describe Goston as a "no-party straw candidate . . . who had entered the race in the hopes of splitting Enneking's base." The complaint alleges that more than seventy percent of Broken Promises' spending supported Goston's campaign, which violates IRS guidelines on political spending by lobbying organizations. Moreover, the Retirement Funds allege that Broken Promises' 2018 IRS filing fraudulently stated that it did not engage in *any* direct or indirect political campaigning. The complaint points to various Florida and federal election laws that the donations may have violated. Enneking lost her election by fewer than 2,000 votes, while Goston secured 4,319 votes.

A parallel scheme is alleged to have taken place in the 2018 Miami-Dade County Commission election. When an FLP-disfavored candidate won her primary, Pitts allegedly 'encouraged' Johnathan Burke, an obscure candidate with a criminal record, to run for the same seat. Retirement Funds allege FPL, using an Alabama corporation, illegally funded a $60,000 salary for Burke along with the full cost of his rent. They also arranged for him to move into the district to make him eligible to run. Burke garnered seventeen percent of the vote in the general election. After the election, Burke allegedly texted Pitts, "Friday March 1st marks the conclusion of *our agreement* and will be the last time I have to bug you about funds, unless further work is agreed upon." (emphasis added).

Again, in 2020, the Retirement Funds allege FPL engaged Matrix to run a series of ghost candidates to siphon support from candidates they viewed as unfavorable. The details follow a similar pattern as the 2018 schemes, except the complaint suggests the straw candidates were even less plausible this time. In District 9, an FPL-backed non-profit sent mailers promoting Jestine Iannotti for Florida State Senate. The mailers depicted a Black woman supporting social justice and (amusingly) campaign finance reform. In reality, Iannotti was "Caucasian and at the time was planning to move to Sweden." The political committee responsible for the mailing, "The Truth," was 'chaired' by a college student who was allegedly paid $1,500 to sign the registration form.

FPL was particularly focused on the District 37 race, where incumbent Javier Rodriguez was running for reelection. Rodriguez had opposed FPL's plans to expand a nuclear power plant. He also supported a proposal that "would allow 'property owners to sell home-generated solar power to others, including tenants,' without being regulated like a traditional 'public utility.'" When Reuter informed Silagy of the proposed bill, Silagy forwarded the message to Martell and FPL's legislative affairs team with the following message: "JJR at it again. I want you to make his life a living hell….seriously." (emphasis omitted). The complaint alleges that an FPL-backed group offered Alex Rodriguez—a man chosen for having the same last name as the incumbent—$50,000 to enter the race. In each of the three 2020 elections where Appellees allegedly backed ghost candidates, FPL's preferred candidate won. In District 37,

Javier Rodriguez was ousted by 32 votes. Alex Rodriguez received over 6,000 votes.

FPL's 2020 funding was allegedly routed through Grow United and a web of intermediary shells in an intentional effort to obfuscate the funding source. The Retirement Funds claim at least $600,000 in Grow United was earmarked for the ghost candidates' political action committees. The funds were routed directly from FPL to Matrix-created entities and were not submitted to Matrix' bookkeepers.

One of Pitts' associates flagged a *POLITICO* article describing a mystery donor spending $180,000 on Florida political mail. The article noted that the phone number listed by the donating entity "also appeared in online advertising for female escorts." The recipient, who allegedly organized the entity for Matrix, responded to Pitts and his associates: "there was no way to know this was an escorts number. That's a random thing they assign AA on the app . . . . I think it's hilarious and just makes them more confused."

After the election, some problems emerged. Alex Rodriguez, the District 37 ghost candidate, pled guilty for accepting a bribe to run for election. He received three years of probation in exchange for investigative cooperation. Iannotti, the would-be Sweden expat, was charged with a felony for accepting illicit contributions. The Miami-Dade State Attorney's office subpoenaed billing records from lawyers at Foley & Lardner, who allegedly assisted Matrix and FPL in the scheme. And at the federal level, a public watchdog organization filed a complaint with the Federal

Election Commission ("FEC"), asking the agency to investigate the source and legality of several FPL-affiliated shells.

### 3. Media Control

The final category of election-related allegations pertains to FPL and Silagy's alleged co-optation of 'independent' news sources to control media narratives and sway public opinion. *The Capitolist* is a Florida news website focusing on "Florida business, policy and politics." It was founded in 2016 by its Editor-in-Chief, Brian Burgess. Beginning in 2018, FPL allegedly began funneling tens of thousands of dollars into *The Capitolist* through "Metis Group," a Matrix-created entity. In November 2018, an FPL executive allegedly asked *The Capitolist* to publish an article criticizing a Florida gubernatorial candidate. After the article was published, Martell directed *The Capitolist* to "Promote the @&;$&!!! Out of [it]."

Over time, FPL through Matrix allegedly sought more control over *The Capitolist*. The Retirement Funds allege that in September 2019, Metis Group executed an agreement to secure a purchase option for *The Capitolist*. The deal was $50,000 in exchange for "executive control" of the news organization, a one percent ownership stake, and an option to purchase a controlling share for an additional $145,000. The complaint describes granular conversations between Silagy and *The Capitolist* about acceptable content. In one case, Silagy allegedly asked Burgess to write a piece criticizing another news outlet which had published content critical of FPL, and Burgess obliged.

The Retirement Funds claim that FPL appointed its own former executive to oversee *The Capitolist*, at which point the website's focus on energy-related topics more than doubled. In August 2020, *The Capitolist* published a story entitled "How politics cost Jacksonville 11 billion dollars," characterizing the unsuccessful acquisition as a political and managerial failure for Jacksonville. Burgess offered to run the piece by Silagy before publication but was given the go-ahead by Matrix. The complaint also alleges that Burgess and Pitts emailed Silagy on his private account to suggest they purchase additional news outlets "stealthily" in order to "inject content" and mask "who's actually pulling the strings."

### B. Appellees' Public and Investor-Facing Denials

So far, we have discussed the Retirement Funds' allegations that Appellees coordinated with political strategists to influence state and local elections. But here, the Retirement Funds allege securities fraud, which means they must show that investors were lied to or defrauded. In this regard, they argue that Appellees knowingly misled investors about NextEra's involvement in the election scheme and substantially downplayed the potential legal and reputational consequences to the company. The Retirement Funds identify several statements made by FPL and NextEra executives that form the basis of this claim.

On December 2, 2021, the *Orlando Sentinel* published an article entitled "Florida Power & Light Execs Worked Closely with Consultants Behind 'Ghost' Candidate Scheme, Records Reveal." The article detailed various aspects of the 2020 ghost candidate

scheme and connected it to FPL. After the article was released, Reuter, Robo, and Silagy made a series of public denials. According to the Retirement Funds, these denials were both knowingly false and materially misleading.

### 1. Reuter's Repudiation

Acting as NextEra's Chief Communications Officer, Reuter gave his firm's initial response. He completely denied FPL's involvement in the ghost candidate scheme and distanced FPL from Grow United:

> Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle. *Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false*, and we have found absolutely no evidence of any legal wrongdoing by FPL or its employees.

 (emphasis added). He also stated that "FPL had no involvement in the creation of Grow United," and that Matrix had another client in Denver who was advocating nationally for the legalization of marijuana. (emphasis omitted). He explained, "Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding structure for 501(c)(4) organizations and we had no knowledge of this structure being used by Matrix." (emphasis omitted).

As part of its investigation, the *Sentinel* obtained a copy of two memos directed to Silagy: A legal memo from Foley &

Lardner and a funding memo drafted by Pitts, each of which conceived of a structure for FPL's political spending during the 2020 election cycle. The funding memo included a structure chart designed to "[m]inimize all public reporting of entities and activities." When specifically asked about the memos, Reuter denied their use. He replied, "we have found no evidence that our employees used [such] proposal to support our communication and outreach activities during the 2020 election cycle."

Reuter then denied FPL's involvement in the job offer extended to Jacksonville City Councilor Garret Davis. He stated, "In July 2019, a Matrix representative . . . approached FPL about a plan to offer Garrett Dennis a job working to decriminalize marijuana. FPL flatly rejected the plan and communicated our lack of interest to Joe Perkins' team." (emphasis omitted).

The Retirement Funds claim each of Reuter's statements was false. They allege that Grow United was exclusively funded by FPL with the express purpose of displacing Councilor Davis. The Retirement Funds claim that Silagy and other FPL personnel directed Matrix' creation of numerous 501(c)(4) entities and other shells. And, of course, the complaint includes extensive allegations about FPL's involvement in the ghost candidate scheme, which Reuter unconditionally denied.

Moreover, the Retirement Funds claim that Reuter knew he was lying. They allege that FPL was in possession of the Robo Memorandum for which Reuter himself acknowledged receipt. The Robo Memorandum allegedly includes bank statements,

24-13372                Opinion of the Court                17

communications, and invoices detailing FPL's orchestration of the ghost candidate scheme, involvement in Grow United, and directive to illicitly funnel campaign contributions. And according to the Retirement Funds, the flow of payments aligns with the structure chart presented to Silagy.

### 2. Executives Double Down

Next, On January 25, 2022, Robo made the following statement to investors:

> I think on some of the Florida political headlines, I think what I'd like to say on that is pretty simple. When we got -- when we received the report and those allegations that have been in the press, we conducted a very extensive and thorough investigation that included looking at company financial records. It included looking at everyone who was named in its company e-mails, also looking at their—they've all provided access to their personal e-mails and text to us as part of that investigation. And the bottom line is *we found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees. And so that's kind of the bottom line.* And I feel very good about the investigation that we did, and *I feel very good that there is no basis to any of these allegations* . . . .

(emphasis added and omitted). The Retirement funds claim this statement was misleading because the Robo Memorandum, sent directly to Robo by FedEx, provided 155 pages of exhibits demonstrating a strong basis of improper and potentially incriminating behavior.

In a June 2022 interview, Silagy was asked by journalist Nate Monroe—the same Nate Monroe FPL allegedly surveilled—whether FPL engaged in the monitoring of journalists. Silagy replied: "We did not engage in any activities having to do with following people like you, Nate, or taking pictures." (emphasis omitted). When presented with emails and text messages from the alleged surveillance effort that same day, Reuter stated that the records did not demonstrate the "veracity" of the claims. The Retirement Funds assert that Silagy's response to Monroe was knowingly false because FPL funded the private investigator, and both Matrix and FPL received real-time updates on the Monroe surveillance operation.

Finally, a spokesperson for FPL denied the firm's apparent control over *The Capitolist*. The spokesperson stated "FPL does not have an ownership interest in the Capitolist –  either directly or indirectly . . . We also do not have editorial control over what the Capitolist writes or publishes." The Retirement Funds allege that this statement was knowingly false because documents obtained by lead counsel demonstrate that FPL provided funding to, had an ownership interest in, and exerted editorial discretion over *The Capitolist*. The complaint specifically identifies Silagy's personal involvement in procuring and approving content.

### C. NextEra's Changed Outlook

After the dust settled, NextEra leadership appeared to change course. On January 25, 2023, NextEra filed two Forms 8-K with the SEC. Form 8-K is a "current report" which must be filed

24-13372                Opinion of the Court                19

within four business days of certain material adverse events.[3] *See* Sec. & Exch. Comm'n, Form 8-K, General Instruction (B)(1); *see also* 15 U.S.C. § 78m(a); 17 C.F.R. § 240.13a-11. NextEra's filing informed the public of three major pieces of information.[4]

First, NextEra disclosed that FPL had unexpectedly severed ties with Silagy, and that he would be replaced as CEO by a formerly retired NextEra executive. Second, the company announced new risks related to potential violations of law by FPL and NextEra. While earlier SEC filings also touched on potential risks, the new disclosure was more comprehensive and warned investors of "material fines" and a potential "material adverse impact on the reputation" of NextEra and FPL. It specifically referenced allegations of election misconduct and the FEC complaint. Lastly, Silagy's severance agreement was filed as an exhibit to one of the Forms 8-K. Therein, Silagy agreed to a compensation claw-back in the event that: (a) he was convicted of or pled guilty to a felony because of actions related to his employment; (b) he admitted facts related to his employment that would constitute a felony; or (c) any member of the "Company Group" was convicted of a felony based on

---

[3] For example, Item 5.02 of Form 8-K requires disclosure if any principal executive retires, resigns, or is terminated between reporting periods, and Item 1.05 requires the disclosure of material cybersecurity incidents. Sec. & Exch. Comm'n, Form 8-K, Item 1.05(a), 5.02(b).

[4] Each disclosure will be excerpted and discussed at greater length *infra* at Part IV.A.

actions he knowingly participated in while at FPL. NextEra later stated that the claw-back provision was not "customary."

Both Forms 8-K became public before the market opened on January 25, 2023. By close-of-market, NextEra's stock had tumbled 8.7 percent. It lost more than $14 billion in market capitalization in one day. A few months later, the current action commenced. The Retirement Funds claim they, along with a putative class of similarly situated investors, suffered financial loss because of Appellees' fraudulent misrepresentations. Appellees moved to dismiss the complaint on two grounds: failure to adequately plead scienter and failure to adequately plead loss causation. The District Court, without reaching the issue of scienter, granted the motion to dismiss for failure to plead loss causation. The Retirement Funds timely appeal.

### III. STANDARD OF REVIEW

We review *de novo* a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Julmist v. Prime Ins. Co.*, 92 F.4th 1008, 1016 (11th Cir. 2024). We accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-movant. *Id.* However, we must parse out legal assertions disguised as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) After discarding these conclusory statements, we must decide whether the well-pleaded facts state a "plausible claim for relief," as opposed to one that is merely "conceivable." *Id.* at 679–80, 129 S. Ct. at 1950–51; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). In

other words, the facts must allow us to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

## IV. DISCUSSION

Section 10(b) of the Exchange Act prohibits the use of any manipulative device or contrivance in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated thereunder, makes it unlawful "[t]o make any untrue statement of material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). It also prohibits omissions if the omitted facts are material and necessary to make other statements not misleading. *Id.* The Private Securities Litigation Reform Act of 1995 ("PSLRA") clarified and heightened the requirements to demonstrate fraud in order to deter "those who seek to line their own pockets by bringing abusive and meritless suits." H.R. Rep. No. 104–369, at 31 (1995) (Conf. Rep); Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737 (1995) (codified as amended in scattered sections of 15 U.S.C.).

The Supreme Court has, over many years, distilled the requirements of a claim brought under Rule 10b-5 and PSLRA. To succeed, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission;[5] (5)

---

[5] Complainants asserting a "fraud-on-the-market theory" are afforded a presumption of reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S. Ct. 978,

economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, 134 S. Ct. 2398, 2407 (2014) (internal quotation marks omitted) (quoting *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds,* 568 U.S. 455, 460–461, 133 S. Ct. 1184, 1192 (2013)).

Here, the District Court dismissed the Retirement Fund's Rule 10b-5 claim for failure to adequately plead loss causation, so we limit our discussion to that element. PSLRA requires a private plaintiff to prove that the misrepresentation "caused the loss" for which he seeks remuneration. 15 U.S.C. § 784u-4(b)(4). "[T]he plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that 'the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.'" *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012) (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 (11th Cir. 2011)).

Markets, creatures of human impulse, move in mysterious ways, and a security's decline in value will never be caused by a singular factor. *See Robbins v. Koger Properties*, 116 F.3d 1441, 1447 (11th Cir. 1997) (explaining that "market responses, such as stock

---

991–92 (1988). This theory posits that public security prices (on which we all rely) reflect public information in an efficient market, and that material misstatements will "taint the total mix of available public information," thereby causing an artificial and fraudulent inflation in price. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011). Appellants here allege a fraud on the market.

24-13372                 Opinion of the Court                        23

downturns, are often the result of many different, complex, and unknowable factors"). Therefore, a plaintiff "need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was substantial, i.e., a significant contributing cause." *Id.* (internal quotation marks omitted) (quoting *Bruschi v. Brown*, 876 F.2d 1526, 1531 (11th Cir. 1989).

PSLRA and Federal Rule of Civil Procedure 9(b) each apply a heightened pleading standard to private securities fraud actions. 15 U.S.C. § 78u-4(b)(1), (2); Fed. R. Civ. P. 9(b). However, PSLRA only requires particularized pleading with respect to the misleading statement(s) and the defendant's scienter. 15 U.S.C. § 78u-4(b)(1), (2). And Rule 9(b) only applies to "the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Accordingly, loss causation need not be pleaded with particularity; we review for general compliance with Federal Rule of Civil Procedure 8(a) as interpreted by *Twombly* and *Iqbal*.[6] *See* Fed. R. Civ. P. 8(a) (stating that a complaint must recite "a short and plain statement of the claim showing that the pleader is entitled to relief").

Applying general pleading standards, then, a plaintiff must plausibly allege that a fraudulent statement inflated the security price—and that this inflated price was later eroded in a way that relates back to the fraud. Because we accept well-pleaded facts as conclusive, "it should not prove burdensome for a plaintiff . . . to

---

[6] It is not clear whether the District Court recognized this distinction. To the extent it reviewed the complaint under a heightened pleading standard, it was erroneous.

provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347, 125 S. Ct. 1627, 1634 (2005). And because this element is limited to exploring a causal connection, we must presume the earlier statements were fraudulent; whether fraud was properly alleged is an important but separate inquiry. In *FindWhat*, we explained that:

> Plaintiffs frequently demonstrate loss causation . . . by (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop. . . .[7]

658 F.3d at 1311–12. We begin with corrective disclosures.

### A. Corrective Disclosures

Fraudulent statements are designed to raise, rather than lower market prices. In *Dura*, the Supreme Court recognized that this alone creates no aggrieved investor: "Normally . . . an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." 544 U.S. at 342, 125 S. Ct. at 1631. "[I]f, say the purchaser sells the shares quickly before the relevant truth

---

[7] We have not held that this is the only way to demonstrate loss causation. But because both parties argue within this analytical framework, we structure our discussion accordingly.

begins to leak out, the misrepresentation will not have led to any loss." *Id*. Fraud might be morally offensive, but it does not become actionable to a private plaintiff until it causes economic harm.[8]

Thus, a plaintiff must identify some new public information that cast doubt on the earlier fraudulent statements and caused the price to decline. *See id*. at 347, 125 S. Ct. at 1634 (holding the plaintiff's claim was insufficient because it failed to "claim that Dura's share price fell significantly after the truth became known"). This information must "share the same subject matter as the prior misstatement" so as to have a "corrective effect rather than merely a negative effect." *FindWhat*, 658 F.3d at 1311 n.28 (internal quotation marks omitted) (quoting *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp.2d 261, 266 (S.D.N.Y. 2005)).

The corrective statement must have been disseminated after the plaintiff purchased the security but before he sold it. *See Dura*, 544 U.S. at 342, 125 S. Ct. at 1631; *see also Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) (explaining that the information must have been "publicly revealed for the first time" after the plaintiff's purchase and after the alleged fraud). In other words, the plaintiff must demonstrate the following chronology: (1) a material misrepresentation artificially inflated the security price;[9] (2) the plaintiff

---

[8] The SEC, on the other hand, is tasked with generally policing fraud on the market and can bring claims without demonstrating any loss. *See, e.g.*, *SEC v. Pirate Inv. LLC*, 580 F.3d 233, 239 n.10 (4th Cir. 2009) ("Unlike private litigants, the SEC need not prove the additional element of reliance or loss causation.").

[9] To be precise, it is also possible for a plaintiff to allege that a material misrepresentation artificially *maintained* a stock price rather than artificially raised it.

purchased the security; (3) *the truth came out*; (4) the price declined; and (5) the plaintiff either sold the security or continues to hold it through litigation.

We now ask what it means for the truth to come out. To preview, we hold that the proper inquiry is whether enough truth has saturated the market to make investors second-guess the earlier fraud.

"Corrective disclosure[s] can come from any source and take any form from which the market can absorb [the information] and react." *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1242–43 (11th Cir. 2023) (second alteration in original) (internal quotation marks omitted) (quoting *FindWhat*, 658 F.3d at 1311 n.28). Importantly, "a plaintiff need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace 'through a series of partial disclosures.'" *Meyer*, 710 F.3d at 1197 (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009)); *accord In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009) ("*Dura* did not suggest that [one source] was the only or even the preferred method of showing loss causation, though; it acknowledged that the relevant truth can 'leak out' . . . ." (quoting *Dura*, 544 U.S. at 342, 125 S. Ct. at 1631)).

---

"There is no reason to draw any legal distinction between fraudulent statements that wrongfully prolong the presence of inflation in a stock price and fraudulent statements that initially introduce that inflation." *FindWhat*, 658 F.3d at 1316.

24-13372                Opinion of the Court                27

Here, the District Court concluded that the Retirement Funds "failed to identify *a* corrective disclosure that reveals a truth that was previously concealed or obscured by [Appellees'] alleged fraud." (emphasis added). Its reasoning, though, misapprehends how markets respond to information. The District Court improperly searched for a singular corrective disclosure. This both contravenes our precedent and erroneously assumes markets cannot link multiple pieces of information. Next, the District Court faulted the corrective statements for not explicitly "mention[ing] any of the alleged misstatements upon which [the Retirement Funds] base their claims of fraud." Companies are not usually keen to draw attention to their earlier fraud, but investors do not need handholding to connect the dots. Last, and most importantly, the District Court substituted its own judgment about whether the corrective statements related to the fraud, in lieu of well-pleaded facts that *investors* made the connection. We conclude that the District Court erred. In our view, the second amended complaint alleges facts that, when read together, plausibly imply enough truth was illuminated to cause investors to seriously question Appellees' earlier misstatements.

As a logical matter, corrective disclosures can impact prices whenever they erode the market's trust in an earlier fraudulent statement. Scattered or less dramatic revelations may indeed make it more difficult for a plaintiff to rule out other explanations (e.g., market sentiment, poor financial performance, general speculation) for the decline. *See In re Williams Sec.*, 558 F.3d at 1137–38 (explaining that lost causation is easier to show with one major corrective statement than with a gradual leakage).  But requiring a

corrective disclosure to decisively and unequivocally debunk the earlier fraud overstates the role of loss causation—especially at the pleading stage.[10] To demonstrate, we offer two hypotheticals.

First, imagine Widget Co. is a manufacturer of widgets. Its CEO fraudulently announces that the company has secured a multi-million-dollar distribution deal with Big Box Mart. Analysts upgrade their valuation and investors bid up the price of Widget Co.'s stock by thirty percent. Shortly thereafter, Widget Co.'s board announces that its CEO was lying and terminates him for cause. Widget Co.'s stock drops forty percent to erase the projected distribution deal and account for the new legal exposure. Here, we have a simple case of a singular, unequivocal corrective statement. An aggrieved investor who purchased at the inflated value and held the stock through the decline could easily plead loss causation.

Next, imagine the same set of facts but that, now, Widget Co. does not outright admit to the fraud. Instead, its board states that the CEO *may* have overstated the distribution agreement, warns of possible adverse effects, fires the CEO, and retains the right to claw back his compensation in the event the company, the CEO, or another employee is convicted of fraud. Based on this new evidence, the stock price drops twenty five percent. Demonstrating

---

[10] At oral argument in *Dura*, Justice Breyer commented that the truth "might come out in many different ways," whether that is because an executive announces "I'm a liar" or whether it "sort of oozes out as earning reports come in." Transcript of Oral Argument at 38–39, *Dura*, 544 U.S. 336 (2005) (No. 03-932); *see* Matthew L. Mustokoff & Margaret E. Mazzeo, *Loss Causation on Trial in Rule 10b-5 Litigation a Decade After* Dura, 70 Rutgers U. L. Rev 175, 197 (2017).

loss causation here is more challenging. An investor has to show that the information, when taken together, sowed enough doubt in the CEO's earlier statement so as to explain a substantial portion the price drop. But to hold that the truth revealed must be irrefutable would deny a remedy where fraud truly was the proximate cause of an economic injury. Our analysis must not be binary because markets operate on probabilities, not certainties.

Turning now to the facts, the second amended complaint identifies three pieces of information that changed the market's perception about the alleged election fraud: (a) NextEra's new risk disclosures; (b) Silagy's abrupt departure; and (c) Silagy's fraud-triggered claw-back provision. All three stem from the January 25, 2023, Form 8-K filings by NextEra, though some new details were released a few days later. We address each in turn, and then examine their alleged cumulative effect on the investing public.

### 1. Risk Disclosure

The first piece of information the market received on January 25, 2023, was a substantive risk disclosure addressing possible legal and reputational consequences stemming from FPL's alleged election scheme. The relevant excerpt from the Form 8-K provides:

> Allegations of violations of law by FPL or NEE have the potential to result in fines, penalties, or other sanctions or effects, as well as cause reputational damage for FPL and NEE, and could hamper FPL's and NEE's effectiveness in interacting with governmental authorities.

FPL's and NEE's business and reputation could be adversely affected by allegations that FPL or NEE has violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations. For example, media articles have been published that allege, among other things, Florida state and federal campaign finance law violations by FPL. . . . FPL and NEE cannot guarantee that the FEC complaint process will not ultimately result in a finding that FPL or NEE violated federal campaign finance or other laws, that applicable federal or state governmental authorities may not investigate or take enforcement actions with respect to the allegations or assert that legal violations by FPL or NEE have occurred, or that violations may not ultimately be found by a court of competent jurisdiction or other authorities to have occurred.

In addition, notwithstanding the completion or pendency of any internal review or investigation by FPL or NEE of any allegations of legal violations, including of the allegations regarding campaign finance laws set forth in the media articles or FEC complaint, FPL and NEE cannot provide assurance that any of the foregoing will not result in the imposition of material fines, penalties, or otherwise result in other sanctions or effects on FPL or NEE, or will not have a material adverse impact on the reputation of NEE or FPL or on the effectiveness of their interactions with governmental regulators or other authorities.

This disclosure is no admission of wrongdoing; NextEra would be foolish to stipulate to fraud. But it is a notably different tune than Robo's earlier statement that there was "no basis to any of [the] allegations." The District Court, though, found this unpersuasive. It noted that the disclosure did not directly mention FPL's earlier denial and that it did not independently "reveal that any of the prior statements were false or fraudulent." As we have discussed, this was not the proper inquiry. The District Court also explained that the Form 8-K discussed a "potential *future* risk" but not a correction of an earlier statement. This is a creative reading but not a persuasive one. Acknowledging that past misconduct may give cause to future liability, of course, necessarily reveals something about the earlier misconduct.

Finally, the District Court held that this disclosure did not provide any new information to investors because NextEra had previously issued a risk disclosure on the same topic. Without over-analyzing the textual Venn diagram, it is sufficient to state that the new disclosure was broader and more comprehensive. Its timing, too, sent a signal to the market. Whereas the earlier disclosure came in a regularly scheduled Form 10-Q (quarterly report), the January 25, 2023, disclosure was issued on an unexpected Form 8-K in connection with Silagy's exit. As discussed, Form 8-K is required only for "major events that shareholders should know about." *Hubbard*, 688 F.3d at 718 n.7 (internal quotation marks omitted). If NextEra were merely reciting its earlier disclosure, it would have no reason to include it in this Form 8-K.

### 2. Silagy's Retirement

The second piece of information revealed in the special SEC filing was FPL's separation from Silagy. Specifically, NextEra announced that Silagy would no longer serve as FPL's CEO as of February 15, 2023, and that he would retire effective May 15, 2023. The company said it would replace him with a former NextEra executive who had previously retired in 2019.

The District Court suggests that this was not a surprise, and in fact, "Silagy announced that he had previously planned to retire after 20 years at FPL." Even if Silagy did *ex post* state that his retirement had always been planned, we should not assume investors would believe him. On the January 25, 2023, call with investors, Silagy tried to emphasize other reasons for his departure, citing "[a] number of distractions, including 2 hurricanes and significant supply chain and inflationary pressures, to name just a few." And at least one investment analyst reported "investors weren't buying" it.

### 3. Silagy's Severance Claw-back

The final piece of relevant news released on January 25 was a copy of Silagy's severance agreement, which was filed as an exhibit to the Form 8-K announcing his departure. Provision 5.3 of the agreement, according to the complaint, raised a red flag to investors. The provision requires Silagy to disgorge and repay his severance under the following circumstances:

> (i) your conviction of a felony in violation of state or federal laws, or your plea of guilty or nolo contendere

to any such felony, in each case based on any actions or omissions in which you engaged during your employment with the Company Group or for which you were responsible during your employment; (ii) your admission to facts that would constitute a felony in violation of state or federal laws in connection with a deferred prosecution agreement, non-prosecution agreement, or other similar agreement based on any actions or omissions, during your tenure as President and Chief Executive Officer of FPL; or (iii) the conviction of a felony in violation of state or federal laws, or the admission to facts that would constitute a felony in violation of state or federal laws in connection with a deferred prosecution agreement, non-prosecution agreement, or other similar agreement, by any member of the Company Group that is an entity (i.e., excluding employees that are deemed to be affiliates) based on any actions or omissions, during your tenure as President and Chief Executive Officer of FPL, (x) in which you participated, (y) of which you had actual knowledge, or (z) of which you recklessly or willfully failed to have actual knowledge.

The Retirement funds allege that NextEra executives later disclosed to Bank of America analysts that the claw-back was not "customary." They also allege that FPL's publicly filed executive compensation policies do not describe any similar claw-back provision. A January 31, 2023, article from the *Florida Times-Union* reported this insight and suggested that the provision tacitly acknowledged the link between Silagy's departure and the political misconduct allegations. When this article hit the market, NextEra's

stock lost an additional $850 million in market capitalization. The complaint describes the claw-back provision as a "foreseeable materialization of concealed risk."

### 4. Cumulative Effect

To properly examine the relationship between corrective disclosures and the earlier fraud, we must consider the proffered statements *in toto*. *See Pub. Emps. Ret. Sys. of Miss., P. R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014) (explaining that "the whole is greater than the sum of its parts" and rejecting "an overly rigid rule" that each corrective disclosure must lead to a "discovery of actual fraud"). Here, the complaint recites an abundance of statements by financial analysts who linked the full January 25, 2023, update with NextEra's political scandal. Several outlets downgraded their rating of NEE stock, specifically citing concerns over legal, regulatory, and reputational damage from the campaign allegations.

As a sample, the complaint identifies the following reports released shortly after the Form 8-K filings:

- Credit Suisse wrote that financial metrics were "in-line with expectations" but that a "sequence[] of disclosures on FL campaign finance law allegations, the announced retirement of FPL CEO Eric Silagy and new risk disclosures around the event" had "overshadow[ed]" the financial update.

- Wolfe Research wrote that "investors weren't buying" NextEra's explanation that Silagy's departure was unrelated to the election misconduct allegations. The article suggested that the resignation seemed rushed and not planned in advance.

- Evercore ISI reported the following: "Based on our conversations with investors, it appears they have some concerns about the timing of Silagy's retirement given the campaign finance allegations against FPL . . . ."

- Bank of America announced that it was downgrading NextEra's stock because Silagy "resigned unexpectedly in the middle of an ongoing [FEC] complaint against FPL which management expects to persist until late 2023."

- *Seeking Alpha* quoted an analyst explaining that the earnings news was not a sufficient "offset to dampen the blow of negative news" from the "Florida developments."

- RBC Capital Markets wrote that despite "solid numbers," NextEra's stock was expected to be under pressure because of the firm's warning that "these allegations could have a material impact on the company" and because of Silagy's resignation "which does not help optics."

- Bloomberg reported that the "political activity news likely sparked [NextEra's] share drop." It quoted an analyst who stated the drop was "driven substantially by the unexpected

management change and the update they gave on their review into political activity."

The District Court's opinion does not mention any of these reports. But they are integral to the analysis, helping to plead loss causation in at least two ways. First, they show that those with financial acumen made the connection at the heart of the loss causation inquiry. Second, as they came from prominent financial outlets, they may have influenced the market's reaction to the statements and helped less savvy investors see the connection to the earlier fraud. Where a court is presented with well-pleaded facts that the investing public related the corrective disclosure to the earlier misinformation, it is improper for such court to substitute its own opinion on the matter. At the pleading stage, non-conclusory statements must be accepted as fact. *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950.

### B. Stock Price Drop

Next, the price of the security must fall in order for a plaintiff to claim he was injured by a misrepresentation. *See MacPhee*, 73 F.4th at 1242. Here, the Retirement Funds properly alleged a price drop. On January 25, 2023, NEE shares fell 8.7 percent. The Retirement Funds claim that this was the worst single-day loss in twenty-five years that was not attributable to the 2008 financial crisis or the Covid-19 pandemic. They also properly allege that they purchased shares after the fraudulent statements were made but prior to the identified crash.

### C. Eliminating Other Explanations

Once we find corrective disclosures that the market related back to the fraud and a contemporaneous price decline, it is still possible that the decline was caused primarily by other factors. Accordingly, our caselaw dictates that a plaintiff must show that the pertinent fraud was a "significant contributing cause." *Bruschi*, 876 F.2d at 1531 (quoting *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 92 (2d Cir. 1981)). "This intermediate approach balances our twin concerns of compensating investors who have suffered loss as a result of a fraudulent misrepresentation, while at the same time preventing 10b-5 from becoming a system of investor insurance . . . ." *Robbins*, 116 F.3d at 1147. At the pleading stage, a plaintiff must adequately rule out other explanations so as to give rise to the inference that the fraud was a significant contributing factor to the price decline.

Here, the complaint does just that. It alleges that the drop was one of the "five worst single-day drops in the Company's share price in 25 years" and was the worst in the last twenty-five years that did not "coincide[] with a market-wide shock." By contrast, the complaint alleges that the Dow Jones Industrial Average rose 0.02 percent that same day. More, the complaint alleges that NextEra contemporaneously released financial news that the market regarded as a positive update. These claims plausibly suggest that the major market activity on January 25, 2023, was driven by the updated risks presented in the Forms 8-K. And, as discussed, a litany of market analysts connected the new disclosure to both the earlier fraud and the price drop.

★          ★          ★

We close our discussion with a point of emphasis. Whatever may be the disposition of loss causation, a plaintiff still must show material fraud to recover under Rule 10b-5. And that fraud must be pled with particularity to survive a motion to dismiss. 15 U.S.C. § 78u-4(b)(1), (2); Fed. R. Civ. P. 9(b). Companies do not subject themselves to liability simply by acknowledging in a mandatory disclosure that they may be subject to future legal liability. Indeed, they would be subject to liability if they *did not* disclose such material risks. *See, e.g.*, 17 C.F.R. § 229.105; *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 717 (3d Cir. 2020) (holding that plaintiffs plausibly alleged defendant's failure to disclose material legal risks associated with a merger violated Item 105 of Regulation S-K). Loss causation, though, is not the element to litigate the fraud. It simply asks whether the loss was proximately caused by the alleged misstatements. In other words, whether the price dropped for the reason the plaintiff claimed it dropped. Here, we hold that the Retirement Funds have identified adequate corrective disclosures, a subsequent price drop, and have plausibly ruled out other explanations.

### V. CONCLUSION

For the foregoing reasons, we **REVERSE** the District Court's grant of the motion to dismiss and **REMAND** for further proceedings consistent with this opinion.